**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------- X

LEOR KWELLER and
ZOE LIBERMAN,

                                    Plaintiff,

        -against-

THE COUNTY OF BROOME, THE CITY OF
BINGHAMTON, DISTRICT ATTORNEY MICHAEL
A. KORCHAK, CHIEF ASSISTANT DISTRICT
ATTORNEY MARK LOUGHRAN, ASSISTANT
DISTRICT ATTORNEY ALYSSA CONGDON,
ASSISTANT DISTRICT ATTORNEY AMANDA
CRONIN, DISTRICT ATTORNEY INVESTIGATOR
JEFF J. WAGNER, BINGHAMTON POLICE
DEPARTMENT CHIEF JOSEPH ZIKUSKI,
BINGHAMTON POLICE DEPARTMENT CAPTAIN
CORY MINOR, BINGHAMTON POLICE
DEPARTMENT INVESTIGATOR AMANDA
MILLER, all in their individual capacities, and JOHN
DOES 1-10, representing Broome County District
Attorney's Office and Police Department Employees
Whose Names Are Currently Unknown, HAILEY
DEMKOVICH, and SAMANTHA HERCEG.

                                    Defendants.

--------------------------------------------------------------------- X

3:25-cv-343 (ECC/ML)

        Plaintiffs Leor Kweller ("Plaintiff Kweller" or "Mr. Kweller") and Zoe Liberman

("Plaintiff Liberman" or "Ms. Liberman"), by their attorneys Newirth Linehan PLLC, Cuomo LLC,

and Brafman & Associates, P.C. as and for their Complaint against the Defendants allege as

follows:

## PRELIMINARY STATEMENT

        1.      Defendants Hailey Demkovich and Samantha Herceg falsely accused Plaintiff Leor

Kweller, a highly regarded and experienced educator, his brother Yaron Kweller and one of Yaron

Kweller's business partners, Jordan Rindgen, of rape. Defendants Demkovich and Herceg made these false accusations intentionally, as revealed by contemporaneous video recordings and communications from and between Defendants Demkovich and Herceg and third parties.

2.      Rather than conduct a genuine investigation into Defendants Demkovich's and Herceg's patently unreliable accounts, Defendants County of Broome and the City of Binghamton, through its employees, officers and agents, violated Plaintiff Kweller's Constitutional and civil rights; arrested Plaintiff Kweller without probable cause; and maliciously prosecuted Plaintiff Kweller.

3.      The result of these events–and all of the acts and omissions set forth herein–was the arrest and prosecution of an innocent man without probable cause, the destruction of his previously stellar reputation; the ruination of his dream job and career; and irreparable harm to his personal and family life. These harms have additional consequential damage which continues to this day.

4.      The charges against Mr. Kweller were dismissed by the Hon. Carol A. Cocchiola on May 30, 2023. The Court ruled that the evidence presented to the Grand Jury was legally insufficient to sustain a criminal prosecution against Leor Kweller for Rape in the First Degree in violation of P.L. §130.35 (2) (Count 11) and legally insufficient to sustain a criminal prosecution against Leor Kweller for Sexual Abuse in the First Degree in violation of P.L. §130.65(2) (Count 12).

5.      The defendants nevertheless pursued their malicious prosecution of Plaintiff, however, by filing a Notice of Appeal without any legal basis.

2

6.       Chemung County District Attorney Weedon Wetmore was subsequently appointed as a Special Prosecutor over Plaintiff's case.   After investigating the matter, DA Wetmore withdrew the appeal within six weeks of his appointment.

7.       The Appellate Division Third Department accepted the withdrawal and dismissed the appeal on April 1, 2024. This phase of Mr. Kweller's nightmare was finally over.

8.       But despite the dismissal, the damage has been done and continues. His reputation is in shambles, he has been publicly humiliated, and he remains unemployed despite sending out hundreds of applications for education-related positions, for which he is abundantly qualified. This lawsuit seeks some measure of justice for these damages and the violations of his constitutional rights.

9.       Similarly, Plaintiff Zoe Liberman's life has been irreparably harmed. Not only has she lost the services and consortium of her husband, but she has also had her own financial damages and diminution of her earning capacity as a direct result of her husband's wrongful arrest and malicious prosecution.

## JURISDICTION

10.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343(a)(3) and (a)(4), as this action seeks redress for the violation of Plaintiff's constitutional and civil rights.

11.     Supplemental jurisdiction is conferred upon this Court by 28 U.S.C. § 1367(a) over any and all state law claims that are so related to the federal claims that they form part of the same case or controversy.

**VENUE**

12.     Venue is proper in the United States District Court for the Northern District of New York pursuant to 28 U.S.C. § 1391(b)(2), as this is the judicial district in which the events giving rise to Plaintiffs' claims took place.

**JURY DEMAND**

13.     Plaintiffs demand a trial by jury in this action on each and every one of their claims for which a jury trial is legally available.

**PARTIES**

14.     Plaintiff Leor Kweller is a citizen of the United States and the State of New York. At all times relevant to this Complaint, Mr. Kweller was a resident of the State of New York, City of New York, and Kings County.

15.     Plaintiff Zoe Liberman is a citizen of the United States and the State of New York. At all times relevant to this Complaint, Ms. Liberman  was a resident of the State of New York, City of New York, and Kings County.

16.     Defendant County of Broome ("the County") is a municipal entity created and authorized under the laws of the State of New York.  The County is responsible for the acts and omissions of the Broome County District Attorney's Office ("BCDAO") and its employees and agents, which act as its agent in the area of prosecution and for which it is ultimately responsible. The County is responsible for the policies and practices of the BCDAO and is responsible for the actions taken by BCDAO employees when they are acting as County agents and officers.

17.     Defendant City of Binghamton ("the City") is a municipal entity created and authorized under the laws of the State of New York. The City is authorized by law to maintain a police department and does maintain the Binghamton Police Department (BPD), which acts as its

4

agent in the area of law enforcement and for which it is ultimately responsible. The City assumes the risks incidental to the maintenance of a police force and the employment of police officers.

18.     Defendant District Attorney Michael A. Korchak was at all times relevant to this Complaint the duly elected District Attorney of Broome County, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Binghamton, County of Broome, and the State of New York.  He is being sued in his individual capacity.

19.     Defendant Chief Assistant District Mark Loughran was at all times relevant to this Complaint a duly appointed and active Assistant District Attorney, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Binghamton, County of Broome, and the State of New York. He is being sued in his individual capacity.

20.     Defendant Assistant District Attorney Alyssa Congdon was at all times relevant to this Complaint a duly appointed and active Assistant District Attorney, acting under color of law and in her individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Binghamton, City of Broome, and the State of New York. She is being sued in her individual capacity.

21.     Defendant Assistant District Attorney Amanda Cronin was at all times relevant to this Complaint a duly appointed and active Assistant District Attorney, acting under color of law and in her individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Binghamton, County of Broome, and the State of New York. She is being sued in her individual capacity.

22.    Defendant District Attorney Investigator Jeff J. Wagner was at all times relevant to this Complaint a duly appointed and active District Attorney Investigator, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Binghamton, County of Broome, and the State of New York. He is being sued in his individual capacity.

23.    Defendant BPD Captain Cory Minor was at all times relevant to this Complaint a duly appointed and active Captain with the BPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Binghamton, County of Broome, and the State of New York. He is being sued in his individual capacity.

24.    Defendant BPD Investigator Amanda Miller was at all times relevant to this Complaint a duly appointed and active Investigator with the BPD, acting under color of law and in her individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Binghamton, County of Broome, and the State of New York. She is being sued in her individual capacity.

25.    Defendants John Does 1-10 are those employees, agents and officers of either the BCDAO or BPD whose names are presently unknown but who violated Plaintiff's civil rights by, *inter alia*, falsely arresting and maliciously prosecuting Plaintiff.

26.    Defendant Hailey Demkovich is a natural person residing in the State of New York.

27.    Defendant Samantha Herceg is a natural person residing in the State of New York.

## STATEMENT OF FACTS

### The Events of November 26-27, 2021

28.     On the night of November 26, 2021, Plaintiff Leor Kweller went to downtown Binghamton, New York with his brother, Yaron Kweller, a well-known, local business owner to visit several of the bars and restaurants Yaron Kweller owns in partnership with others (the "Businesses"). It was the Friday night after Thanksgiving and the Businesses were crowded with customers.  It was also Yaron Kweller's birthday.

29.     Over the course of the evening, Plaintiff Kweller and his brother visited the Colonial located at 56 Court Street Binghamton NY ("Colonial"); the Stone Fox, at 15 Hawley Street, Binghamton, NY ("Stone Fox"); and Dos Rios Cantina, at 60 Court Street, Binghamton NY ("Dos Rios"). Yaron Kweller was a part owner of all three establishments.

30.     The Kweller brothers first went to Dos Rios, arriving there around 10 p.m. After staying there for a time, they went to the Colonial and after some time there, went to the Stone Fox.

31.     At the Stone Fox, the Kweller brothers met up with Jordan Rindgen, who was the general manager of Dos Rios, the Colonial, and the Stone Fox.  On the night of November 26, 2021, Mr. Rindgen was working at the Stone Fox. Mr. Rindgen clocked out of work, and he, Plaintiff Kweller, and Yaron Kweller left the Stone Fox to go to Dillinger's, an establishment located on State Street in Binghamton, New York.

32.     The group arrived at Dillinger's after midnight.  At the upstairs bar in Dillinger's, a woman who was a stranger to Plaintiff Kweller approached him, Yaron Kweller and Jordan Rindgen and bought them a round of drinks and a shot of alcohol. This stranger was Defendant

Herceg, who was at Dillinger's with some friends. Plaintiff, his brother Yaron, and Mr. Rindgen stayed at Dillinger's for a period of time and left at around 2 a.m.

33.    From Dillinger's, Plaintiff, his brother Yaron, Jordan Rindgen and Defendant Herceg walked in the direction of the Stone Fox.  Mr. Rindgen went inside to the establishment, which was closed to the public, and brought out a bottle of wine and some White Claw alcoholic beverages.

34.    The group continued to Yaron Kweller's business office on Washington Street in Binghamton, New York, where the group remained for approximately 30-40 minutes.

35.    While at the office on Washington Street, Defendant Herceg sent text messages to her friends on a text group the members had named "UE Hoezzz."  UE stands for "Union Endicott" and Hoezzz is slang for promiscuous women. Defendant Demkovich was also a member of the UE Hoezzz group.

36.    According to these messages, Defendant Herceg was excited about being with Yaron Kweller and Jordan Rindgen. Defendant Herceg took at least two photographs of Mr. Rindgen and sent it to the UE Hoezzz group.

37.     Via text, Defendant Herceg invited her friends from the UE Hoezzz text group to join her, Plaintiff, Yaron Kweller, and Mr. Rindgen at the office on Washington Street.

38.    Via video telephone call, Mr. Rindgen provided Defendant Demkovich directions to the office, and she arrived shortly thereafter.

39.    Defendant Herceg met Defendant Demkovich on the street outside of the office and the two reentered the Washington Street office together.

40.     Cameras owned and/or operated by BPD, the City of Binghamton, and various third parties captured the street and sidewalk near the Washington Street office on the night of November 26-27, 2021.

41.     The group – now consisting of Plaintiff, Yaron Kweller, Mr. Rindgen, and Defendants Herceg and Demkovich – left the office to go to the Colonial.

42.     Security camera footage captured the group arriving at the Colonial.  The security footage shows Defendants Herceg and Demkovich walking, laughing, and entering the Colonial freely and without assistance. As discussed in greater detail *infra*, this footage was provided to the Binghamton Police Department by Yaron Kweller promptly after he was advised that Defendants Herceg and Demkovich had accused him, Plaintiff and Jordan Rindgen of wrongdoing – months before criminal charges were filed and the case was presented to a Grand Jury.

43.     At the Colonial, Defendants Herceg and Demkovich ordered and drank shots of alcohol.  They began making out with each other at the bar.  Plaintiff, Yaron Kweller, and Mr. Rindgen were standing apart from Defendants Herceg and Demkovich and socializing together.

44.     Thereafter, Defendants Herceg and Demkovich approached Mr. Rindgen and, together, kissed him and rubbed his genitals. Defendants Herceg and Demkovich danced together in a sexual manner, including by grinding their groins and buttocks against one another.  They also danced sexually with Yaron Kweller, grinding their bodies against his.

45.     Security cameras installed inside of the Colonial captured the foregoing.  As discussed in greater detail *infra*, this footage was provided to the Binghamton Police Department by Yaron Kweller promptly after he was advised that Defendants Herceg and Demkovich had accused him of wrongdoing – months before criminal charges were filed and the case was presented to a Grand Jury.

9

46.     When the Colonial closed at approximately 3 a.m., the group of five decided to go back to Yaron Kweller's business office on Washington Street.

47.     Once again, the security cameras outside of the Colonial captured the group's departure, and again showed Defendants Herceg and Demkovich laughing and walking freely and on their own accord.  As discussed in greater detail *infra*, this footage was also provided to the Binghamton Police Department by Yaron Kweller promptly after he was advised that Defendants Herceg and Demkovich had accused him of wrongdoing – months before criminal charges were filed and the case was presented to a Grand Jury.

48.     Back at the office, Defendants Herceg and Demkovich asked to use the bathroom, which was in the downstairs portion of the office.

49.     The group went downstairs and Defendants Herceg and Demkovich went into the bathroom together.

50.     Defendants Herceg and Demkovich emerged from the bathroom partially undressed.  They then disrobed completely and began engaging in sexual contact with each other – making out and fondling each other's breasts and genitals – in full view of Plaintiff, Yaron Kweller, and Mr. Rindgen.

51.     Mr. Rindgen and Defendants Herceg and Demkovich did cocaine together. Defendants Herceg and Demkovich put cocaine on their own and each other's bodies and snorted it off.  They also allowed Mr. Rindgen to snort cocaine off of their bodies.

52.     Defendant Herceg came over to the couch where Plaintiff Kweller was sitting and tried to kiss him and stated that she wanted him to have sex with her and ejaculate inside her. Plaintiff Kweller took no action towards Defendant Herceg at that time or at any time during the encounter. Defendant Hereg then moved towards Defendant Rindgen.

10

53.    Mr. Rindgen and Defendant Demkovich then began kissing and touching each other sexually. Defendant Demkovich initiated oral sex on Yaron Kweller.

54.    Mr. Rindgen moved away from Defendant Demkovich and began having consensual contact with Defendant Herceg. Neither Plaintiff Kweller, nor Yaron Kweller, nor Jordan Rindgen had sexual intercourse with Defendant Demkovich or Defendant Herceg.

55.    Soon thereafter – approximately forty-five minutes after the group had returned to the office for the second time – Defendants Herceg and Demkovich told Plaintiff, his brother Yaron, and Mr. Rindgen that they were ready to go home.

56.    Defendants Herceg and Demkovich appeared to be in a good mood and were joking with Plaintiff Kweller, Yaron Kweller, and Mr. Rindgen.  Defendants Herceg or Demkovich stated in substance that, in the future, she expected not to have to wait in line to get into any of the establishments Yaron Kweller owned.

57.    Security cameras owned and/or operated by third parties captured Defendants Herceg and Demkovich leaving the Washington Street office and walking to a nearby parking garage.  They got into the car of a friend who was also a member of the UE Hoezzzz group. Security footage shows Defendants Herceg and Demkovich walking on their own and entering the car without assistance.

58.    After Defendants Herceg and Demkovich left, Plaintiff, his brother Yaron, and Jordan Rindgen returned to the Colonial where staff was cleaning up and closing the bar.  Yaron Kweller ordered a ride via his Uber telephone app, and he and Plaintiff took the Uber back to Yaron Kweller's home, arriving at approximately 4 a.m.

59.    Plaintiff never had sexual intercourse with either Defendant Herceg or Demkovich. Plaintiff had no sexual contact at all with Defendant Herceg except for kissing at the Colonial,

which was initiated by Defendant Herceg, as captured on security cameras. Plaintiff had no sexual contact with Defendant Demkovich.

60.     All physical contact between Plaintiff and Defendants Herceg and/or Demkovich was consensual.

**Mr. Kweller Learns that Defendants Herceg and Demkovich Were Falsely Accusing Him of Rape**

61.     During the afternoon or evening of November 27, 2021, Yaron Kweller received a phone call from Jordan Rindgen.

62.     Mr. Rindgen informed Yaron Kweller that a person had called the Colonial, identifying himself as Dylan Wesco.  Mr. Wesco stated that he was Defendant Demkovich's boyfriend and that the owners of the Colonial had drugged and raped Defendant Demkovich.

63.     Yaron Kweller was shocked by Mr. Rindgen's report.

64.     Yaron Kweller called a friend named Bob Fimbres, who was a detective in the Binghamton Police Department ("BPD").

65.     Detective Fimbres confirmed to Yaron Kweller that a report of a sexual assault at the Colonial had been made or was being made.

66.     Yaron advised Plaintiff of the complaint.

67.     Yaron retained counsel, F. Paul Battisti, Esq. and Plaintiff retained Andrea Zellan, Esq. of Brafman & Associates, P.C. and Elena Fast of The Fast Law Firm, P.C.

68.     In an effort to establish the falsity of any allegation of wrongdoing by Defendant Herceg and/or Defendant Demkovich, Yaron Kweller voluntarily submitted to a private drug test. This test established that he had no illegal substances in his system.

69.     Yaron Kweller also directed his employees to preserve all security camera footage from the Colonial or any other business owned by him from the night in question.

70.      From the moment he learned of the allegations, Plaintiff and Yaron Kweller also sought to ensure that law enforcement preserved and reviewed all cell phone and other electronic data (including social media posts) of Defendants Herceg and Demkovich, as they felt certain that their electronic data would exonerate them of any claim of wrongdoing.

71.     Neither Defendant BCDAO nor Defendant BPD took any reasonable steps to obtain or preserve the electronic communications or data of Defendants Herceg and Demkovich.  Indeed, Defendants BPD and BCDAO failed even to direct Defendants Herceg and Demkovich to preserve and/or retrieve their electronic data.  This failure continued even as Defendants BPD and BCDAO became aware of contradictions, inconsistencies, and false statements made by Defendants Herceg and Demkovich and even as Defendants Herceg and Demkovich refused to consent to Defendants BPD or BCDAO's request to access to their electronic data.

72.     Defendant Herceg ultimately testified at the criminal trial in this matter that she was instructed to destroy electronic data relating to the night in question by Defendant Congdon, the lead prosecutor on the case, and that she did in fact destroy that evidence.

**Defendants Herceg and Demkovich's Electronic Communications and Data from the Night in Question and the Days Following Make Clear that Any Sexual Contact Was Consensual, but that They Believed and Agreed that a False Rape Accusation Could Benefit them Personally**

73.     Beginning on or about November 27, 2021, Defendants Herceg and Demkovich exchanged text messages between themselves and with third parties regarding the events of the evening.

13

74.    These messages make clear that any sexual contact was consensual, that they were fully cognizant and aware of all events of the evening, and that false rape allegations to cover up their consensual participation in sex acts–in particular with Yaron Kweller and Jordan Rindgen, whom they believed to have significant assets–could benefit them personally. These messages include (all typos are in original material):

   a.  November 27, 2021 – Defendant Demkovich to a Third Party: "I don't want anyone to know…." "And it was consensual. I knew what was happening. But those guys should be fucking disgusted with themselves."

   b.  November 27, 2021 – Defendant Demkovich to Defendant Herceg: "And I remember saying to Jordan I was like I better not get denied at any of ur bars."

   c.  November 27, 2021 - Defendant Herceg to Defendant Demkovich: "Like I can't have this get out…"

   d.  November 28, 2021, Exchange between Defendant Herceg and Defendant Demkovich (referencing Defendant Miller): "I am not gonna show her those" Herceg: "I don't think you should" Demkovich: "I am 100% not going to" Herceg: "I am worried about her calling stupid f**king Bianca"

   e.  November 29, 2021 – Defendant Herceg to Defendant Demkovich and a  Third Party: "I'm settling for nothing Less then a million"

   f.  November 29, 2021 – Defendant Herceg to Defendant Demkovich and a Third Party: (referring to Yaron Kweller and Mr. Rindgen) "I want the Benz and the Beamer" "And both their houses"

   g.  November 29, 2021 – Defendant Herceg and Defendant Demkovich and a Third Party: (referring to Yaron Kweller and Mr. Rindgen) "I want all their bars . . ."

h.  November 29, 2021 - Defendant Herceg to Defendant Demkovich: "Yup 100% but i do remember being at Alisha's and when she said we were at Jordan's i was like wtf we were w them? And she was like yeah haikey said u guys got raped and obviously I'm still drunk I'm like whattt no way it doesn't even feel like I've had sex i don't think anything happened and Alisha was like exactly"

i.  November 30, 2021 - Defendant Demkovich to Defendant Herceg and Third Parties: "the reason i had to call 911 is because when i told my parents my dad literally got in the car and was headed straight to downtown"

j.  December 3, 2021 - Defendant Demkovich instant messages to Defendant Herceg and Third Parties: "if you guys have any photos of us drinking if u could delete them that would be good" "we can't erase everything but minimize it as much as possible" "Danayah maybe archive ur disposals of them on insta" "i might just delete any risky pics" "i need to go on my computer to delete my vsco"

k.  December 3, 2021- Defendant Herceg instant message to Defendant Demkovich: "I've deleted all my posts and changed my user name to no last night and trying to delete all my republishes"

l.  December 3, 2021, from a Third Party to Defendant Demkovich, Defendant Herceg, and Third Parties: "i already deleted everything w [Herceg] in it and everything hailet sent me to delete"

m.  December 7, 2021 from a Third Party ("T.P.") to Defendant Demkovich: T.P.: "it da took me 5 mins of silence to go all the way back up to the messages that night" Demkovich.: "mad far and i don't even have them bc i think i accidentally deleted

15

them that night" T.P.: "yeah i deleted them all out of your phone bc u were going to dylan's [Demkovich.'s then boyfriend]"

n.  December 7, 2021 from a Third Party to Defendant Demkovich: "and then i told her that when [Herceg] came over she told me she didn't have sex but she turned the corner and saw you but thats all she could remember" "bro yeah she [Herceg] was like that whole night i would know if i got fucked i don't feel anything in my vagina but it was prob bc bitch was numb af"

o.  December 8, 2021 - Defendant Demkovich. to Defendant Herceg: "okay so i'm slightly panicking at work because i was just reading my texts from the day after the incident and i said to danayah that it was consensual and that i knew what was happening. but the whole day after the incident i was questioning if i got raped and i thought it might be classified as consensual because i didn't say no."

p.  December 8, 2021 - Defendant Herceg to Defendant Demkovich: "Trust me i was panicking too [about the text messages] Bc i said in the groupchat that night "I'd fuck"

q.  December 8, 2021 - Defendant Herceg to Defendant Demkovich: "I don't think you have anything to worry about. Bc if she did get the subpoena [for the phone messages] I'm sure she only got it from the times of like 1-4am"

r.  December 8, 2021 from Defendant Herceg. to Defendant Demkovich and Third Parties: "Yes i deleted everything then made it private and changed everything"

s.  December 27, 2021 Defendant Demkovich to her mother - (after Yaron Kweller's defense counsel served and filed an Order to Show Cause on December 22, 2021, requesting preservation of the Defendants Herceg and Demkovich's cell phones):

"i told you i have a message of me saying it was consensual the day after, because i was confused and not in the right head space if the defense sees it, i'm done"

t.  December 27, 2021 - Defendant Demkovich. to Defendant Herceg.: "and i have a message of me saying it's consensual" "the day after"

u.  December 27, 2021 - Defendant Herceg to Defendant Demkovich: "I have messages w Alisha saying I'd fuck ring ding [Jordan Rindgen]"

v.  December 27, 2021 - Defendant Demkovich. to Defendant Herceg: "yeah they will take the message of me saying it's consensual and i'm done" "the lawyer tom [Saitta] needs to make it so they can't get our phones period" .

w.  December 28, 2021 – Defendant Demkovich to her mother: "I told them [BPD] the next day I was questioning if what happened to me was actually rape . . . "

x.  December 28, 2021 - Defendant Demkovich to her mother: "i accidentally deleted one text it was in the group text"

y.  December 28, 2021 - text message from Defendant Demkovich to Defendant Herceg: "i told him i said it was consensual" "i'm just worried that I said more than once it was consensual" "i said something about it being consensual"

z.  January 13, 2022 - Defendant Demkovich to her mother: "I just don't want [Herceg's] parents to judge me for saying it was consensual"

aa. January 14, 2022 Defendant Demkovich to Defendant Herceg: "i really don't see why they'd still want to supoena our phones after i've provided all of That" "so fingers crossed"

bb. March 7, 2022 Defendant Herceg to Defendant Demkovich: "My parents wanted us to press charges because why tf would we not if the cops are called and we're

getting fucking rape kits done. I told my mom the second i told her i didn't want the cops involved. I didn't have a choice in that matter. Whoever is telling you what you're doing is okay is enabling bad behavior that is literally gonna take a shit on you in the future, again you've already said it was consensual and now you're acting essentially like nothing happened which is exactly what the defense is gonna say. So good luck w that, trying to get you to understand is like talking to a brick wall. Maybe 30 days now hailey they have to turn in every last bit of evidence if you think they aren't watching you right now more then ever you'd be fucking dumb. I've said what i had to say to you now three times and I'm sure you'll go right behind my back and disrespect me a fourth. What you do reflects you, not me so idk what i give a fuck anyway."

cc. June 6, 2022 - Defendant Demkovich to her mother: "and the text messages i sent really fuck me up" "i didn't know because i didn't say no"

dd. June 13, 2022, Defendant Herceg to Defendant Demkovich: ". . . Fuck you hailey you're a piece of shit. You think you sit in a high horse bc you "came looking for me" that night "only one who cared" no you didn't. If you thought I was in such danger like you say then you would've called the cops you would've brought everyone their w you to get me out. You came for what you thought was gonna be a good time. You're a garbage human who see nothing wrong w their actions."

ee. June 15, 2022, Defendant Herceg to a Third Party: "She [Demkovich] told Bianca on FaceTime on her walk to "save me" that she wanted to fuck Jordan [Rindgen], she wanted to go because she wanted to sleep w Jordan. Not to come save me" . . .

18

"And she came for what she thought was going to be a good time" . . . "I don't remember anything from that night" "Everything I know is from hee [Demkovich]"

ff. July 25, 2022 - Defendant Demkovich to her mother: "i wanna drop the charges" Demkovich's mother: "[Herceg] got a new phone…" "No access to her old cloud" Demkovich: "and i texted [Herceg] and she got a new phone so they didn't subpoena hers"

75.     Critically, none of these text messages reference Plaintiff, or indeed anyone other than Yaron Kweller and Jordan Ringden.

**BPD 's Initial Investigation Finds No Support for Defendant Herceg and Defendant Demkovich's Allegations, Instead Uncovering Many Reasons to Doubt their Veracity and Reliability**

76.     On November 27, 2021, Defendants Herceg and Demkovich reported a sexual assault to the New York State Police.  In this initial report, neither Defendant Herceg or Demkovich stated that they said "no", otherwise indicated a lack of consent, resisted, or were overpowered or physically forced to engage in physical contact or sexual intercourse with anyone on the night in question.  The New York State Police advised Defendants Herceg and Demkovich to contact the Binghamton Police Department given the location of the events being reported.

77.     On November 28, 2021, Defendant BPD Investigator Amanda Miller was assigned to investigate Defendants Herceg and Demkovich's false allegation of sexual assault.  Defendant Minor supervised Defendant Miller and reported to Defendant Joseph Zikuski.

78.     On November 28, 2021, Defendant Miller separately interviewed Defendant Herceg and Defendant Demkovich.

79.     Thereafter, Defendants Herceg and Demkovich and others provided Defendant Miller with photographs and text messages from the night in question.  These materials confirmed

that Defendants Herceg and Demkovich voluntarily spent time with Plaintiff, Yaron Kweller and Jordan Rindgen on the night in question.

80.     The messages provided represented selected, non-continuous accounts of the night in question and did not provide a complete record of the relevant period.

81.     The excluded text messages – which were sent to the entire UE Hoezzz group, between Defendants Herceg and Demkovich only, and between each of Defendants Herceg and Demkovich and third parties – included messages stating that the contact between Defendants Herceg and Demkovich and Plaintiff, Yaron Kweller, and/or Jordan Rindgen had been consensual, as well as messages from Defendants Herceg and Demkovich to others directing that they delete electronic data, including text messages, photographs from the night in question, and social media.

82.     According to text messages between Defendant Demkovich and her mother, Defendant Demkovich told members of BPD that she was questioning whether she was, in fact, raped, or if the physical or sexual contact was consensual.  This was not recorded by Defendant Miller or anyone else from BPD and thus not timely turned over to counsel for the accused.

83.     Defendants Herceg and Demkovich did delete certain electronic data from their phones, although on information and belief, these deletions did not remove the same from other sources, including third parties who received and/or stored the locally deleted electronic data.

84.     Defendants Herceg and Demkovich explicitly refused, repeatedly, to grant Defendant Miller or anyone from BPD consensual access to their cell phones or electronic data.

85.     Defendant Miller nor anyone from BPD took any steps during the early days of the investigation to obtain or preserve Defendant Herceg or Defendant Demkovich's electronic data. Neither Defendant Miller nor anyone from BPD advised Defendant Herceg or Defendant Demkovich to preserve their electronic data.

86.    On the same day, November 28, 2021, BPD was notified that Yaron Kweller had retained counsel, F. Paul Battisti.  In a call the next day, November 29, 2021, Mr. Battisti advised Defendant Miller that Yaron Kweller intended to provide BPD information including surveillance video.

87.    On December 7, 2021, BPD and BCDA were  notified that Plaintiff had retained counsel, Andrea Zellan, Esq. and Elena Fast, Esq.

88.    On November 30, 2021, Mr. Battisti's office provided Defendant Miller with security camera footage from the Colonial which covered the inside of the bar and the basement that led out of the Colonial to the employee entrance.

89.    As described *supra*, this camera footage showed Defendants Herceg and Demkovich cognizant, in control of their actions, initiating and engaging in consensual sexual contact – kissing and touching – with each other and with Plaintiff, Yaron Kweller, and Mr. Rindgen, and smiling and appearing in good spirits throughout the evening.  It also showed them walking through the basement area of their own free will.

90.    On December 6, 2021, Defendants Minor and Miller executed a duly issued search warrant at the Washington office.  No physical evidence of any kind, including any bodily fluids, was identified.

91.    BPD also obtained footage from security cameras installed on Washington Street by third parties, including but not limited to the City of Binghamton, which showed Defendants Herceg and Demkovich exiting the Washington Street office at approximately 3:48 a.m. in the morning, and walking to a nearby parking garage.

92.    This footage materially contradicted Defendant Herceg and Defendant Demkovich's accounts of the evening insofar as they claimed to have been scared, coerced, abused, or physically overpowered by the three men.

93.    This footage, together with all of the other facts and circumstances, raised substantial concerns about Defendants Herceg and Demkovich's credibility and reliability.

94.    Despite this, Defendant Herceg testified that she was never shown footage from the Colonial that materially contradicted her and Defendant Demkovich's account by either BPD or BCDAO.  The first time Defendant Herceg saw this footage was when she was cross-examined by Yaron Kweller's counsel at his criminal trial.

95.    On information and belief, Defendant Demkovich was similarly not confronted by BPD or BCDAO with any of the contradictory footage provided by Yaron Kweller.

**Despite the Lack of Any Credible Evidence Supporting Defendant Herceg and Defendant Demkovich's False Allegations, the Allegations are Leaked to the Public, Resulting in a Frenzy of Rapidly Proliferating Lies, Destroying Plaintiff's Reputation and Livelihood**

96.    Within days of Plaintiff learning of the false allegations against him, rumors that a sexual assault had been perpetrated by owners of the Colonial, Dos Rios, and the Stone Fox  and an unnamed  third party (later alleged to be Plaintiff) began to spread throughout the Binghamton community.  These rumors began appearing almost immediately on social media sites, including Facebook, Snapchat, Reddit, and a forum called BC Voice.  Plaintiff was kept informed of these incidents via conversations with his brother Yaron Kweller. For example (all errors in original):

a.  On November 29, 2021, a forum "Downtown Binghamton rape" was started on
    www.bcvoice.com, a local website.  The first post refers to a "rape that allegedly
    happened at a downtown Binghamton business.  One of the worst stories I've heard
    in a long time."   on November 30, 2021, the original poster elaborated "[a]n
    underage girl was drugged and raped at a downtown Binghamton bar.  Not going
    to name any names at this point." On December 7, 2021, a different user posted a
    photograph of The Colonial.  The site would continue to grow.

b.  On Thursday, December 8, 2021, a Facebook group originally called "Boycotting
    Colonial, Dos Rios, Stone Fox, etc." launched and gained more than 5,200 members
    within hours of its appearance.  The group changed its name to "Binghamton
    believes Survivors of Sexual Assault." Members of the group falsely accused the
    owners of the Colonial, Dos Rios, and Stone Fox of sexual assault.

23

c. One of the earliest posts – which has since established to be false – reads:





I am absolutely disgusted by the acts happening in Downtown Binghamton over the last few months. I have never been one to go out and drink at bars downtown, but I know several people from high school and college who go regularly. In case you haven't been informed, one of the owners of the most popular bars downtown, (The Colonial, Dos Rios, etc) have been drugging and raping girls in the basement of their establishments. This is absolutely HORRIFYING. 15 girls have come forward, the youngest being 17. This is so scary, and I feel so upset for my friends from school who go regularly and may have been victims of this. If you go downtown...BRING A FRIEND!!! The owner who has been getting away with this for months, should be sitting in jail for a long time. I'm speechless.

Update: thank you ALL for sharing this, as of now there is no local news coverage!!! I received this information from MULTIPLE sources!!!

d. As of the filing of this complaint, this Facebook group still exists and has 13,200 members. The "About this group" section of the page reads: "This group started as a means to empower the victims of sexual assault from a couple owners from the Colonial and there other restaurants. The allegations are horrific and truly terrible, but investigation is ongoing. In the midst of these stories, women have reached out to share their stories of countless other issues that have taken place in restaurants downtown and more. As a community it is responsibility of its citizens to set the

24

community standard. Please join us in finding a solution to enact real change for a better future and to bring these victims peace."

    e.   In addition to social media posts and rumors, local news media began reporting on the false accusations and soon identified Plaintiff by name.

97. On or about December 9, 2021, a protest – publicized on social media – was announced for December 11, 2021, in downtown Binghamton in response to the sexual assault allegations.

98. On December 10, 2021 – notwithstanding Defendant Zikuski's prior statement that he had recommended against filing criminal charges – BPD issued a press release stating that it is investigating a November 28, 2021, incident involving the owners of the Colonial and that it is aware of additional allegations being made on social media.

99. The same day, Defendant Korchak issued a video statement to Facebook and other channels in which he asserted that his office received "numerous" emails and phone calls regarding "several incidents that occurred recently" in Broome County. He explained that the laws of the State of New York prevented him from discussing the details of ongoing investigations and prosecutions and encouraged those with knowledge to contact the BCDAO or local police departments.

100. On December 11, 2021, more than 500 protestors gathered in front of the Colonial and Dos Rios and marched to the Stone Fox. According to the local Fox affiliate, the purpose of the gathering was "to protest and criticize the restaurant owners' handling of several sexual assault allegations that came earlier this week via social media." *See* https://www.wicz.com/story/45425463/protestors-gather-downtown-in-front-of-restaurants-amidst-sexual-assault-allegations

101.    Rumors continued to grow, including claims that there are "far more than 15 victims" and that "every single member of the owner group" has been implicated.

**The Broome County District Attorney's Office Joins the Investigation into Defendants' Herceg and Demkovich's Allegations**

102.    As of December 7, 2021, defense counsel for Plaintiff Leor Kweller had contacted both the BPD and BCDAO and advised those offices of their representation, asserted their clients' Fifth Amendment rights against self-incrimination, and demanded notice of any presentation to the Grand Jury pursuant to New York CPL § 190.50(5).

103.    On December 8, 2021, either Defendant Korchak or Defendant Loughran asked Defendant Congdon to attend a meeting with members of BPD regarding Defendants Herceg and Demkovich's sexual assault allegations as Bureau Chief of BCDAO's Special Victim's Bureau.

    a.  Defendant Congdon had been hired by BCDAO less than a month earlier, on November 15, 2021, having never been a prosecutor before.

    b.  During Defendant Congdon's interview process with BCDAO, she was informed that BCDAO intended to make her Bureau Chief of the Special Victims Bureau.

    c.  Defendant Congdon indicated to BCDAO that she believed she lacked sufficient prosecutorial experience for the role of Bureau Chief of the Special Victims Bureau. Nevertheless, soon after starting at BCDAO as Senior District Attorney, Defendant Congdon was offered the position of Bureau Chief of the Special Victims Bureau. Despite knowing she was not qualified for the position, Defendant Congdon accepted this promotion.

d.  Despite Defendant Congdon's lack of prosecutorial experience and her expressed concerns about having the experience to handle the role of Bureau Chief of the Special Victims Bureau, BCDAO provided her no training whatsoever, including with respect to discovery obligations generally; identifying and disclosing *Brady* or *Giglio* information; mechanisms for obtaining evidence; the requirements for certifying discovery under CPL § 245.50; the use and application of digital discovery tools; and all other aspects of prosecutorial work.

e.  Defendant Congdon's workload, consisting of multiple serious felony cases plus supervisory and administrative responsibilities as Bureau Chief, meant that she could not conduct her work responsibly, even if she had received proper training.

f.  Despite having been a member of the Bar of the State of New York from 2012, and despite having practiced criminal defense for nearly a decade, Defendant Congdon did not understand her legal obligations as a prosecutor; she did not know what materials constituted *Brady* or *Giglio*; she was unaware of, unfamiliar with, or did not understand critical provisions of New York's criminal law and criminal procedure law; and she did not seek to remedy any of these deficiencies during the pendency of the underlying investigation and prosecution.

g.  It is also evident that BPD had no training of its members as to *Brady, Giglio,* and discovery obligations of law enforcement officers as no one from BPD, at any meetings with members of BCDAO, ever expressed any concerns with ADA Congdon's handling of the case and the evidence received; members of BPD including Defendant Miller never interceded or suggested to anyone from BCDAO

that some of the evidence they were obtaining was exculpatory and/or impeachment evidence.

104.    At the December 8, 2021, meeting, Defendants Korchak, Loughran, Congdon, Minor, and Miller discussed Defendants Herceg and Demkovich's allegations and the ongoing investigation.

105.    Defendant Loughran – who was then the Chief Assistant District Attorney – asserted that the contents of Defendants Herceg and Demkovich's phones should be obtained and asked whether they had consented to turn their phones over.  Upon information and belief, Defendants Korchak, Loughran, Congdon, Minor, and Miller discussed subpoenaing Defendants Herceg and Demkovich's phones.

106.    At or after the December 8, 2021, meeting, Defendant Korchak and/or Defendant Loughran assigned Defendant Congdon to the investigation and determined that Defendant Congdon would work with Defendant Loughran, and Defendant Korchak would be available for guidance.

107.    This assignment was made despite Defendant Congdon's lack of any relevant prosecutorial experience and lack of any training whatsoever, including by BCDAO, her new employer.

108.    Despite recognizing the evidentiary value of Defendant Herceg and Defendant Demkovich's phones, and considering subpoenaing the phones, no one from BPD or BCDAO took any steps to obtain or preserve either Defendant Herceg or Defendant Demkovich's electronic data. Defendant Herceg and Defendant Demkovich continued to refuse consensual access to their phones by BPD or BCDAO.

28

109.    On December 14, 2021, Defendants Loughran, Miller, Congdon and District Attorney Investigator Anthony Diles met separately with Defendants Herceg and Demkovich. Defendant Herceg and Defendant Demkovich refused to consent to the extraction of electronic data from their respective cellular phones.

110.    Defendant Herceg ultimately testified at Yaron Kweller's trial that Defendant Congdon instructed her to delete her social media accounts and that she followed Defendant Congdon's instruction.

111.    On December 22, 2021, defense counsel for Plaintiff and his brother, Yaron Kweller, filed an Order to Show Cause seeking preservation of the electronic data belonging to Defendants Herceg and Demkovich, which BCDAO opposed. The Corporation Counsel's Office, on behalf of the BPD, also opposed the application.  Oral argument was heard.

112.    BCDAO and BPD opposed the motion despite their office's repeated, unsuccessful attempts to obtain Defendant Herceg and Defendant Demkovich's electronic data with their consent and the offices' recognition that the electronic data would be critical to the investigation.

113.    Even while the Order to Show Cause was pending, BCDAO continued to unsuccessfully seek Defendants Herceg and Demkovich's consent to extract their electronic data.

114.    Defendants Herceg and Demkovich retained counsel, Thomas Saitta, Esq.

115.    On January 14, 2022, Mr. Saitta emailed Defendant Congdon and informed her that he had a folder containing printouts of electronic data from Defendants Herceg and Demkovich's telephones (hereinafter, the "Saitta Folder").

116.    Defendant Congdon directed Defendant Wagner to retrieve the Saitta Folder from Mr. Saitta.

117.    Defendant Congdon informed her supervisors, including Defendant Loughran and/or Defendant Korchak about the Saitta Folder and its availability to BCDAO.

   a.    Neither Defendant Wagner, Defendant Congdon or anyone else from BCDAO or BPD ever retrieved the Saitta Folder.

   b.    Neither Defendant Congdon nor anyone else from BCDAO or BPD informed counsel for Plaintiff, Yaron Kweller, or Jordan Rindgen or the court before whom the Order to Show Cause was pending, of the existence of the Saitta Folder.

   c.    Even when Defendant Congdon learned that Defendant Wagner had not picked up the Saitta Folder as directed, she took no steps to obtain the Saitta Folder.

   d.    Neither Defendant Wagner nor Defendant Congdon was ever disciplined for failure to retrieve or turn over the Saitta Folder to the defense.

   e.    Defense counsel for Plaintiff, Yaron Kweller, and Jordan Rindgen ultimately obtained the Saitta Folder by judicial subpoena *duces tecum* in July 2023 – at a time when neither BCDAO or BPD had obtained the folder – and discovered that it contained numerous exculpatory and impeaching text messages.

118.    During the same period – January 2022 – Defendant Loughran and Defendant Congdon agreed that they would continue to try to obtain Defendant Herceg's and Defendant Demkovich consent to extract their electronic data.  Defendants Herceg and Demkovich continued to refuse to consent to BCDAO or BPD requests for access to their phones or electronic data.

119.    The Order to Show Cause was denied on January 21, 2022.

120.    BCDAO and BPD worked closely during the investigatory period prior to the decision to charge Plaintiff, Yaron Kweller and Jordan Rindgen with any crime.  In addition to the foregoing, for example, Defendant Congdon tried to assist Detective Miller in drafting a search

warrant for Plaintiff's, Yaron Kweller's, and Jordan Rindgen's DNA.  Defendant Congdon did not know that she could apply directly to a court to obtain a suspect's DNA and neither she, Defendant Miller, or anyone at BCDAO or BPD knew how to draft an appropriate application.  No reasonable prosecutor or  investigator in 2021-2023 would not be aware that they could apply directly to a court for an order compelling a suspect's DNA.

121.    No search warrant or motion to compel a buccal swab or a DNA sample was ever completed because Defendant Congdon and Detective Amanda Miller erroneously believed that they could not obtain a criminal defendant's DNA pre-arrest.  This mistake of law – uncorrected by supervisors Defendants Korchak, Loughran, Zikuski, and Minor – was the result of a lack of training, supervision, and proper procedures within the BCDAO and BPD.  No reasonable prosecutor or investigator in 2021-2023 would believe that they could not lawfully obtain a DNA sample from a criminal suspect accused of a sex crime prior to arrest.

122.    Defendant Congdon also did not know how to obtain Defendant Herceg and Defendant Demkovich's electronic data.  She mistakenly believed that she did not have probable cause to believe that the phones contained evidence relating to the purported crime under investigation.  This was a mistake of law and objectively unreasonable, given that she knew that Defendants Herceg and Demkovich were using their phones and sending and receiving electronic data before, during, and after the alleged crime. This mistake of law and lack of basic knowledge of her role and responsibility as a prosecutor – uncorrected by supervisors Defendants Korchak, Loughran, Zikuski, and Minor – was the result of a lack of training, supervision, and proper procedures within the BCDAO and BPD.  No reasonable prosecutor or investigator in 2021-2023 would not know how to obtain a complaining witness's electronic data under these circumstances.

123.    Defendant Korchak, Defendant Loughran, and Defendant Congdon met multiple times to discuss the investigation between December 8, 2021, and February 22, 2022.  Despite the aforementioned issues, Defendant Congdon was provided with no meaningful supervision, training, correction or instruction regarding proper investigatory or prosecutorial procedures.

124.    During the period November 2021 through February 2022, Defendant Korchak, Defendant Loughran, and Defendant Congdon were aware that the reports issued by traditional media and claims posted on social media were false, and that these false claims were leading to the destruction of Plaintiff's reputation and his brother's businesses.  Nevertheless, they took no steps to correct that information or otherwise temper the public outrage over false rape accusations against Plaintiff and the others.

125.    Beginning in December 2021, Defendant Korchak and Defendant Loughran ceded ultimate decision-making authority over the investigation to Defendant Congdon, whom they knew lacked the necessary prosecutorial experience, knowledge, and training to handle a serious felony investigation, and who repeatedly expressed concern to them, as her supervisors, that she was being given more responsibility than she could handle.  Indeed, Defendant Congdon had never before handled a criminal investigation from start to finish.  No reasonable supervising prosecutor, or elected District Attorney, in 2021-2023, would believe it reasonable to cede authority for a high-profile felony sex crimes investigation to an untrained, novice prosecutor.

**Mr. Kweller Is Arrested Without Probable Cause**

126.    In or about February 2022, because neither ADA Congdon, nor anyone else at BCDAO or BPD seemingly knew how to gain access to Defendant Herceg and Demkovich's

electronic data or the DNA of any of the accused, Defendant Congdon mistakenly believed that the investigation had reached a dead end.

127.    Defendant Amanda Cronin was hired by the BCDAO from another prosecuting agency, where she had served as a sex crimes prosecutor for a number of years.  She was also assigned to the instant case and worked together with Defendant Congdon and under the supervision of Defendants Korchak and Loughran.

128.    Because of her incorrect, erroneous, and unreasonable beliefs, Defendant Congdon decided that Plaintiff, Yaron Kweller, and Jordan Rindgen should be arrested and charged in local court. The arrest was effectuated and processed by members of BPD.

129.    The decision to arrest was not based on a determination that probable cause existed to arrest Plaintiff, Yaron Kweller, or Jordan Rindgen; rather it was based on Defendant Congdon's mistake of law and mistaken belief that their arrest would give Defendant Congdon and the BCDAO the ability to gather more evidence to advance the investigation.

130.    Indeed, no probable cause existed to arrest Plaintiff.

131.    Despite there being no probable cause to charge Plaintiff, Defendant Congdon met with BPD on or about February 22, 2022, and decided with BPD to file criminal charges against Plaintiff, Yaron Kweller, and Jordan Rindgen in local court.  Each of the accused asserted their innocence and pleaded not guilty.

132.    On February 22, 2022, BPD notified Plaintiff's attorney that Mr. Kweller would have to appear to be arrested, charged and arraigned.  Counsel for Mr. Kweller produced him on the same date.

133.    On information and belief, representatives of the press were informed in advance that Plaintiff, Yaron Kweller, and Jordan Rindgen were being charged and arrested and were

present at the BPD and the local courthouse to cover the event.  Numerous stories were published

in traditional media as well as social media about the arrest and charging of Plaintiff, Yaron

Kweller, and Jordan Rindgen.

134.    Mr. Kweller was charged with Rape in the Third Degree in violation of New York

Penal Law section 130.25(d), a Class E Felony, which provides:

> Lack of consent results from:(a) Forcible compulsion; or (b) Incapacity to consent; or (c)
> Where the offense charged is sexual abuse or forcible touching, any circumstances, in
> addition to forcible compulsion or incapacity to consent, in which the victim does not
> expressly or impliedly acquiesce in the actor's conduct; or (d) Where the offense charged
> is rape in the third degree as defined in subdivision three of section 130.25, or criminal
> sexual act in the third degree as defined in subdivision three of section 130.40, in addition
> to forcible compulsion, circumstances under which, at the time of the act of intercourse,
> oral sexual conduct or anal sexual conduct, the victim clearly expressed that he or she did
> not consent to engage in such act, and a reasonable person in the actor's situation would
> have understood such person's words and acts as an expression of lack of consent to such
> act under all the circumstances.

135.    The statutory language and case law interpreting New York Penal Law section

130.25(d) require that, for victims with the capacity to consent (as alleged here), the victim clearly

must express that they do not consent and a reasonable person in the actor's situation would have

understood the person's words and acts as an expression of lack of consent under all the

circumstances.

136.    Plaintiff was charged in the felony complaint with a single count of Rape in the

Third Degree under Penal 130.25(3)(sexual intercourse with another person without such person`s

consent where such lack of consent is by reason of some factor other than incapacity to consent.

When he was indicted six weeks later the charges were Rape in the First  Degree under Penal law

130.35(2) and Sexual Abuse in the First Degree under Penal Law 130.65(2) despite the fact that

Defendant Herceg stated she had no recollection of the events and Demkovich only told Defendant

Miller, Defendant Congdon, and others at BPD and BCDAO that she thought she saw Herceg and Plaintiff having sex and that any sex she had was consensual.

137.    BPD and BCDAO, including through Defendants Minor, Miller, Congdon, and Cronin, never disclosed this exculpatory information to the defense. Rather, the defense learned of it a year after Plaintiff's arrest when they finally received forensic images of Defendants Herceg and Demkovich's cell phones.

138.    Furthermore, neither complainant made any direct allegations against Plaintiff having had any sexual contact with either of them that would meet the elements of the statute.

139.    The only evidence that could have conceivably provided probable cause for Plaintiff's arrest were the statements of Defendants Herceg and Demkovich.

140.    Under the facts and circumstances of this case, however, those statements did not provide probable cause for Plaintiff's arrest because objective evidence obtained during the investigation prior to the decision to arrest Plaintiff contradicted their allegations and undermined their reliability and veracity.

141.    Furthermore, their allegations against Plaintiff did not meet the elements of the statute.

142.    Prior to Plaintiff's arrest, Defendants Zikuski, Congdon, Miller, and Korchak were in possession of information and material that vitiated any allegedly existent probable cause, and which called into serious doubt the reliability and credibility of Defendants Herceg and Demkovich.

143.    Any reasonable law enforcement officer or prosecutor would have known that any probable cause provided by the complainants' initial report of the crime had dissipated and became non-existent by the time of the arrest and commencement of the prosecution. There were

significant circumstances known to the BCDAO and BPD that would have made any reasonable law enforcement officer hold off on the arrest of Plaintiff and continue the investigation.

144.    Plaintiff, prior to his arrest and after his arrest, along with Yaron Kweller and Jordan Rindgen pressed the BPD and BCDAO to retrieve the texts, messages, images, and other electronic data from Defendants Herceg's and Demkovich's phones knowing that it would likely contain exculpatory evidence. For example:

     a.    On or about December 22, 2021, Plaintiff filed an Order to Show Cause pursuant to C.P.L. § 245.50(3) to ensure that evidence was not lost or destroyed, which was opposed by BPD and BCDAO and then denied on or about January 21, 2022, because no criminal action was then pending;

     b.    On or about March 10, 2022, following the Plaintiff's arrest on the Criminal Court Complaint, Plaintiff filed a motion pursuant to C.P.L. § 245.50(3) seeking to compel preservation and disclosure of forensic images of Defendants Herceg's and Demkovich's cell phones, which was opposed by BPD and BCDAO and denied on or about March 15, 2022, based, in part, on the allegedly speculative nature of the Plaintiff's arguments that the phones would contain relevant, material, admissible evidence and due in part to the lack of jurisdiction over what was at that time a local court matter;

     c.    In or around July 2022, Plaintiff made a motion to compel production of Defendants Herceg and Demkovich's cell phones and also issued several subpoenas to cell phone carriers and social media platforms to try to independently obtain the sought after material.

145.    The Defendants utterly failed to quickly and timely obtain or provide the requested material.

146.    Even when Defendants Herceg's and Demkovich's attorney, Thomas Saitta, notified BCDAO in January 2022 that he had obtained text messages and other material that was relevant to the investigation well before Plaintiff's arrest, Defendants refused and failed to obtain that material and never told the Plaintiff's defense counsel of its existence.

147.    Yaron Kweller provided video footage from security cameras he had access to establishing the falsity of the Defendants Herceg and Demkovich's claims, but, on information and belief, neither Defendant Herceg nor Defendant Demkovich were ever confronted with that footage and asked to explain why their report differed from the objective evidence in material ways.

148.    Defendants obtained other security camera footage which also established the falsity of Defendants Herceg and Demkovich's claims.

149.    During the course of the investigation, the Defendants obtained no evidence supporting or corroborating the allegations of Defendants Herceg and Demkovich.

**Mr. Kweller's Arrest is Widely Reported, and He and His Family Face Severe Consequences from the False Accusations**

150.    The alleged incident was widely reported on social media and  traditional media outlets as described above. Additionally, the story was picked up by media in the Jewish and Orthodox Jewish community in New York City.

151.    Plaintiffs and their families are members of these communities.

152.    The media reporting caused Plaintiff Kweller to be terminated from his position as a teacher at the Yeshiva of Flatbush Joel Braverman High School, a position he had held for approximately ten years.

153.    This position was the fulfillment of a lifelong dream of Plaintiff Kweller to teach and mentor children.

154.    In fact, Mr. Kweller had attended law school; passed the Bar; and begun a successful career as a lawyer, but left the practice of law in order to pursue his dream of being an educator.

155.    Due to this incident, he has still not been able to regain employment as an educator or obtain employment in any position for which he is qualified.

156.    The false accusations against and false arrest and malicious prosecution of Mr. Kweller had other negative, direct and foreseeable effects:

    a.    Mr. Kweller stopped being able to provide economically for his family because he lost his job and could not find another job causing them to rely on their savings for day-to-day expenses;

    b.    Mr. Kweller developed depression and anxiety; he sought treatment; and went on medication;

    c.    Mr. Kweller's depression and anxiety made it impossible for him to continue providing childcare for his children, including his special needs son;

    d.    All of the foregoing caused additional stress and pressure on Mr. Kweller's wife and children;

e.  Under the stress and pressure facing the family, the Kwellers' son lost many of the developmental achievements he had made over the prior year, including losing all speech;

f.  Plaintiff Zoe Liberman, Mr. Kweller's wife, had to take on additional responsibilities at home–including caring for Mr. Kweller during his depression– which caused her performance at work to deteriorate;

g.  Ms. Liberman's mental health also suffered; she developed depression and anxiety; sought treatment; and went on medication;

h.  In October 2022, Ms. Liberman lost her job as a Project Manager at NYU's Langone Health's Center for Department of Population Health, where she had worked for approximately eight years;

i.  Because Ms. Liberman had become the sole breadwinner and sole source of health insurance for her family as a result of the false allegations against Mr. Kweller and his false arrest and malicious prosecution, Ms. Liberman was desperate to find work;

j.  As a result, she applied for and accepted a role at a lower salary and outside of her established professional specialty of public health, becoming a Program Manager at NYU Grossman School of Medicine;

157.   The incident and attendant stress caused Ms. Liberman to get negative performance reviews for the first time in her professional career and to not get expected salary increases due to those poor performance reviews.

158.    In addition to the foregoing, the Defendants' actions and inaction caused other significant financial, emotional and psychological harm to the Plaintiffs.

**The Baseless Prosecution Proceeds**

159.    The Defendants nevertheless continued with the prosecution of Plaintiff in the absence of probable cause.

160.    The Defendants all continued with the prosecution of Plaintiff despite being in possession of exculpatory evidence which they suppressed from Plaintiff and his co-defendants, Yaron Kweller and Jordan Rindgen.

161.    In addition to the Saitta Folder materials and the full set of electronic data on Defendants Herceg and Demkovich's cellular phones, at some point during the investigation or prosecution, Defendant Demkovich informed Defendant Congdon and others at BCDAO that she never said "no" or physically resisted any sex acts.

162.    Defendant Herceg claimed to have no memory of what occurred and therefore could not make out charges against Plaintiff Kweller.  No witness gave a statement to BPD or BCDAO where they stated that they had any sexual contact with Plaintiff.

163.    Neither Defendant Congdon nor Defendants Korchak, Loughran, Cronin or anyone else at BCDAO recognized the exculpatory nature of this information and did not disclose it to the defense.  That Defendant Congdon did not recognize the exculpatory nature of this information and her obligation to turn it over to the defense further reflects the lack of training, supervision, policies and procedures within BCDAO.

164.    Once Plaintiff was arrested, his attorneys sought the discovery to which Plaintiff was legally entitled.

165.    Defendant Congdon was unfamiliar with New York's discovery laws and her obligations as a prosecutor under those laws.  Neither Defendant Korchak nor Defendant Loughran, as supervisors, provided Defendant Congdon any training or direct supervision regarding BCDAO's obligations to provide criminal defendants discovery pursuant to New York law, as well as the New York State and federal constitutions.

166.    Defendant Congdon, again mistaken about the law, believed that she had a limited amount of time to share discovery before she had to indict the case.  Neither Defendant Korchak nor Defendant Loughran, as supervisors, provided Defendant Congdon any training or direct supervision regarding how and when to indict a criminal case.  Defendant Cronin did not intervene to ensure that Plaintiff received the material to which he was legally entitled, nor did Defendant Cronin correct Defendant Congdon's mistaken apprehension of the law.

167.    Overwhelmed by the amount of discovery and having still not reviewed all of the materials available to her and BCDAO, and having still not obtained the Saitta File, Defendant Congdon instead decided to present the case to the grand jury at the end of March 2022.  No new information was available to Defendant Congdon or BCDAO since the time of Plaintiff's arrest.

168.    Defendants Congdon and Cronin kept exculpatory information from the Grand Jury.  For example, the Grand Jury did not learn that Defendant Demkovich had reported that she was questioning whether a rape had occurred and that she believed and told numerous people that any contact had been consensual, nor did the Grand Jury learn of the exculpatory DNA results that were learned after the Grand Jury returned a voted indictment.

169.    Defendants Loughran, Defendant Cronin, and Defendant Congdon presented the case to the Grand Jury, with Defendant Congdon – who had almost no experience presenting a

case to the Grand Jury – as the lead prosecutor.  Defendant Korchak supervised the attorneys and the presentation to the Grand Jury.  There were serious flaws with the presentation including:

    a.  The instructions provided to the grand jury included inaccurate statements of the law.

    b.  The materials presented to the Grand Jury necessarily did not include the exculpatory and impeachment material that had either been suppressed or not obtained as of the date of the presentation.

170.    The Grand Jury returned an indictment as to Plaintiff, charging him with Rape in the First Degree in violation of New York Penal Law § 130.35(2), a Class "B" violent felony, punishable by up to 25 years imprisonment and Sex Offender Registration  and Sexual Abuse in the First Degree, in violation of New York Penal Law § 130.65(2), class "D" violent felony punishable by up to 7 years imprisonment and Sex Offender Registration and punishable by post-releae supervision.

171.    On March 31, 2022, Plaintiff was arraigned in Broome County Court and pleaded not guilty to both charges.

172.    Despite not having obtained all of the available evidence, including the exculpatory and impeachment evidence in the Saitta Folder and exculpatory DNA test results, Defendants Congdon and Cronin.

173.     Supervised by Defendants Korchak and Loughran, filed a Certificate of Compliance as required by New York Criminal Procedure Law §245.50 at Plaintiff's arraignment. This statute requires that a prosecutor certify that they have exercised due diligence and made reasonable inquiries to ascertain the existence of material and information subject to discovery, and after so doing, has disclosed and made available all known material and information subject

to discovery. As described *supra*, such representations were inaccurate and false given the many failings by Defendants Korchak, Loughran, Congdon, and Cronin to identify and obtain information that existed and was available to them.

174.    Ultimately, after Plaintiff was arraigned on the Rape in the First Degree and Sexual Abuse in the First Degree charges, Plaintiff and Yaron Kweller were excluded by DNA as contributors to the DNA obtained through Defendant Herceg's forensic rape examination.

175.    In June 2022, Plaintiff consented to having his DNA obtained via buccal swab and in July 2022, he was excluded as a contributor to the two-male DNA profile mixture obtained from Defendant Hereg's rape kit.

    a.    Both Defendants Herceg and Demkovich underwent forensic rape examinations immediately after the night in question. Material thereby obtained for Defendant Demkovich was unsuitable for testing, while material obtained from Defendant Herceg revealed a mixture of two male DNA profiles.

    b.    This result was inconsistent with Defendants Herceg and Demkovich's account to Defendants Miller and Congdon, insofar as Herceg denied having intercourse for more than a month and Defendant Demkovich described only seeing Defendant Herceg with one man, Leor Kweller – an allegation Leor Kweller consistently denied.

    c.    Ultimately, Plaintiff was excluded as a contributor to the DNA-mixture obtained from Defendant Herceg's rape kit, thus establishing that Defendant Herceg provided false information to BPD and Defendant Miller that she stated that she had not had sexual intercourse for a month and a half before the night in question.

d.  At some point during the investigation, Defendant Herceg changed her account and revealed a potential consensual sexual partner from the relevant time period to BCDA.  After testing, that potential partner was also excluded as a contributor to the two-profile DNA mixture.  Defendants Korchak, Loughran, Cronin, and Congdon failed to disclose Defendant Herceg's changed account concerning the potential consensual sexual partner for six weeks — until the DNA results, which excluded the newly disclosed partner as a contributor, came back.

e.  Because the method of testing applied to Plaintiff's biological material was Y-STR, Yaron Kweller as his biological brother was also excluded as a contributor to the material obtained from Defendant Herceg.

176.  As of early July 2022, when Plaintiff and Yaron Kweller were excluded as contributors to the material obtained from Defendant Herceg, neither BCDAO nor BPD had obtained forensic images of the cell phones of Defendant Herceg or Defendant Demkovich, both of whom continued to refuse to consent to any search of their cell phones.   Neither Defendant Congdon, Defendant Cronin, Defendant Loughran, nor Defendant Korchak took any steps to preserve or ensure the preservation of Defendant Herceg's and Defendant Demkovich's cell phones.

**A Forensic Image of Defendant Demkovich's Phone – and its Exculpatory Contents – is Finally Produced to Plaintiff, Leor Kweller, and Jordan Rindgen**

177.  On July 11, 2022, counsel for Plaintiff, Yaron Kweller, and Jordan Rindgen filed a Request to Preserve, and a Motion to Compel Production of Defendants Herceg and Demkovich's Cellular Phones.

44

178.    On August 5, 2022, Defendant Congdon notified the Defense that Defendants Herceg and Demkovich agreed to the imaging of their cellular phones, which was conducted by BCDAO and BPD.

179.    On November 10, 2022, BCDAO received a hard drive with the extractions of the cell phones of Defendants Herceg and Demkovich (hereinafter, the "Hard Drive") from BPD.

180.    Due to a lack of training, supervision, procedures, or protocols, and due to Defendants Congdon's and Cronin's lack of experience, and due to the fact that Defendant Congdon's work load did not permit her to devote the necessary time to the instant case, neither Defendant Congdon, Cronin, Loughran, Korchak, Miller, Minor, Zikuski, or anyone else from BCDAO or BPD reviewed the contents of the Hard Drive – notwithstanding the fact that they had been trying to obtain the materials for nearly a year and counsel for Plaintiff, Yaron Kweller, and Jordan Rindgen's insistence that exculpatory material could be found there.

181.    On November 17, 2022, BCDAO purportedly granted access to the Hard Drive to counsel for Plaintiff, Yaron Kweller, and Jordan Rindgen.  However, the conditions of the review – including that the review be conducted at BCDAO's office which did not have the appropriate hardware or software – made it impossible for counsel for the accused to productively review the materials.

182.    Counsel for Plaintiff, Yaron Kweller, and Jordan Rindgen repeatedly requested access to the hard drive materials, but BCDAO would only agree to its production if a protective agreement was executed.  Counsel for Plaintiff, Yaron Kweller, and Jordan Rindgen agreed to the protective order, but, as of January 2023, BCDAO still did not produce the materials, despite repeated requests from the accused.

183.    Counsel for Plaintiff, Yaron Kweller, and Jordan Rindgen again sought judicial intervention and on January 13, 2023, the presiding court ordered Defendants Congdon and Cronin and the BCDAO to provide the Hard Drive to the accused on or before February 13, 2023.

184.    The agreed-to protective order was executed and Defendants Congdon, Cronin and BCDAO timely turned over a working Cellebrite report of Defendant Demkovich's cellular phone (the "Cellebrite Material").

185.    However, a working copy of the forensic image of Defendant Herceg's cellular phone from the time of the alleged incident was never produced, because in March 2022 — more than three months after the defense's first request for preservation — Defendant Herceg obtained a new phone and a new iCloud account. Consequently, none of Defendant Herceg's communications from November 27, 2021, through March 2022 were present on the Cellebrite report that was provided to the accused.

186.    On February 14, 2023, counsel and private investigators for Plaintiff, Yaron Kweller, and Jordan Rindgen commenced the review of Defendant Demkovich's cellular phone. Within the first 36 hours, counsel unearthed relevant and exculpatory material from cellular communications between the Defendant Demkovich and Defendant Herceg and between the Defendant Demkovich and Defendant Herceg and third parties described *supra*. Over the next several days, Counsel for Plaintiff, Yaron Kweller, and Jordan Rindgen uncovered even more relevant and exculpatory evidence that indicated that not only was the November 27 encounter consensual, but that the Defendant Demkovich advised Defendant Congdon of same, before testifying in the Grand Jury. Additionally, these communications indicated that complainant Defendant Herceg was certain that she did not have intercourse on the night in question, which was inconsistent with her testimony in the Grand Jury.

187.    The Cellebrite Material made clear that the information that Defendant Demkovich was "questioning it" was in the possession of Defendants Korchak, Loughran, Congdon, and Cronin prior to Plaintiff's arrest and prior to the Grand Jury presentation. Yet, the messages and the underlying information were never identified and disclosed to the Counsel for Plaintiff, Yaron Kweller, and Jordan Rindgen by Defendant Korchak, Loughran, Congdon, or Cronin or anyone at BCDA. Instead, Counsel for Plaintiff, Yaron Kweller, and Jordan Rindgen unearthed it independently by reviewing the Cellebrite Materials in February 2023, almost one year after the arrests and arraignment of the defendants on felony complaints.

188.    During the course of counsel's February 2023 review of the Cellebrite Material, Counsel for Plaintiff, Yaron Kweller, and Jordan Rindgen learned that Thomas Saitta had been retained by Defendant Herceg and Defendant Demkovich and that they had provided him with copies of their electronic communication from the relevant period.  Defendant Herceg and Defendant Demkovich exchanged messages to the effect that Mr. Saitta was going to review and turn over their communications to BCDAO on Defendant Herceg and Defendant Demkovich's behalf.

189.    Soon thereafter, in February 2023, Plaintiff's attorney attempted to speak to Mr. Saitta to learn more about the materials and whether they had in fact been turned over to BCDAO.

190.    In fact, the BCDAO had still not collected the Saitta Folder and would not do so even as late as June 22, 2023.

191.    On February 24, 2023, Plaintiff, Yaron Kweller, and Jordan Rindgen filed a joint omnibus motion, seeking, *inter alia* the dismissal of charges against all clients. Counsel for Plaintiff and the other accused had previously sent a letter to Defendants Korchak, Congdon and Cronin identifying all the issues with the case and calling for a dismissal.

192.    On May 31, 2023, Hon. Judge Carol A. Cocchiola of the Broome County Court dismissed the charges against Plaintiff. Specifically, Judge Cocchiola found that the complainants' testimony, together with contemporaneous video recordings of Defendant Herceg engaging in various, complex activities during the relevant time period, rendered impossible the prosecution's theory that Defendant Herceg was unable to consent by reason of physical helplessness.

193.    Judge Cocchiola's decision also pointed out improper practices and procedures by the Broome County District Attorney's Office in the Grand Jury process.

194.    Specifically, Judge Cocchiola noted that ADA Congdon charged the Grand Jury with regard to a corroboration requirement on sexual assault cases that "was repealed by the Legislature in 1974 and is not an accurate statement of law." Additionally, Judge Cocchiola took issue with ADA Congdon's Grand Jury instruction on the legal standard for the indictment, which ADA Congdon charged as "reasonable cause to believe the defendant is guilty of some wrongdoing" rather than "reasonable cause to believe that Defendant committed the offense."

195.    The Court remarked that such erroneous instructions "have appeared in other instructions by the prosecutors in the Broome County District Attorney's Office" and incorrectly imply that the function of the Grand Jury is to determine guilt or innocence.

**Despite All of the Evidence Exculpating Leor Kweller and Revealing the Falsity of Defendant Herceg and Defendant Demkovich's Allegations, BCDAO Attempts to Salvage the Prosecution Against Plaintiff Kweller**

196.    In June 2023, Defendants Korchak and Congdon filed a notice of appeal of the decision dismissing the indictment as to Plaintiff.

197.    Plaintiff's attorney, Andrea Zellan, made repeated attempts to contact Defendants Korchak and Congdon among others  to try to meet to discuss the case and lack of any evidence against the Plaintiff and to urge the BCDAO not to perfect the appeal of the criminal case dismissal.

198.    These attempts were ignored.

199.    On October 23, 2023, jury selection began in the prosecution of Yaron Kweller and Jordan Rindgen.

200.    On October 31, 2023, Yaron Kweller  and Jordan Rindgen were acquitted of all charges after the jury deliberated for only two hours before returning a not guilty verdict.  The two hours of deliberation included readbacks of some testimony.

201.    Despite all the foregoing, the Defendants Korchak and Congdon among others continued the appeal of Judge Cocchiola's decision dismissing Plaintiff's case.

202.    After the election of Paul Battisti to the position of District Attorney for Broome County, a special prosecutor, Weeden A. Wetmore, the District Attorney for Chemung County, was appointed to handle the appeal.

203.    DA Wetmore applied to the Appellate Division Third Department to withdraw the Notice of Appeal on or about February 20, 2024.

204.    No reasonable prosecutor or law enforcement officer would have proceeded as far and as long as Defendants did with a prosecution for rape with the foregoing material in hand.

205.    Nevertheless, Defendants did proceed with the prosecution and appeal out of malice; recklessness; willful blindness; and for ulterior motives including their own promotion, publicity, and appeasement of public pressure.

206.    Defendants proceeded with the prosecution of Plaintiff without probable cause.

207.    The dismissal of the case against Plaintiff and the acquittal of Yaron Kweller and Jordan Ringden did not end either Plaintiff Kweller or Plaintiff Liberman's damages.

208.    Plaintiff Kweller still has not been able to obtain gainful employment in his chosen field; he still believes that his community still believes that there must have been some truth to the allegations; and he continues to suffer from the trauma and emotional distress caused by this ordeal.

209.    Plaintiff Liberman continues to not have the same support and services from Plaintiff Kweller that she did prior to this incident. The stress and strain on her and her family remains.

## DAMAGES

210.    The injuries and damages sustained by Plaintiff arising from his false arrest and malicious prosecution include but are not limited to the following: loss of freedom; pain and suffering; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; loss of property; violation of his civil rights; legal expenses; loss of income; humiliation, indignities, and embarrassment; degradation. As a direct result of his false arrest and malicious prosecution, many of the effects of these injuries continue to this day and will continue into the future.

211.    Leor Kweller can never be returned to the position he occupied before this nightmare began:  his previously stellar reputation is destroyed, and he has lost his career as an educator. He has been branded a rapist, a false label that remains notwithstanding the dismissal of his case and withdrawal of the frivolous appeal.

212.    The false arrest and malicious prosecution of Plaintiff has shattered personal and professional relationships that cannot ever be fully restored.

213. Plaintiff Zoe Liberman has also lost the life she once knew.

214. Not only did she lose the love, services and consortium of her husband, but due to his unemployability, she and her family were placed under great financial and personal strain.

215. She began to have physical and mental health symptoms due to the stress of the criminal action against Plaintiff and due to his unemployability.

216. The quality of her work diminished, and she lost her job – twice.

217. She had to be the sole caretaker of her children as Plaintiff was too damaged to fully participate in their care.

218. She eventually found a lesser paying job which added to the financial and emotional strain on the family.

219. As a result of all the foregoing, she also suffered additional emotional and physical injuries.

## **FEDERAL CLAIMS**

### **FIRST CAUSE OF ACTION**
**42 U.S.C. § 1983**
**Fourth and Fourteenth Amendment False Arrest and Malicious Prosecution**
*Against Defendants Korchak, Congdon, Cronin, Wagner, Minor, Zikuski and Miller*

220. Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows:

221. Defendants Korchak, Congdon, Cronin, Wagner, Minor, Zikuski, and Miller, with malice and knowing that probable cause did not exist to arrest Leor Kweller and prosecute him for the purported rape of Defendants Demkovich and Herceg, acting individually and in concert, caused Leor Kweller to be falsely arrested, charged, and prosecuted for those crimes, thereby violating Leor Kweller's clearly established rights under the Fourth and Fourteenth Amendments

of the United States Constitution to be free of unreasonable searches and seizures and to be free of prosecution absent probable cause.

222.    Specifically, these Defendants, acting individually and in concert, fabricated evidence and intentionally withheld from and misrepresented to Mr. Kweller's defense counsel, the court, grand jury, and trial court, exculpatory facts that vitiated probable cause against Leor Kweller and would have impeached witnesses for the prosecution at trial.

223.    These Defendants also deliberately failed to conduct a constitutionally adequate investigation in light of evidence clearly demonstrating that Mr. Kweller did not rape Defendant Demkovich or Defendant Herceg.

224.    These Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Leor Kweller's clearly established constitutional rights. No reasonable prosecutor or police officer in 2021-2023 would have believed this conduct was lawful.

225.    Leor Kweller is completely innocent of the crimes alleged by Defendants Demkovich and Herceg. The prosecution finally terminated in Mr. Kweller's favor on April 1, 2024, when the Appellate Division Third Department dismissed Defendants' frivolous appeal.

226.    As a direct and proximate result of these Defendants' actions, Leor Kweller spent nearly two years fighting patently false allegations and criminal charges, arrested, and subjected to indictment, and suffered the other grievous and continuing damages and injuries set forth above.

227.    As a direct and proximate result of these Defendants' actions, Zoe Liberman suffered grievous and continuing damages and injuries set forth above.

## SECOND CAUSE OF ACTION

### 42 U.S.C. § 1983

**Fourteenth Amendment Deprivation of Liberty Without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence, Withholding Material Exculpatory and Impeachment Evidence, and Deliberately Failing to Conduct a Constitutionally Adequate Investigation**

*Against Defendants Korchak, Congdon, Cronin, Wagner, Minor and Miller*

228. Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows:

229. Defendants Korchak, Congdon, Cronin, Wagner, Minor and Miller, acting individually and in concert, deprived Leor Kweller of his clearly established constitutional right, under the Fourteenth Amendment of the United States Constitution, to due process.

230. These Defendants deprived Leor Kweller of his right to due process by deliberately failing to conduct a constitutionally adequate investigation.

231. These Defendants deprived Leor Kweller of his right to due process by fabricating inculpatory evidence including false witness statements inculpating Leor Kweller. These Defendants deprived Leor Kweller of his right to due process by withholding material exculpatory and impeachment evidence from Mr. Kweller's defense counsel and the Court.

232. These Defendants deprived LeorKweller of his right to due process by directing the destruction of material exculpatory and impeachment evidence in order to hide it from Mr. Kweller's defense counsel and the Court.

233. These Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Kweller's clearly established constitutional rights. No reasonable prosecutor, investigator or police officer in 2021-2023 would have believed this conduct was lawful.

234. Leor Kweller is completely innocent of the crimes alleged by Defendants Demkovich and Herceg. The prosecution finally terminated in Mr. Kweller's favor on April 1,

2024, when the Appellate Division Third Department dismissed Defendants' frivolous appeal.

235.    As a direct and proximate result of these Defendants' actions, Leor Kweller spent nearly two years fighting patently false allegations and criminal charges, arrested, and subjected to indictment, and suffered the other grievous and continuing damages and injuries set forth above.

236.    As a direct and proximate result of these Defendants' actions, Zoe Liberman suffered grievous and continuing damages and injuries set forth above.

### THIRD CAUSE OF ACTION

**42 U.S.C. § 1983**
**Failure to Intervene**
*Against Defendants County of Broome, City of Binghamton,*
*Korchak, Loughran, Congdon, Cronin, Wagner, Minor, Miller and Zikuski*

237.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows:

238.    By their conduct and under color of state law, Defendants Korchak, Loughran, Congdon, Cronin, Wagner, Minor, Miller and Zikuski had opportunities to intervene on behalf of Leor Kweller to prevent his false arrest, malicious prosecution, false imprisonment, and deprivation of liberty without due process of law, but, due to their intentional conduct and/or reckless or deliberate indifference, declined or refused to do so.

239.    These Defendants' failures to intercede violated Leor Kweller's clearly established constitutional right to be free from unreasonable search and seizure and not to be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments. No reasonable police officer or prosecutor in 2021 through 2023 would have believed that failing to intervene to prevent these Defendants from deliberately failing to conduct a constitutionally adequate investigation, fabricating inculpatory evidence, directing the destruction of material,

exculpatory and/or impeachment evidence, material, withholding, exculpatory and/or impeachment evidence, and causing Leor Kweller to be arrested and prosecuted without probable cause, were lawful.

240. Leor Kweller is completely innocent of the rape of Defendants Demkovich and Herceg. The prosecution finally terminated in Mr. Kweller's favor on April 1, 2024, when the Appellate Division Third Department dismissed Defendants' frivolous appeal.

241. As a direct and proximate result of these Defendants' actions, Leor Kweller spent nearly two years fighting patently false allegations and criminal charges, arrested, and subjected to a trial, and suffered the other grievous and continuing damages and injuries set forth above.

242. As a direct and proximate result of these Defendants' actions, Zoe Liberman suffered grievous and continuing damages and injuries set forth above.

### FOURTH CAUSE OF ACTION

**42 U.S.C. § 1983**
**Supervisory Liability**
*Against Defendant Korchak, Defendant Loughran, Defendant Minor, and Defendant Zikuski*

243. Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows:

244. The individual defendant assistant district attorneys and police officers acted with impunity in an environment in which they were not adequately trained, supervised, or disciplined by Defendant Korchak, Defendant Zikuski, and other supervisors, including Defendant Loughran and Defendant Minor, and others, in this case and as a matter of practice.

245. Defendants Korchak and Zikuski, and other supervisors, including Defendant Loughran and Defendant Minor, and others, acted with gross negligence, recklessness, and/or

deliberate indifference to the constitutional rights of citizens by failing to provide adequate training, supervision, and discipline of the defendant assistant district attorneys or police officers, and thereby caused the individual defendant assistant district attorneys and police officers to deprive Leor Kweller of his clearly established constitutional rights, including his rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, and deprivation of liberty without due process of law.

246.    Had Defendants Korchak and Zikuski, and other supervisors, including Defendant Loughran and Defendant Minor, and others, not provided grossly inadequate training, supervision, and discipline of the defendant assistant district attorneys and police officers, these defendants would not and should not have fabricated inculpatory evidence, withheld exculpatory and impeachment evidence, directed the destruction of exculpatory evidence, and intentionally and maliciously caused Leor Kweller to be arrested and prosecuted without probable cause. Defendants Korchak and Zikuski, and other supervisors, including Defendant Loughran and Defendant Minor, and others, were directly involved in the investigation of Leor Kweller and directly supervised the specific investigative acts taken by the individual assistant district attorney and police officer defendants in this case.

247.    The grossly negligent, reckless, and/or deliberately indifferent conduct of Defendants Korchak and Zikuski, and other supervisors, including Defendant Loughran and Defendant Minor, and others, under color of state law violated their clearly established duty, in 2021 through 2023, to supervise Defendants Congdon, Cronin, and Miller, and no reasonable District Attorney or Police Chief or other supervising prosecutor or police officer in 2021 through 2023 would have believed that grossly negligent, reckless, and/or deliberately indifferent supervision in the face of actual or constructive notice of misconduct by their subordinate officers

was lawful.

248.    Leor Kweller is completely innocent of the rape of Defendants Demkovich and Herceg. The prosecution finally terminated in Mr. Kweller's favor on April 1, 2024, when the Appellate Division Third Department dismissed Defendants' frivolous appeal.

249.    As a direct and proximate result of these Defendants' actions, Leor Kweller spent nearly two years fighting patently false allegations and criminal charges, arrested, and subjected to indictment, and suffered the other grievous and continuing damages and injuries set forth above.

250.    As a direct and proximate result of these Defendants' actions, Zoe Liberman suffered grievous and continuing damages and injuries set forth above.

### FIFTH CAUSE OF ACTION

**42 U.S.C. § 1983**
***Monell* Claim**
*Against Defendant County of Broome  for the Actions and Omissions of the Broome County DA's Office and its employees*

251.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows:

252.    The Broome County District Attorney and his authorized delegates, at all relevant times, had final authority with respect to the training, supervision, discipline, and overall management of personnel employed by or assigned to the BCDAO with respect to all of the office's functions, including the investigation and prosecution of criminal cases, and constituted County policymakers for whose actions or omissions the County is liable.

253. The District Attorney, at all relevant times, was and is an elected officer of the County, and the BCDA was and is substantially funded out of the County's budget.

254. The District Attorney was and is designated a "local officer," rather than a "state officer," under New York Public Officers Law § 2.

255. When dealing with issues of the administration of their office and their office's policies, the District Attorney and his assistant district attorneys are agents and employees of the Defendant County.

256. Under Federal and New York State law, the County of Broome at all relevant times, was liable for torts committed by County officers and employees, including the District Attorney and his assistants.

257. The County Attorney represents such officers and employees in judicial proceedings and indemnifies them because they are County officials.

258. At the time of Mr. Kweller's criminal prosecution, criminal defendants were entitled, under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, to timely disclosure of all material information that was in the actual or constructive possession, custody, or control of the BCDA and that was favorable to the defense, including but not limited to exculpatory information that tended to contradict the prosecution's case or otherwise show he was innocent, and impeachment information that tended to undercut the credibility of the witnesses against him, known as "*Brady* material." They were also entitled under the Fourth Amendment to be arrested and prosecuted only upon the existence of probable cause.

259. The prosecution was constitutionally required to disclose *Brady* material as soon as reasonably possible regardless of whether the defense had made a specific request for it.

260. The prosecution was constitutionally required to find out about and disclose such information, whether it was in its actual possession or in the possession of any police department that had been involved in the investigation or prosecution of the matter.

261. While the right to timely disclosure of *Brady* material was intended to guarantee the fairness of a criminal trial, the prosecution also had an obligation under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution to disclose evidence favorable to the defense early in a criminal prosecution, when it was so clearly relevant to whether the prosecution should continue, or the defendant should be released on bail, that the suppression of it would shock the conscience.

262. Similar to the *Brady* obligation is the state constitutional requirement, established by *People v. Rosario*, 9 N.Y.2d 286 (1961), requiring disclosure at trial of the prior recorded statements of prosecution witnesses so that defense counsel could decide how to use such material to impeach such witnesses.

263. Often, *Rosario* material also contains information favorable to the defense as defined by *Brady* and its progeny.

264. Related to *Rosario* and *Brady* is a prosecutor's constitutional obligation, at all stages of a criminal prosecution, not to advance, rely on, or fail to correct misleading evidence or argument.

265. At the time of Mr. Kweller's arrest and prosecution in 2021-2023, there were well-established rules of behavior for prosecutors during a pre-arrest investigation and at trial, particularly with respect to the need for probable cause to exist prior to agreeing to, directing, or advising that an arrest be effectuated, and regarding the disclosure of *Brady* and *Giglio* material,

which were intended to ensure a fair trial.  If serious enough, the violation of such rules would deprive a criminal defendant of their federal constitutional rights.

266.  These well-established rules prohibited prosecutors from agreeing to, directing, or advising that an arrest be effectuated in the absence of probable cause, or for any reason other than the existence of probable cause, and withholding from the defense favorable evidence, and from directing witnesses to destroy evidence, including favorable evidence.

267. Furthermore, BCDAO failed to implement policies and procedures including training and supervision to ensure that criminal defendants like Plaintiff who are being investigated and charged by or through their offices would not have their constitutional rights violated.

268.  BCDAO had unconstitutionally infirm policies and procedures that led to assistant district attorneys not knowing their obligations under *Brady, Giglio,* and discovery; or knowing the law as to obtaining critical evidence that went to the heart of an ongoing investigation.

269.  For example, BCDAO allowed Defendant Congdon to become the Bureau Chief of the Special Victims Bureau despite her having zero experience and competence to handle this position.

270.  Even when Defendant Congdon warned Defendant Korchak, Defendant Loughran, and the BCDAO that she was utterly unprepared and lacked the knowledge and training to handle the position, her protestations were ignored and Defendant Korchak, Defendant Minor, and the BCDAO took no steps whatsoever to ensure that Defendant Congdon's lack of knowledge and experience did not lead to the violation of the constitutional rights of criminal defendants, including Plaintiff.

271. Defendant Congdon should have declined the assignment but failed to do so, continuing the infirm policy in doing so.

272. Then, Defendants Korchak and Loughran assigned her to investigate and try the Plaintiff's case even though it was reasonably foreseeable that she may violate his constitutional rights due to her lack of training and experience.

273. And that is exactly what happened. Congdon should have declined the assignment of Plaintiff's case but did not, continuing the infirm policy by doing so. Plaintiff's Constitutional rights were then violated as described above due to the failure of BCDAO and Defendants Korchak and Loughran to train, supervise and intervene.

274. Korchak, Loughran, Congdon, and Cronin are policy makers, as that term is described in law, at BCDAO.

275. By virtue of the foregoing, Defendants are liable for having substantially caused the foregoing violations of Plaintiff's constitutional rights and his resultant injuries.

## SIXTH CAUSE OF ACTION

### *Monell* Claim for the Unconstitutional BPD Custom or Policy
*Against Defendants City of Binghamton, Zikuski, and Minor*

276. Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows:

277. Chief Zikuski, Minor and their authorized delegates, at all relevant times, had final authority with respect to the training, supervision, discipline, and overall management of personnel employed by or assigned to the BPD with respect to all of the office's functions, including the investigation and prosecution of criminal cases, and constituted City policymakers for whose actions or omissions the City is liable.

278. Defendants Zikuski and Minor, at all relevant times, were and are officers of the City, and the BPD were and are substantially funded out of the City's budget.

279.    The Defendants Zikuski and Minor and BPD officers and staff are agents and employees of the Defendant City of Binghamton.

280.    Under Federal and New York State law, the City of Binghamton, at all relevant times, was liable for torts committed by its officers and employees, including the District Attorney and his assistants that resulted from a municipal policy, custom and practice.

281.    At the time of Mr. Kweller's criminal prosecution, criminal defendants were entitled, under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, to timely disclosure of all material information that was in the actual or constructive possession, custody, or control of the BPD and that was favorable to the defense, including but not limited to exculpatory information that tended to contradict the prosecution's case or otherwise show he was innocent, and impeachment information that tended to undercut the credibility of the witnesses against him, known as "*Brady* material." They were also entitled under the Fourth Amendment to be arrested and prosecuted only upon the existence of probable cause.

282.    At the time of Mr. Kweller's criminal prosecution, criminal defendants were entitled, under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, to timely disclosure of all material information that was in the actual or constructive possession, custody, or control of the BPD and that was favorable to the defense, including but not limited to exculpatory information that tended to contradict the prosecution's case or otherwise show he was innocent, and impeachment information that tended to undercut the credibility of the witnesses against him, known as "*Brady* material." They were also entitled under the Fourth Amendment to be arrested and prosecuted only upon the existence of probable cause.

283.    The police and prosecution were constitutionally required to disclose *Brady* material as soon as reasonably possible regardless of whether the defense had made a specific request for it.

284.    The police and prosecution were constitutionally required to find out about and disclose such information, whether it was in its actual possession or in the possession of any police department that had been involved in the investigation or prosecution of the matter.

285.    While the right to timely disclosure of *Brady* material was intended to guarantee the fairness of a criminal trial, the police and prosecution also had an obligation under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution to disclose evidence favorable to the defense early in a criminal prosecution, when it was so clearly relevant to whether the prosecution should continue that the suppression of it would shock the conscience.

286.    Similar to the *Brady* obligation is the state constitutional requirement, established by *People v. Rosario*, 9 N.Y.2d 286 (1961), requiring disclosure at trial of the prior recorded statements of prosecution witnesses so that defense counsel could decide how to use such material to impeach such witnesses.

287.    Often, *Rosario* material also contains information favorable to the defense as defined by *Brady* and its progeny.

288.    Related to *Rosario* and *Brady* is a prosecutor's constitutional obligation, at all stages of a criminal prosecution, not to advance, rely on, or fail to correct misleading evidence or argument.

289.    At the time of Mr. Kweller's prosecution in 2023, there were well-established rules of behavior for police and prosecutors during a pre-arrest investigation and at trial, particularly with respect to the need for probable cause to exist prior to agreeing to, directing, or effectuating

an arrest, and regarding the disclosure of *Brady* and *Giglio* material, which were intended to ensure a fair trial. If serious enough, the violation of such rules would deprive a criminal defendant of their federal constitutional rights.

290.    These well-established rules prohibited police from agreeing to, directing, or effectuating an arrest in the absence of probable cause, or for any reason other than the existence of probable cause, and withholding from the defense favorable evidence, and from directing witnesses to destroy evidence, including favorable evidence.

291.    Furthermore, BPD failed to implement policies and procedures including training and supervision to ensure that defendants like Plaintiff who are being investigated and charged by or through their offices would not have their Constitutional rights violated.

292.    BPD had unconstitutionally infirm policies and procedures that led officers not to know, or comply with, their obligations under *Brady, Giglio,* and discovery more broadly.

293.    Det. Amanda Miller had insufficient training and experience in making determinations about *Brady, Giglio* and probable cause.

294.    Zikuski, Minor, and Miller are policy makers, as that term is described in law, at BPD.

295.    By virtue of the foregoing, Defendants are liable for having substantially caused the foregoing violations of Plaintiff's constitutional rights and his resultant injuries.

### SEVENTH CAUSE OF ACTION

### 42 U.S.C. § 1983 Civil Rights Conspiracy
*Against All Defendants*

296.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows:

297.     The Defendants, acting within the scope of their employment and under color of state law, and Defendants Herceg and Demkovich, agreed among themselves and with other individuals to act in concert in order to deprive Plaintiff of his clearly established Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, and deprivation of liberty without due process of law, and also deprived Plaintiff of his right to a fair trial.

298.     In furtherance of the conspiracy, Defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

    a.   Falsely arresting and imprisoning Plaintiff, knowing that they lacked probable cause;

    b.   Fabricating inculpatory evidence in reports, statements, and pretrial communications with the prosecution, including the statements of Herceg and Demkovich;

    c.   Suppressing exculpatory evidence for the purpose of inculpating Plaintiff;

    d.   Committing, suborning and failing to correct perjury during grand jury, hearings and trials.

299.     Plaintiff  is completely innocent of the alleged rape of Defendant Demkovich and Herceg. The prosecution finally terminated in Mr. Kweller's favor on April 1, 2024, when the Appellate Division Third Department dismissed Defendants' frivolous appeal.

300.     As a direct and proximate result of these Defendants' actions, Leor Kweller spent nearly two years fighting patently false allegations and criminal charges, arrested, and subjected to indictment, and suffered the other grievous and continuing damages and injuries set forth above.

301.     As a direct and proximate result of these Defendants' actions, Zoe Liberman

suffered grievous and continuing damages and injuries set forth above.

## STATE LAW CLAIMS

## EIGHTH CAUSE OF ACTION
### False Arrest and Malicious Prosecution
*Against All Defendants*

302.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows:

303.    Defendants despite knowing that probable cause did not exist to arrest and prosecute Leor Kweller for the rape of Defendant Demkovich and Herceg  intentionally, recklessly, and with malice caused Leor Kweller to be arrested and prosecuted for the rape of Defendant Demkovich and Herceg.   Furthermore, these Defendants intentionally withheld evidence, made false statements and misrepresented to Mr. Kweller's defense counsel, the grand jury, and the court, facts that further vitiated probable cause against Leor Kweller.

304.    Defendants Demkovich and Herceg played active roles in the arrest and prosecution of Plaintiff.

305.     Defendants Demkovich and Herceg provided false evidence in the arrest and prosecution of Plaintiff.

306.    Defendants Demkovich and Herceg withheld exculpatory evidence during the arrest and prosecution of Plaintiff.

307.    Defendants Demkovich and Herceg, by providing false information to the government, importuned the government defendants to act and caused the arrest and prosecution of Plaintiff.

308.    From the time they made their false complaint against Plaintiff up until the time of Plaintiff's arrest, Defendants Demkovich and Herceg were engaged in driving up public calls for

66

the arrest of Plaintiff.

309.    From the time they made their false complaint against Plaintiff up until the time of Plaintiff's arrest, Defendants Demkovich and Herceg were engaged in pressuring and importuning the government defendants to arrest Plaintiff.

310.    Meanwhile, Defendants Demkovich and Herceg  knew that Plaintiff committed no crimes on the night in question.

311.    In furtherance of their drive to cause Plaintiff to be arrested and prosecuted for crimes he did not commit, Defendants Demkovich and Herceg filed false police statements, withheld evidence, and committed perjury.

312.    Defendants Demkovich and Herceg did all the foregoing intentionally, maliciously, knowingly and/or in reckless disregard of the truth.

313.    The actions and omissions of Defendants Demkovich and Herceg were a substantial factor in causing the false arrest and malicious prosecution of Plaintiff.

314.    Plaintiff  is completely innocent of the alleged rape of Defendant Demkovich and Herceg. The prosecution finally terminated in Mr. Kweller's favor on April 1, 2024, when the Appellate Division Third Department dismissed Defendants' frivolous appeal.

315.     As a direct and proximate result of these Defendants' actions, Leor Kweller spent nearly two years fighting patently false allegations and criminal charges, arrested, and subjected to indictment, and suffered the other grievous and continuing damages and injuries set forth above.

316.    As a direct and proximate result of these Defendants' actions, Zoe Liberman suffered grievous and continuing damages and injuries set forth above.

**NINTH CAUSE OF ACTION**

**Intentional, Reckless, or Negligent Infliction of Emotional Distress**

*Against All Defendants*

317. Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows:

318. The improper, deliberate, and traumatizing conduct of the Defendants in deliberately and knowingly causing, or recklessly disregarding the risk of causing, the wrongful arrest, prosecution, and concomitant severe emotional distress, was extreme and outrageous, and directly and proximately caused the grievous injuries and damages set forth above.

319. In the alternative, Defendants negligently and grossly negligently, and in breach of their duties owed to Leor Kweller to, *inter alia*, refrain from relying on statements from witnesses that these Defendants knew or should have known were false; refrain from fabricating evidence; refrain from directing the destruction of exculpatory and/or impeachment evidence; disclose material exculpatory and/or impeachment evidence; and otherwise act to deny Leor Kweller due process of law, directly and proximately caused Leor Kweller to be falsely arrested and maliciously prosecuted. Defendants' actions unreasonably endangered Leor Kweller's physical and mental health and safety, and caused him to suffer physical and emotional harm, including physical ailments resulting from the circumstances and duration of his wrongful incarceration.

320. These Defendants engaged in these acts within the scope of their employment.

321. These claims are tolled as these Defendants concealed from Leor Kweller—and still are concealing to this day—their wrongful conduct giving rise to this cause of action.

## TENTH CAUSE OF ACTION

**Article I, §§ 6 and 12 of the New York State Constitution**
*Against All Defendants*

322. Plaintiffs hereby incorporate by reference all the foregoing paragraphs and further

alleges as follows:

323.    The conduct of Defendants, described above, also violated Mr. Kweller's rights under the New York State Constitution, Article I, §§ 6 and 12, to due process of law and to be free from unreasonable searches and seizures.

324.    Plaintiff  is completely innocent of the alleged rape of Defendant Demkovich and Herceg. The prosecution finally terminated in Mr. Kweller's favor on April 1, 2024, when the Appellate Division Third Department dismissed Defendants' frivolous appeal.

325.     As a direct and proximate result of these Defendants' actions, Leor Kweller spent nearly two years fighting patently false allegations and criminal charges, arrested, and subjected to indictment, and suffered the other grievous and continuing damages and injuries set forth above.

326.    As a direct and proximate result of these Defendants' actions, Zoe Liberman suffered grievous and continuing damages and injuries set forth above.

## ELEVENTH CAUSE OF ACTION

### *Respondeat Superior*
### *Against City of Binghamton and County of Broome*

327.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows:

328.    At all times relevant to this Complaint, the Individual Defendants Zikuski, Minor and Miller acted as agents of the City in furtherance of the business, including law enforcement and prosecutorial functions, of the City, and within the scope of their employment or agency with the City.

329.    At all times relevant to this Complaint, the Individual Defendants Korchak, Loughran, Cronin and Congdon acted as agents of the County of Broome in furtherance of the

business, including law enforcement and prosecutorial functions, of the County, and within the scope of their employment or agency with the County.

330.    The conduct by which the Individual Defendants committed the torts of malicious prosecution, intentional, reckless, or negligent infliction of emotional distress, and negligence was not undertaken for the Individual Defendants' personal motives, but rather was undertaken while the Individual Defendants were on duty, carrying out their routine prosecutorial and investigative functions as police officers and assistant district attorneys.


331.    Under the doctrine of *respondeat superior*, the County is liable for their agents' state law torts of malicious prosecution, intentional, reckless, or negligent infliction of emotional distress, and negligence.


## TWELFTH CAUSE OF ACTION

### Abuse of Process
*Against The City of Binghamton and Defendants Korchak and Zikuski*

332.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows:

333.    The criminal complaint and indictment in this matter were improperly used and obtained by Defendants Korchak and Zikuski through the non-disclosure of exculpatory evidence and in the absence of probable cause.

334.    The criminal complaint and indictment in this matter were improperly used and obtained by Defendants Korchak and Zikuski not to serve the interests of justice or to even properly prosecute Plaintiff but rather to serve collateral objectives.

335.    After the allegations were filed with the BPD by Defendants Herceg and Demkovich, public pressure grew against Plaintiff, Jordan Rindgen and Yaron Kweller and called for his arrest and prosecution.

336.    Protests were staged in front of Yaron Kweller's businesses calling for a boycott of his establishments and calling for his arrest and prosecution.

337.    Online forums and websites continued to call for the arrest and prosecution of Plaintiff and the others.

338.    Defendant Korchak was facing a re-election in the upcoming year.

339.    To bolster and support Defendant Korchak's re-election and to quell the growing public outcry for the arrest and prosecution of Plaintiff and others, Defendants Korchak and Zikuski continued with the arrest and prosecution of Plaintiff in the absence of probable cause.

**WHEREFORE**, Plaintiffs Leor Kweller and Zoe Liberman pray as follows:

a.    That the Court award compensatory damages to them and against the defendants, jointly and severally, in an amount to be determined at trial;

b.    That the Court award punitive damages to them against all individual defendants, in an amount to be determined at trial, that will deter such conduct by defendants in the future;

c.    For a trial by jury;

d.    For pre-judgment and post-judgment interest and recovery of his costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

e.    For any and all other relief to which he may be entitled.

Dated:      New York, New York
            March 18, 2025


NEWIRTH LINEHAN PLLC          CUOMO LLC                      BRAFMAN & ASSOCS.
43 West 43rd Street, Suite 160 200 Old Country Road          256 Fifth Avenue, 2d Floor
New York, NY 10036            Suite 2 South                  New York, NY 10001
(917) 426-5551               Mineola, NY 11501              (212) 750-7800
karen@newirth-law.com        (516) 741-3222                azellan@braflaw.com
                             omichelen@cuomollc.com


/s/ Karen A. Newirth         /s/ Oscar Michelen              /s/ Andrea Zellan
Karen A. Newirth             Oscar Michelen                  Andrea Zellan
*N.D.N.Y Bar Roll #705865*   *N.D.N.Y. Bar Roll # 705863*    *N.D.N.Y Bar Roll #705985*

*Attorneys for Plaintiffs Leor Kweller and Zoe Liberman*