**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

LEOR KWELLER and
ZOE LIBERMAN,

               Plaintiff,

                                    3:25-CV-343 (AJB/ML)

       -v-

The COUNTY OF BROOME et al,

               Defendants.

**Hon. Anthony Brindisi, U.S. District Judge:**

## DECISION and ORDER

## I.    INTRODUCTION

On March 18, 2025, Leor Kweller ("plaintiff") and his wife, Zoe Liberman ("Ms. Liberman") filed this 42 U.S.C. § 1983 action against defendants Hailey Demkovich, Samantha Herceg, the City of Binghamton (the "City"), City Police Chief Joseph Zikuski ("Chief Zikuski"), City Police Captain Cory Minor ("Captain Minor"), City Police Investigator Amanda Miller ("Investigator Miller"), the County of Broome (the "County"), County District Attorney Michael Korchak ("DA Korchak"), County Chief Assistant District Attorney Mark Loughran ("Chief ADA Loughran"), County Assistant District Attorneys Alyssa Congdon ("ADA Congdon") and Amanda Cronin ("ADA Cronin"), Broome County District Attorney's Office Investigator Jeff Wagner ("BCDA Investigator Wagner"), and unidentified Broome County District Attorney's Office and City Police Department employees numbered one through ten (the "Does").  Dkt. No. 1.

In short, plaintiff alleges that Hailey Demkovich and Samantha Herceg falsely accused him of rape, the Binghamton Police Department ("BPD") inadequately investigated those false allegations, and the Broome County District Attorney's Office (the "BCDA") deliberately disregarded exculpatory evidence and chose to prosecute him anyway. *See generally* Dkt. No. 1. The Broome County Court ultimately granted plaintiff's motion to dismiss all criminal charges against him on May 31, 2023, and the BCDA's appeal of that decision was withdrawn on February 20, 2024. *Id.* ¶¶ 191–92.

The twelve-count complaint asserts § 1983 claims for "False Arrest and Malicious Prosecution" (Count I), "Due Process and Denial of the Right to a Fair Trial" (Count II), "Failure to Intervene" (Count III), "Supervisory Liability" (Count IV), "*Monell* Liability" (Counts V & VI), "Civil Rights Conspiracy" (Count VII), as well as related state law claims for "False Arrest and Malicious Prosecution" (Count VIII), "Intentional, Reckless, or Negligent Infliction of Emotional Distress" (Count IX), violations of Article I, sections 6 and 12 of the New York State Constitution (Count X), "*Respondeat Superior*" (Count XI), and "Abuse of Process" (Count XII). Dkt. No. 1, ¶¶ 191–302.[1]

Defendants Hailey Demkovich and Samantha Herceg answered the complaint, Dkt. Nos. 37, 39, but the remaining defendants moved to dismiss the pleading pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. Nos. 19, 27, 29–31, 37

Defendants' motions have been fully briefed,[2] *see* Dkt. Nos. 43–44, 46–47, 53–54, 56, 58, 61, and will be considered on the basis of the submissions without oral argument.

---

[1] The complaint is sequentially numbered by line. Accordingly, citations to the pleading correspond with that document's internal pagination.

[2] Pagination corresponds to the electronically generated CM/ECF headers.

II.    **BACKGROUND**

The following facts are taken from the complaint and will be assumed true for the purpose of assessing defendants' motions to dismiss.

On the night of November 26, 2021, plaintiff accompanied his brother, Yaron Kweller ("Yaron"), to downtown Binghamton, New York, to visit "several of the bars and restaurants Yaron . . . owns in partnership with others," including Dos Rios Cantina, the Colonial, and the Stone Fox. Dkt. No. 1 ("Compl.") ¶ 28.

Around 10:00 p.m., the brothers arrived at Dos Rios Cantina, staying for some time before going to the Colonial and, eventually, the Stone Fox. Compl. ¶ 30. At the Stone Fox, the brothers met up with Jordan Rindgen ("Rindgen"). *Id.* ¶ 31. Rindgen was the general manager of the Stone Fox, the Colonial, and Dos Rios Cantina. *Id.*

After Rindgen completed his shift at the Stone Fox, he and the brothers went to Dillinger's, a nearby bar not owned by Yaron. Compl. ¶ 31. The three arrived at Dillinger's sometime after midnight. *Id.* ¶ 32. There, an unknown woman, later identified as Samantha Herceg ("Herceg"), approached plaintiff, Yaron, and Rindgen. *Id.* Herceg purchased a round of alcoholic beverages and shots of alcohol for the men. *Id.*

Around 2:00 a.m., plaintiff, Yaron, Rindgen, and Herceg walked to the Stone Fox. Compl. ¶¶ 32–33. The Stone Fox had closed for the night, but Rindgen went inside to retrieve a bottle of wine and canned alcoholic seltzers for the group. *Id.* at 33. The four then traveled to Yaron's business office, which was located nearby. *Id.* ¶ 34. While at Yaron's office, Herceg texted her friends in a group message and invited them to come to the office. *Id.* ¶ 35. Among those invited was Demkovich, who agreed to join, arriving at Yaron's office a short time later. *Id.* ¶¶ 37–38.

Once Demkovich arrived, the group—now consisting of plaintiff, Yaron, Rindgen, Herceg, and Demkovich—returned to the Colonial. Compl. ¶ 41. There, Herceg and Demkovich (the "complainants") ordered shots of alcohol and began to kiss each other. *Id.* ¶ 43. The complainants approached and kissed Rindgen, who was socializing with plaintiff and Yaron. *Id.* ¶ 44. Then, the complainants "danced together in a sexual manner," and "danced sexually with Yaron." *Id.* At some point, Herceg kissed plaintiff. *Id.* ¶ 59. Surveillance cameras inside the Colonial captured footage of these events. *Id.* ¶ 45.

Around 3:00 a.m., the Colonial closed for the night, and the five returned to Yaron's office. Compl. ¶ 46. The complainants went into the bathroom together, emerging partially undressed before disrobing completely and engaging in sexual contact with one another in front of plaintiff, Yaron, and Rindgen. *Id.* ¶¶ 49–50. After that, Rindgen and the complainants used cocaine together. *Id.* ¶ 51.

Then, Ringden and Demkovich "began kissing and touching each other sexually." Compl. ¶ 53. "Herceg [went] over to the couch where [plaintiff] was sitting and tried to kiss him." *Id.* ¶ 52. Herceg "stated that she wanted [plaintiff] to have sex with her and ejaculate inside her," but plaintiff "took no action towards . . . Herceg at that time or at any time during the encounter." *Id.* Meanwhile, "Demkovich initiated oral sex on Yaron." *Id.* ¶ 53. Rindgen moved away from Demkovich and Yaron and "began having consensual contact with . . . Herceg." *Id.* ¶ 54.

"[A]pproximately forty-five minutes after the group had returned to the office for the second time . . . Herceg and Demkovich told [p]laintiff, his brother Yaron, and . . . Rindgen that they were ready to go home." Compl. ¶ 55. Before leaving, the complainants "appeared to be in a good mood and were joking with [plaintiff], Yaron . . ., and [ ] Rindgen." *Id.* ¶ 56.

- 4 -

Surveillance footage showed complainants leaving plaintiff's office and walking toward a parking garage at 3:48 a.m. on November 27, 2021.  *Id.* ¶ 91.

Later that day, the complainants reported to the New York State Police that they had been sexually assaulted and underwent rape examinations.  Compl. ¶¶ 76, 175(a).  The State Police advised the complainants to contact BPD.  *Id.* ¶ 76.  That evening, Demkovich's boyfriend called the Colonial to report that the owners had drugged and raped Demkovich the night before.  *Id.* ¶ 62.  Rindgen, who was also the general manager of the Colonial, informed Yaron that Demkovich's boyfriend had called, and Yaron contacted a friend in BPD, Detective Bob Fimbres, who confirmed that a report had been filed against the men.  *Id.* ¶¶ 64–65.  Yaron advised plaintiff of the complaint, and both men retained counsel.  *Id.* ¶¶ 66–67.

On November 28, 2021, BPD Investigator Miller was assigned to investigate the complainants' allegations.  Compl. ¶ 77.  Investigator Miller separately interviewed the complainants, who restated their accusations and provided text messages and photographs from the night of the alleged assault.  *Id.* ¶¶ 78–79.  Demkovich allegedly told Investigator Miller that she was questioning if she was, in fact, raped, or if the physical or sexual contact was consensual, but this statement was never recorded.  *Id.* ¶ 82.  Two days later, plaintiff's attorney provided Investigator Miller with surveillance footage from inside the Colonial.  *Id.* ¶ 88.

One week after the alleged sexual assaults, Investigator Miller and her supervisor, Captain Minor, executed a search warrant at Yaron's office, where the alleged assaults occurred, but they did not recover any physical evidence.  Compl. ¶ 90.  BPD also obtained surveillance footage from third parties that covered the street area surrounding Yaron's office.  *Id.* ¶ 91.

On December 8, 2021, newly hired ADA Congdon attended a meeting with DA Korchak, Chief ADA Loughran, Captain Minor, and Investigator Miller to discuss the

complainants' allegations and the ongoing investigation.  Compl. ¶¶ 103–04.  Chief ADA

Loughran suggested that BPD and the BCDA attempt to obtain the complainants' phones.

*Id.* ¶ 105.  After the meeting, DA Korchak and Chief ADA Loughran assigned ADA Congdon to

the investigation.  *Id.* ¶ 106.  ADA Congdon had previously worked as a criminal defense lawyer

for nearly a decade, but she had no experience working as a prosecutor.  *Id.* ¶ 103(f).

Meanwhile, rumors of the complainants' allegations spread throughout the Binghamton

community.  Compl.  ¶ 96.  Public outrage intensified as local news outlets picked up the story.

*Id*.  On December 10, 2021, BPD issued a press release stating that it was "investigating a[n] . . .

incident involving the owners of the Colonial," and that it was "aware of additional allegations

being made on social media."  *Id.* ¶ 98.  Likewise, DA Korchak issued a video statement,

acknowledging that "his office received 'numerous' emails and phone calls regarding 'several

incidents that occurred recently' in Broome County," and "encourag[ing] those with knowledge

to contact the BCDA[ ] or local police departments."  *Id.* ¶ 99.  The next day, "more than 500

protestors gathered in front of the Colonial and Dos Rios and marched to the Stone Fox."  *Id.* ¶

100.

On December 14, 2021, Chief ADA Loughran, Investigator Miller, and ADA Congdon

met separately with the complainants, seeking consent to access their electronic data, but the

complainants refused.  Compl. ¶ 109.  On December 22, 2021, plaintiff's defense attorney filed

an order to show cause in county court requesting preservation of the complainants' cell phone

data.  *Id.* ¶ 113.  The BCDA opposed this motion, but continued its own attempts to obtain the

complainants' consent to access this data.  *Id.* ¶¶ 114–15.  Plaintiff's motion was denied on

January 21, 2022, because, at that time, there was no criminal action pending against plaintiff or

Yaron.  *Id.* ¶ 121.

Sometime during the investigation, the complainants retained attorney Thomas Saitta. Compl. ¶ 114.  On January 14, 2022, Saitta informed ADA Congdon that he had a folder containing printouts of the complainants' electronic data (the "Saitta folder").  *Id.* ¶ 115.  ADA Congdon directed BCDA Investigator Jeff Wagner to pick up the Saitta folder, but he never did. *Id.* ¶¶ 116–17.  Throughout January 2022, members of the BCDA, including ADA Congdon and Chief ADA Loughran, continued to request the complainants' consent to extract electronic data from their phones.  *Id.* ¶ 118.  Those attempts were unsuccessful.  *Id.*

Though ADA Congdon held "ultimate decision-making authority" over the investigation, she met with DA Korchak and Chief ADA Loughran multiple times between November 2021 and February 2022.  Compl.  ¶¶ 123–25.  ADA Congdon also worked closely with BPD during the investigation.  *Id.* ¶ 120.  For instance, she worked with Investigator Miller to draft a search warrant for plaintiff's DNA.  *Id.*  According to the complaint, "[ADA] Congdon did not know that she could apply directly to a court to obtain a suspect's DNA and neither she, . . . [Investigator] Miller, or anyone at BCDA[] or BPD knew how to draft an appropriate application."  *Id.*  Consequently, "[n]o search warrant or motion to compel a buccal swab or a DNA sample was ever completed."  *Id.* ¶ 121.

Eventually, on February 22, 2022, ADA Congdon met with BPD officers and decided to file criminal charges against plaintiff, Yaron, and Rindgen in local court.  Compl. ¶ 131. Members of the press were present at the courthouse when the three were arrested and charged. *Id.* ¶ 133.  Plaintiff was charged with "Rape in the Third Degree in violation of New York Penal Law section 130.25(d)," a Class E felony.  *Id.* ¶ 134.  He entered a plea of not guilty.  *Id.* ¶ 131.

At some point, the BCDA hired ADA Cronin to assist ADA Congdon with plaintiff's prosecution. Compl. ¶ 127. By that time, ADA Cronin had worked as a sex crimes prosecutor for several years. *Id.*

Even after his arrest, plaintiff continued to urge members of BPD and the BCDA to obtain the complainants' electronic data. Compl. ¶ 144. On or around March 10, 2022, plaintiff "filed a motion pursuant to C.P.L. § 245.50(3) seeking to compel preservation and disclosure of forensic images of [the complainants'] cell phones." *Id.* ¶ 144(b). But BPD and the BCDA opposed, and plaintiff's motion was denied, "based, in part, on the allegedly speculative nature of [plaintiff]'s arguments that the phones would contain relevant, material, admissible evidence and due in part to the lack of jurisdiction over what was at that time a local court matter." *Id.* Plaintiff also subpoenaed cell phone carriers and social media companies in an attempt to independently obtain the complainants' electronic data. *Id.* ¶ 144(c). Unbeknownst to plaintiff at that time, Herceg had obtained a new phone and iCloud account sometime in March 2022. *Id.* ¶ 185.

At the end of March 2022, ADA Congdon presented the case to the grand jury with assistance from Chief ADA Loughran and ADA Cronin. Compl. ¶¶ 167, 169. According to plaintiff, ADA Congdon inaccurately instructed the grand jury on the law. *Id.* ¶ 169(a). The grand jury returned an indictment as to plaintiff, charging him with: "Rape in the First Degree in violation of New York Penal Law § 130.35(2), a Class 'B' violent felony. . . and Sexual Abuse in the First Degree, in violation of New York Penal Law § 130.65(2), [a] [C]lass 'D' violent felony." *Id.* ¶ 170. Plaintiff was arraigned in Broome County Court and pleaded not guilty to all charges on March 31, 2022. *Id.* ¶ 171.

In June 2022, plaintiff consented to a buccal DNA swab.  Compl. ¶ 175.  His DNA was compared with the material obtained during Herceg's rape examination.  *Id.* ¶ 175(a).  A two-male DNA profile mixture was obtained from Herceg's sample, despite her earlier claim that she had not had any other sexual partners for more than a month prior to the alleged assault.  *Id.* ¶ 175(b).  At some point during the investigation, though, Herceg informed authorities of a possible consensual sexual partner from the relevant period, but investigators excluded that person as a contributor.  *Id.* ¶ 175 (d).  Plaintiff was also excluded as a contributor to the mixture obtained from Herceg's rape kit.  *Id.* ¶ 175(c).

On July 11, 2022, counsel for plaintiff, Yaron, and Rindgen moved to compel production of the complainants' phones.  Compl. ¶ 177.  On August 5, 2022, while the motion to compel was still pending, ADA Congdon notified the defense that the complainants agreed to let BPD image their phones.  *Id.* ¶ 178.  Three months later, the BCDA received a hard drive with the extractions of the complainants' electronic data.  *Id.* ¶ 179.  The BCDA insisted that plaintiff's counsel review the data at BCDA's office, despite lacking the technology needed to review the materials efficiently.  *Id.* ¶ 181.  Plaintiff's counsel repeatedly requested access to the hard drive, but the BCDA refused to do so absent a protective order.  *Id.* ¶ 182.

In January 2023, plaintiff's counsel sought court intervention, and the presiding judge ordered ADA Congdon and ADA Cronin to turn over the hard drive.  Compl. ¶ 183.  The parties executed a protective order, and ADA Congdon tendered a report containing the data extracted from Demkovich's phone (the "BCDA report").  *Id.* ¶ 186.  Plaintiff never received a copy of the relevant data from Herceg's phone because she had obtained a new phone and iCloud account in March 2022.  *Id.* ¶ 185.

On February 14, 2023, plaintiff's attorney and private investigators began reviewing the

BCDA report.  Compl. ¶ 186.  They discovered relevant exculpatory and impeaching text

messages.  *Id.*  They also learned that both complainants turned over their electronic data from

the relevant period to their attorney, Saitta, before Herceg obtained a new cell phone.  *Id.* ¶ 188.

For some reason, though, the BCDA still had not retrieved the Saitta folder.  *Id.* ¶ 189.

According to plaintiff, the following messages were exchanged between the complainants

and third parties and between the complainants themselves:[3]

    a.  November 27, 2021 - Defendant Demkovich to a Third Party: "I don't want anyone to know…." "And it was consensual. I knew what was happening. But those guys should be fucking disgusted with themselves."

    b.  November 27, 2021 - Defendant Demkovich to Defendant Herceg: "And I remember saying to Jordan I was like I better not get denied at any of ur bars."

    c.  November 27, 2021 - Defendant Herceg to Defendant Demkovich: "Like I can't have this get out…"

    d.  November 28, 2021 - Exchange between Defendant Herceg and Defendant Demkovich (referencing Defendant Miller): "I am not gonna show her those" Herceg: "I don't think you should" Demkovich: "I am 100% not going to" Herceg: "I am worried about her calling stupid f**king Bianca"

    e.  November 29, 2021 - Defendant Herceg to Defendant Demkovich and a Third Party: "I'm settling for nothing Less then a million"

    f.  November 29, 2021 - Defendant Herceg to Defendant Demkovich and a Third Party: (referring to Plaintiff and Mr. Rindgen) "I want the Benz and the Beamer" "And both their houses"

    g.  November 29, 2021 - Defendant Herceg and Defendant Demkovich and a Third Party: (referring to Plaintiff and Mr. Rindgen) "I want all their bars . . ."

    h.  November 29, 2021 - Defendant Herceg to Defendant Demkovich: "Yup 100% but i do remember being at Alisha's and when she said we were at Jordan's i was like wtf we were w them? And she was like yeah haikey said u guys got raped and obviously I'm still drunk I'm like whattt no way it doesn't even feel like I've had sex i don't think anything happened and Alisha was like exactly"

---

[3] Plaintiff does not indicate whether these messages were obtained from the BCDA report or the subsequently obtained Saitta folder.  Compl. ¶ 74.

i. November 30, 2021 - Defendant Demkovich to Defendant Herceg and Third Parties: "the reason i had to call 911 is because when i told my parents my dad literally got in the car and was headed straight to downtown"

j. December 3, 2021 - Defendant Demkovich instant messages to Defendant Herceg and Third Parties: "if you guys have any photos of us drinking if u could delete them that would be good" "we can't erase everything but minimize it as much as possible" "Danayah maybe archive ur disposals of them on insta" "i might just delete any risky pics" "i need to go on my computer to delete my vsco"

k. December 3, 2021- Defendant Herceg instant message to Defendant Demkovich: "I've deleted all my posts and changed my user name to no lastnight and trying to delete all my republishes"

l. December 3, 2021 from a Third Party to Defendant Demkovich, Defendant Herceg, and Third Parties: "i already deleted everything w [Herceg] in it and everything hailet sent me to delete"

m. December 7, 2021 from a Third Party ("T.P.") to Defendant Demkovich: T.P.: "it da took me 5 mins of silence to go all the way back up to the messages that night" Demkovich.: "mad far and i don't even have them bc i think i accidentally deleted them that night" T.P.: "yeah i deleted them all out of your phone bc u were going to dylan's [Demkovich.'s then boyfriend]"

n. December 7, 2021 from a Third Party to Defendant Demkovich: "and then i told her that when [Herceg] came over she told me she didn't have sex but she turned the corner and saw you but thats all she could remember" "bro yeah she [Herceg] was like that whole night i would know if i got fucked i don't feel anything in my vagina but it was prob bc bitch was numb af"

o. December 8, 2021 - Defendant Demkovich. to Defendant Herceg: "okay so i'm

p. slightly panicking at work because i was just reading my texts from the day after the incident and i said to danayah that it was consensual and that i knew what was happening. but the whole day after the incident i was questioning if i got raped and i thought it might be classified as consensual because i didn't say no."

q. December 8, 2021 - Defendant Herceg to Defendant Demkovich: "Trust me i was panicking too [about the text messages] Bc i said in the groupchat that night "I'd fuck"

r. December 8, 2021 - Defendant Herceg to Defendant Demkovich: "I don't think you have anything to worry about. Bc if she did get the subpoena [for the phone messages] I'm sure she only got it from the times of like 1-4am"

s.  December 8, 2021 - from Defendant Herceg. to Defendant Demkovich and Third Parties: "Yes i deleted everything then made it private and changed everything"

t.  December 27, 2021 - Defendant Demkovich to her mother - (after defense counsel served and filed an Order to Show Cause on December 22, 2021, requesting preservation of the Defendants Herceg and Demkovich's cell phones): "i told you i have a message of me saying it was consensual the day after, because i was confused and not in the right head space if the defense sees it, i'm done"

u.  December 27, 2021 - Defendant Demkovich. to Defendant Herceg.: "and i have a message of me saying it's consensual" "the day after"

v.  December 27, 2021 - Defendant Herceg to Defendant Demkovich: "I have messages w Alisha saying I'd fuck ring ding [Jordan Rindgen]"

w.  December 27, 2021 - Defendant Demkovich. to Defendant Herceg: "yeah they will take the message of me saying it's consensual and i'm done" "the lawyer tom [Saitta] needs to make it so they can't get our phones period"

x.  December 28, 2021 - Defendant Demkovich to her mother: "I told them [BPD] the next day I was questioning if what happened to me was actually rape . . . "

y.  December 28, 2021 - Defendant Demkovich to her mother: "i accidentally deleted one text it was in the group text"

z.  December 28, 2021 - text message from Defendant Demkovich to Defendant Herceg: "i told him i said it was consensual" "i'm just worried that I said more than once it was consensual" "i said something about it being consensual"

aa. January 13, 2022 - Defendant Demkovich to her mother: "I just don't want [Herceg's] parents to judge me for saying it was consensual"

bb. January 14, 2022 - Defendant Demkovich to Defendant Herceg: "i really don't see why they'd still want to supoena our phones after i've provided all of That" "so fingers crossed"

cc. June 6, 2022 - Defendant Demkovich to her mother: "and the text messages i sent really fuck me up" "i didn't know because i didn't say no"

dd. June 13, 2022 - Defendant Herceg to Defendant Demkovich: ". . . Fuck you hailey you're a piece of shit. You think you sit in a high horse bc you "came looking for me" that night "only one who cared" no you didn't. If you thought I was in such danger like you say then you would've called the cops you would've brought everyone there w you to get me out. You came for what you thought was gonna be a good time. You're a garbage human who see nothing wrong w their actions."

ee. June 15, 2022 - Defendant Herceg to a Third Party: "She [Demkovich] told Bianca on FaceTime on her walk to "save me" that she wanted to fuck Jordan [Rindgen], she wanted to go because she wanted to sleep w Jordan. Not to come save me" . . . "And she came for what she thought was going to be a good time" . . . "I don't remember anything from that night" "Everything I know is from he[r] [Demkovich]"

ff. July 25, 2022 - Defendant Demkovich to her mother: "i wanna drop the charges" Demkovich's mother: "[Herceg] got a new phone…" "No access to her old cloud" Demkovich: "and i texted [Herceg] and she got a new phone so they didn't subpoena hers"

Compl. ¶ 74(a)–(ff) (errors in original).

On February 24, 2023, counsel for plaintiff, Yaron, and Rindgen filed a joint motion seeking dismissal of all charges. Compl. ¶ 191. Plaintiff's motion was granted, and the Broome County Court dismissed all charges against him. *Id.* ¶ 192.

"In June 2023, [DA] Korchak and [ADA] Congdon filed a notice of appeal of the decision dismissing the indictment as to [p]laintiff." Compl. ¶ 196. Plaintiff's attorney "made repeated attempts to contact [DA] Korchak and [ADA] Congdon . . . to try to meet to discuss the case and lack of any evidence against the [p]laintiff and to urge the BCDA[ ]not to perfect the appeal of the criminal case dismissal." *Id.* ¶ 197.

"On October 31, 2023, Yaron . . . and . . . Rindgen were acquitted of all charges" after a jury trial. Compl. ¶ 200. Thereafter, Yaron's former defense attorney, Paul Battisti, was elected Broome County District Attorney, and a special prosecutor was appointed to handle the BCDA's appeal of plaintiff's case. *Id.* ¶ 202. The special prosecutor withdrew the appeal on or about February 20, 2024. *Id.* ¶ 203.

## III.    LEGAL STANDARD

The Federal Rules of Civil Procedure permit a party to move to dismiss a pleading for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim

to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see also Ginsburg v. City of Ithaca*, 839 F. Supp. 2d 537, 540 (N.D.N.Y. 2012) ("[T]he '[f]actual allegations must be enough to raise a right to relief above the speculative level.'") (quoting *Twombly*, 550 U.S. at 555).

To assess this facial plausibility requirement, the court "must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and draw all reasonable inferences in favor of the plaintiff, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). In doing so, the court generally confines itself to the facts alleged in the pleading, documents attached to the complaint or incorporated into it by reference, and matters of which judicial notice may be taken. *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).

## IV.    DISCUSSION

Chief Zikuski, Captain Minor, Investigator Miller, DA Korchak, Chief ADA Loughran, ADA Cronin, ADA Congdon, the City, and the County have moved to dismiss all of plaintiff's claims against them. *See* Dkt. No. 40, 57, 65, 67, 74.

Plaintiff asserts a number of § 1983 claims against the moving defendants, including:

(1) False arrest against Chief Zikuski, Captain Minor, Investigator Miller (collectively, the "individual BPD defendants"), DA Korchak, ADA Cronin, ADA Congdon, and BCDA Investigator Wagner, Compl. ¶¶ 220–27;

(2) Malicious prosecution against the individual BPD defendants, DA Korchak, ADA Cronin, ADA Congdon, and BCDA Investigator Wagner, *id.*;

(3) Violations of his fair trial and due process rights against Captain Minor, Investigator Miller, DA Korchak, ADA Cronin, ADA Congdon, and BCDA Investigator Wagner, *id.* ¶¶ 228–36;

- 14 -

(4) Failure to intervene against the individual BPD defendants, DA Korchak, Chief ADA Loughran, ADA Congdon, ADA Cronin, (collectively, the "prosecutor defendants"), BCDA Investigator Wagner, the City, and the County, *id.* ¶¶ 237–42;

(5) Supervisory liability against Chief Zikuski, Captain Minor, DA Korchak, and Chief ADA Loughran, *id.* ¶¶ 243–50;

(6) Municipal liability against Chief Zikuski, Captain Minor, the City, and the County, *id.* ¶¶ 251–95; and

(7) Civil rights conspiracy claims against the individual BPD defendants, the prosecutor defendants, BCDA Investigator Wagner, the City, and the County, *id.* ¶¶ 296–301.

Along with his § 1983 claims, plaintiff brings several related state law claims including:

(1) False arrest against the individual BPD defendants, the prosecutor defendants, BCDA Investigator Wagner, the City, and the County, Compl. ¶¶ 302–16;

(2) Malicious prosecution against the individual BPD defendants, the prosecutor defendants, BCDA Investigator Wagner, the City, and the County, *id.*;

(3) Intentional, reckless, or negligent infliction of emotional distress against the individual BPD defendants, the prosecutor defendants, BCDA Investigator Wagner, the City, and the County, *id.* ¶¶ 316–21;

(4) Violations of Article I, sections 6 and 12 of the New York State Constitution against the individual BPD defendants, the individual BCDA defendants, the BCDA, the City, and the County, *id.* ¶¶ 322–26;

(5) *Respondeat superior* against the City and the County, *id.* ¶¶ 327–31; and

(6) Abuse of process against Chief Zikuski, DA Korchak, and the City, *id.* ¶¶ 332–39.

Plaintiff's wife, Ms. Liberman, is also a plaintiff in this action, and she brings a claim for damages that she allegedly suffered "as a . . . result of her husband's wrongful arrest and malicious prosecution." Compl. ¶ 9.

Defendants primarily argue that plaintiff has failed to plausibly allege any of his claims against them, and that Ms. Liberman has similarly failed to state an actionable claim for damages. *See generally,* Dkt. Nos. 19-1 ("Korchak & Loughran Mem."); 27-1 ("County

Mem."); 29-1 ("BPD Mem."); 30 ("Cronin Mem."); 31-1 ("Congdon Mem."); 37-1 ("Wagner Mem.").

In addition, the prosecutor defendants contend that, to the extent plaintiff might have plausibly alleged any of his claims against them, they are entitled to absolute or, alternatively, qualified immunity. Korchak & Loughran Mem. at 11–17; Cronin Mem. at 10–14; Congdon Mem. at 7–21.

In opposition, plaintiff contends that he has plausibly alleged his claims against each of the moving defendants, and maintains that neither absolute nor qualified immunity applies. *See* Dkt. No. 44 ("Pl.'s First Opp."); Dkt. No. 47 ("Pl.'s Second Opp.").

## A.    Absolute Immunity

The prosecutor defendants argue that absolute prosecutorial immunity bars plaintiff's federal and state law claims against them. Korchak & Loughran Mem. at 11–16; Cronin Mem. at 10–12; Congdon Mem. at 7–18. In opposition, plaintiff maintains that the prosecutor defendants' alleged conduct falls "outside the scope of absolute immunity." Pl.'s Second Opp. at 41.

As the Second Circuit has repeatedly acknowledged, the principles affording prosecutors absolute prosecutorial immunity from § 1983 claims for damages are the same as those that protect prosecutors from civil liability under state law. *Shmueli v. City of N.Y.*, 424 F.3d 231, 237–38 (2d Cir. 2005) (citing *Rudow v. City of N.Y.,* 822 F.2d 324, 329 (2d Cir. 1987)).

Absolute prosecutorial immunity is broad, applying even in situations where a prosecutor is alleged to have acted maliciously. *Johnson v. Town of Colonie*, 102 A.D.2d 925, 925 (N.Y. App. Div. 3d Dep't 1984) ("Actions performed by the prosecutor which are associated with the prosecutorial phase of the criminal process . . . bar civil liability for such action, even if it be assumed that such actions were done maliciously."); *Giraldo v. Kessler*, 694 F.3d 161, 166 (2d

Cir. 2012) ("[A]bsolute immunity applies to protect the prosecutor even in the face of a complaint's allegations of malicious or corrupt intent behind the acts.").

"In determining whether absolute prosecutorial immunity attaches, [courts] apply a 'functional approach.'" *Giraldo*, 694 F.3d at 165 (quoting *Hill v. City of N.Y.*, 45 F.3d 654, 660 (2d Cir. 1995)); *see also Rodrigues v. City of N.Y.*, 193 A.D.2d 79, 86 (N.Y. App. Div. 1st Dep't 1993) ("[L]ike federal courts, the courts of [New York] take a functional approach when analyzing claims of immunity.").

1. **Advocacy Function**

Consistent with this functional approach, courts routinely find prosecutors are absolutely immune for actions taken in connection with their advocacy function. *Johnson v. Kings Cnty. Dist. Att'y's Off.*, 308 A.D.2d 278, 285 (N.Y. App. Div. 2d Dep't 2003) ("District Attorneys are immune from civil liability for activities 'intimately associated with the judicial phase of the criminal process,' meaning 'initiating a prosecution and in presenting the State's case.'" (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430–31 (1976)).

For instance, "a prosecutor enjoys absolute immunity when determining which offenses to charge, initiating a prosecution, presenting a case to a grand jury, and preparing for trial." *Anilao v. Spota*, 27 F.4th 855, 864 (2d Cir. 2022); *see also Blake v. City of N.Y.*, 148 A.D.3d 1101, 1104 (N.Y. App. Div. 2d Dep't 2017) (holding prosecutors entitled to absolute immunity for "activities in processing criminal charges after . . . arrest . . . based upon evidence assembled by police"); *Giraldo*, 694 F.3d at 167 (same, for interviewing putative victim after suspect was arrested); *Flagler v. Trainor*, 663 F.3d 543, 550 (2d Cir. 2011) (same, "for withholding/preserving evidence to be used in connection with a criminal prosecution").

## 2.    Investigative Function

However, absolute prosecutorial immunity does not shield a prosecutor's investigative activities from liability.  *See Simon v. City of N.Y.,* 727 F.3d 167, 172 (2d Cir. 2013) ("Investigation, arrest, and detention have historically and by precedent been regarded as the work of police, not prosecutors, and 'they do not become prosecutorial functions merely because a prosecutor has chosen to participate.'") (quoting *Day v. Morgenthau,* 909 F.2d 75, 77–78 (2d Cir.1990)).

"Although all investigative activity could be considered in some sense to be 'preparing for the initiation of judicial proceedings,' . . . the Supreme Court has sought to draw a line between . . . preparatory steps that a prosecutor takes to be an effective advocate of a case already assembled and . . . investigative steps taken to gather evidence." *Smith v. Garretto*, 147 F.3d 91, 94 (2d Cir. 1998) (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993)).

In doing so, "[t]he Court has identified 'evaluating evidence and interviewing witnesses' as falling on the absolute immunity side of the line, leaving 'searching for the clues and corroboration' that might lead to a recommendation for an arrest on the qualified immunity side." *Smith v. Garretto*, 147 F.3d at 94 (quoting *Buckley,* 509 U.S. at 273); *Sculti v. Finley*, 167 A.D.3d 796, 797 (N.Y. App. Div. 2d Dep't 2018) ("Conduct in connection with the application for a search warrant is investigative in nature and, therefore, is governed by qualified immunity."); *Buckley*, 509 U.S. at 275  (holding prosecutor not absolutely immune for fabricating evidence during preliminary investigation); *Kirchner v. Cnty. of Niagara*, 107 A.D.3d 1620, 1624 (N.Y. App. Div. 4th Dep't 2013) (same, for coaching witness to provide false information to police in effort to reopen closed investigation).

- 18 -

### 3.   Functional Analysis

The Court must look to the prosecutor defendants' alleged conduct to determine which acts, if any, are advocative in nature and shielded by absolute prosecutorial immunity.

### i.   DA Korchak & Chief ADA Loughran

DA Korchak and Chief ADA Loughran argue that they are entitled to absolute immunity from plaintiff's claims because "their alleged activities were entirely prosecutorial in nature and were not of an investigatory nature." Korchak & Loughran Mem. at 11. Plaintiff disagrees, arguing that "[DA] Korchak and [Chief ADA] Loughran personally approved and authorized [p]laintiff's arrest." Pl.'s Second Opp. at 45.

"The directing of an investigation by police and other law enforcement personnel[,]" is an investigative activity, falling outside the scope of absolute immunity. *Barbera v. Smith*, 836 F.2d 96, 101 (2d Cir. 1987); *Claude H. v. Cnty. of Oneida*, 214 A.D.2d 964, 965, 626 N.Y.S.2d 933, 935 (1995) ("Where a prosecutor goes outside his quasi-judicial role[,] and acts as an investigator or police officer, he is entitled only to qualified immunity."). Here, the complaint contains a number of allegations that detail DA Korchak and Chief ADA Loughran's involvement in the investigation.

First, plaintiff alleges that DA Korchak and Chief ADA Loughran worked together with ADA Congdon and police to plan and execute the investigation, Compl. ¶¶ 103–06, 123, and that Chief ADA Loughran also allegedly met with the complainants in an attempt to gather evidence. *Id.* ¶¶ 109, 118. These actions fall outside the scope of DA Korchak's and Chief ADA Loughran's prosecutorial function and are not shielded by absolute prosecutorial immunity.

Second, plaintiff alleges that DA Korchak issued a video statement "assert[ing] that his office received 'numerous' emails and phone calls regarding 'several incidents that occurred

recently' in Broome County . . . and encourag[ing] those with knowledge to contact the BCDA[] or local police departments."  Compl. ¶ 99.  Because a prosecutor's "statements to the media are not entitled to absolute immunity[,]" *Buckley*, 509 U.S. at 277, DA Korchak is not entitled to absolute immunity for his alleged video statement.

Third, plaintiff alleges that DA Korchak and Chief ADA Loughran failed to (1) supervise and train ADA Congdon; (2) advise ADA Congdon of her discovery obligations; and (3) correct her various mistakes of law.  Compl. ¶¶ 121–22, 165–66.  However, prosecutors are absolutely immune for failing to train or supervise their subordinates as to their prosecutorial duties and obligations.  *See Van de Kamp v. Goldstein*, 555 U.S. 335, 344 (2009) ("[P]rosecutors involved in such supervision or training or information-system management enjoy absolute immunity from the kind of legal claims at issue here."); *see also Crawford v. N.Y. Cnty. Dist. Att'y*, 99 A.D.3d 600, 601 (N.Y. App. Div. 1st Dep't 2012) (holding district attorney entitled to absolute immunity where he allegedly "discourage[d] ADAs from being respectful of individuals' constitutional rights when prosecuting gun possession cases") (citing *Van de Kamp*, 555 U.S. at 344–46)).  Accordingly, DA Korchak and Chief ADA Loughran are absolutely immune from liability for their alleged failure to instruct and advise ADA Congdon on her prosecutorial responsibilities.

Absolute prosecutorial immunity also protects the remainder of plaintiff's allegations against DA Korchak and Chief ADA Loughran because they concern activities routinely recognized as "intimately associated with the judicial process."  Compl. ¶¶ 169 (presenting case to grand jury), 172 (filing certificate of compliance), 175(d) (failing to disclose evidence), 176 (failing to preserve evidence after plaintiff's indictment), 180 (failing to review evidence); 196 (filing notice of appeal).

In sum, DA Korchak and Chief ADA Loughran are shielded from liability for their involvement in plaintiff's prosecution following his arrest, but not for their earlier investigative conduct.

### ii. ADA Cronin

Like DA Korchak and Chief ADA Loughran, ADA Cronin argues that she is entitled to absolute prosecutorial immunity because the complaint contains "no allegation that [ADA] Cronin, at any point, worked outside of her prosecutorial function." Cronin Mem. at 11. Plaintiff disagrees, arguing that he has plausibly alleged that ADA Cronin "participated in investigative acts and decision[-]making pertaining to the investigation." Pl.'s Second Opp. at 45.

"Among the acts for which a prosecutor is absolutely immune is the initiation of a prosecution." *Schloss v. Bouse*, 876 F.2d 287, 289 (2d Cir. 1989) (citing *Imbler*, 424 U.S. at 430)). A prosecutor also "enjoys absolute immunity for failure to disclose exculpatory evidence, because deciding what disclosure to make is part of a prosecutor's role as advocate, and constitutes a core prosecutorial function." *Schnitter v. City of Rochester*, 556 F. App'x 5, 7 (2d Cir. 2014) (summary order) (citing *Warney v. Monroe Cnty.*, 587 F.3d 113, 125 (2d Cir.2009)).

Consequently, a prosecutor is protected by absolute immunity for withholding exculpatory evidence from a grand jury.[4] *See Hill*, 45 F.3d at 653 (holding absolute immunity protected assistant district attorney's decision to initiate prosecution and withhold alleged *Brady* material); *Drake v. City of Rochester*, 408 N.Y.S.2d 847, 857 (N.Y. Sup. Ct. 1978) ("[A] district

---

[4] A prosecutor has no duty to present exculpatory evidence to a grand jury, either. *See United States v. Williams*, 504 U.S. 36, 37 (1992) ("Because it has always been thought sufficient for the grand jury to hear only the prosecutor's side, and, consequently that the suspect has no right to present, and the grand jury no obligation to consider, exculpatory evidence, it would be incompatible with the traditional system to impose upon the prosecutor a legal obligation to present such evidence.").

attorney alleged to have withheld exculpatory evidence from a Grand Jury, given improper advice to a Grand Jury, suppressed and concealed evidence and conspired with others to obtain a Grand Jury indictment, permitted the presentation of false and misleading testimony to a Grand Jury, and took no action to correct the same was immune from liability."), *aff'd*, 74 A.D.2d 996 (N.Y. App. Div. 4th Dep't 1980).

Plaintiff's allegations against ADA Cronin concern wholly prosecutorial functions for which she enjoys absolute immunity. Specifically, Plaintiff alleges that ADA Cronin failed to identify and disclose exculpatory evidence, Compl. ¶¶ 137, 163, 166, 175(d), 187, withheld exculpatory evidence from the grand jury, *id.* ¶ 168, filed a certificate of compliance, *id.* ¶¶ 172–73, failed to preserve evidence, *id.* ¶ 176, and failed to review evidence, *id.* ¶ 180.

Contrary to plaintiff's assertions, none of these allegations plausibly suggest that ADA Cronin had any involvement in the pre-arrest investigation or the decision to arrest plaintiff. *Id.* ¶¶ 125 ("Beginning in December 2021, [DA] Korchak and [Chief ADA] Loughran ceded ultimate decision-making authority over the investigation to . . . *Congdon*."); 131 ("*ADA Congdon* . . . decided with BPD to file criminal charges against [p]laintiff.") (emphases added).

In sum, ADA Cronin's alleged conduct is protected by absolute immunity, warranting dismissal of all claims against her.

### iii. ADA Congdon

Finally, ADA Congdon argues that she is entitled to absolute immunity from plaintiff's claims. Congdon Mem. at 7–18. Plaintiff disagrees, arguing that the complaint plausibly alleges ADA Congdon's extensive role in investigative acts and decision-making. Pl.'s Second Opp. at 45–46.

"[W]here the prosecutor advises the police [*Burns v. Reed,* 500 U.S. 478, 493–95 (1991)] or performs investigative work in order to decide whether a suspect should be arrested [*Buckley,* 509 U.S. at 273–75], the prosecutor is not entitled to absolute immunity." *Kirchner*, 107 A.D.3d at 1623.

Plaintiff alleges that, as early as December 8, 2021, ADA Congdon met with members of BPD and the BCDA to discuss the complainants' allegations and the ongoing investigation. Compl. ¶ 104. DA Korchak and Chief ADA Loughran assigned ADA Congdon to the investigation that same day, *id.* ¶ 106, and "ceded ultimate decision-making authority over the investigation" to her. *Id.* ¶ 125. On December 14, 2021, ADA Congdon and others met separately with the complainants and tried, unsuccessfully, to obtain the complainants' consent to extraction of their electronic data. *Id.* ¶ 109. On January 14, 2022, the complainants' attorney informed ADA Congdon "that he had a folder containing printouts of electronic data from the complainants' phones." *Id.* ¶ 115. ADA Congdon allegedly instructed BCDA Investigator Wagner to retrieve the folder, but he never did, and ADA Congdon continued to seek the complainants' consent to an extraction of their data throughout January 2022. *Id.* ¶¶ 116–18. At some point during the investigation, ADA Congdon also allegedly assisted Investigator Miller with trying to draft a search warrant for plaintiff's DNA. *Id.* ¶ 120.

Taken together, the complaint plausibly alleges that ADA Congdon worked alongside police to gather evidence during the pre-arrest investigation. Accordingly, ADA Congdon is not immune for her participation in the investigation in the months preceding plaintiff's arrest.

Relatedly, plaintiff alleges that, at trial, complainant Herceg testified that ADA Congdon allegedly instructed her "to destroy electronic data relating to the night in question,"

Compl. ¶ 72, and "to delete her social media accounts," *id.* ¶ 110.  But, notably, the complaint does not indicate when this instruction allegedly occurred.

ADA Congdon argues that plaintiff has not plausibly alleged that she instructed Herceg to delete electronic data during the investigation.  Congdon Mem. at 14.  Indeed, ADA Congdon posits that plaintiff "strategically sandwich[ed]" these allegations "between . . . paragraphs that do include dates . . . to induce the reader to conclude that it occurred between December 14, 2022 [*sic*][,] and December 22, 2021."  *Id.*[5]

Taking every reasonable inference in plaintiff's favor, the complaint plausibly alleges that ADA Congdon instructed Herceg to delete exculpatory data prior to plaintiff's indictment.  Plaintiff's allegation that Herceg obtained a new phone prior to plaintiff's indictment provides additional support for the inference that ADA Congdon instructed her to delete exculpatory data before proceedings began.  Compl. ¶ 185.

In any event, it is ADA Congdon's burden to demonstrate entitlement to absolute immunity, *Burns v. Reed*, 500 U.S. 478, 478 (1991), and:

> Quite plainly, when it may not be gleaned from the complaint whether the conduct objected to was performed by the prosecutor in an advocacy or an investigatory role, the availability of absolute immunity from claims based on such conduct cannot be decided as a matter of law on a motion to dismiss.

*Hill*, 45 F.3d at 663.  Accordingly, at this early stage, the Court cannot conclude that ADA Congdon is entitled to absolute immunity as a matter of law for allegedly instructing Herceg to delete exculpatory data.

---

[5] ADA Congdon also insists that "[a] plain reading of the complaint . . . makes clear that, prior to [ADA Congdon]'s assignment to the case . . . the complainants themselves had already conspired to delete their social media accounts."  Congdon Mem. at 15.  But, the complainants' alleged conduct is irrelevant to whether ADA Congdon's alleged conduct occurred while acting in an investigative capacity.

ADA Congdon also argues that absolute prosecutorial immunity protects her decision to arrest plaintiff.  Congdon Mem. at 10–14.

Plaintiff alleges that, "[o]n or about February 22, 2022," ADA Congdon "met . . . and decided with BPD to file criminal charges against [p]laintiff."  Compl. ¶ 131.

As the Supreme Court made clear in *Buckley*:

> a prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as "preparation" for a possible trial; every prosecutor might then shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial.

509 U.S. at 276; *see also Claude H*, 214 A.D.2d at 965 (holding prosecutor acted "in an investigative, law-enforcement role when he directed the police to arrest plaintiff"); *Hill*, 45 F.3d at 661 (holding that assistant district attorney entitled to only qualified immunity for advising police to arrest).  Thus, at this stage, ADA Congdon has not demonstrated that she is absolutely immune for advising BPD to arrest plaintiff.

ADA Congdon is entitled to absolute immunity for the remainder of plaintiff's allegations, because they pertain to actions taken in her role as advocate.  *See* Compl. ¶¶ 137, 163, 166, 175(d), 187 (failing to identify and disclose exculpatory evidence); 167 (presenting case to grand jury); 168 (withholding exculpatory evidence from grand jury); 172–73 (filing certificate of compliance); 176 (failing to preserve evidence); 180 (failing to review evidence).

The remaining prosecutor defendants (DA Korchak, Chief ADA Loughran, and ADA Congdon) also argue that they are entitled to qualified immunity for any alleged conduct not protected by absolute immunity.  Korchak & Loughran Mem. at 16, Congdon Mem. at 18–21.  But "the better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 842 n.5 (1998).

**B.    Section 1983 Claims**

Plaintiff asserts §1983 claims for false arrest, malicious prosecution, denial of the right to a fair trial, failure to intervene, civil conspiracy, and supervisory liability against the individual BPD defendants, the prosecutor defendants, and BCDA Investigator Wagner.  Compl. ¶¶ 220–50, 296–301.  He also brings those claims against the City and the County under a theory of municipal liability pursuant to *Monell v. Dept. of Soc. Services of City of N.Y.,* 436 U.S. 658 (1978).  Compl. ¶¶ 251–95.  All have moved to dismiss the § 1983 claims asserted against them.

**1.    Personal Involvement & Supervisory Liability[6]**

Because "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983," *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991), the Court addresses it first.

Investigator Miller, Chief Zikuski, Captain Minor, DA Korchak, Chief ADA Loughran, and BCDA Investigator Wagner argue that plaintiff has not plausibly alleged their personal involvement in any alleged constitutional violations.  Korchak & Loughran Mem. at 25; BPD Mem. at 18–24; Wagner Mem. at 11–14.  The City also argues that plaintiff has not sufficiently alleged the personal involvement of the unidentified BPD Doe defendants.  BPD Mem. at 24 n.3.

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia,* the defendant's personal involvement in the alleged constitutional deprivation."  *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013).  The same applies to supervisory officials.  *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) ("[T]here is no special rule for supervisory liability.  Instead, a plaintiff must

---

[6] For reasons that will be explained *infra*, the Court will address plaintiff's Fourth Cause of Action for "supervisory liability" in conjunction with personal involvement.

plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" (quoting *Iqbal*, 556 U.S. at 676)).

### i. Investigator Miller

Investigator Miller argues that plaintiff's § 1983 claims against her must be dismissed, because plaintiff's allegations against her are innocuous and demonstrate only that she "participated in routine investigatory tasks." BPD Mem. at 23. In opposition, plaintiff maintains that "the [c]omplaint clearly specifies Investigator [ ] Miller's personal involvement in investigative misconduct." Pl.'s Second Opp. at 21.

At this stage, plaintiff has sufficiently pleaded Investigator Miller's personal involvement in the allegedly violative conduct. Specifically, plaintiff alleges that Investigator Miller interviewed the complainants, Compl. ¶¶ 78, 109; collected evidence, *id.* ¶¶ 79, 88; executed a search warrant at plaintiff's office, *id.* ¶ 89; discussed the investigation at meetings with members of the BCDA, *id.* ¶¶ 104–05; assisted ADA Congdon in attempting to obtain a DNA sample from plaintiff, *id.* ¶ 120; neglected to retrieve, obtain, or otherwise preserve other evidence, *id.* ¶ 85; and failed to document exculpatory statements, *id.* ¶¶ 82, 74(w). Accordingly, Investigator Miller's motion to dismiss is denied on this ground.

### ii. Wagner

BCDA Investigator Wagner argues that plaintiff's § 1983 claims against him must be dismissed because plaintiff's singular allegation against him cannot plausibly establish his personal involvement in any alleged constitutional violation. Wagner Mem. at 11. Plaintiff maintains that his allegation concerning BCDA Investigator Wagner's "continuing failure to collect the Saitta folder" is sufficient to avoid dismissal on this ground. Pl.'s First Opp. at 10–12.

As defendant points out, plaintiff alleges only that ADA Congdon directed him to retrieve the Saitta folder, but that he failed to do so.  Compl. ¶¶ 116–17.  Notably, the pleading does not allege that BCDA Investigator Wagner had any other involvement in plaintiff's investigation or prosecution.  *See generally id.*

Absent additional non-conclusory allegations that Wagner was aware of the contents of the Saitta folder and intentionally suppressed it, plaintiff has not plausibly alleged BCDA Investigator Wagner's personal involvement in any constitutional violations.  Accordingly, plaintiff's § 1983 claims against BCDA Investigator Wagner must be dismissed.

### iii. Supervisory Defendants

As an initial matter, Plaintiff asserts "Supervisory Liability" as an independent cause of action against DA Korchak, Chief ADA Loughran, Chief Zikuski, and Captain Minor.  Compl. ¶¶ 243–50.  Specifically, plaintiff claims that these defendants "provided grossly inadequate training, supervision, and discipline of the defendant assistant district attorneys and police officers," resulting in the deprivation of his constitutional rights.  *Id.* ¶ 246.

Defendants argue that this claim must be dismissed because there is no longer a special rule for supervisory liability in the Second Circuit, and plaintiff has not otherwise alleged that they were personally involved in any alleged constitutional violations.  BPD Mem. at 37; Korchak & Loughran Mem. at 25–26.  Plaintiff maintains that his supervisory liability claim is proper, and, in any event, he has plausibly alleged that defendants violated his constitutional rights through their own individual actions.  Pl.'s Second Opp. at 65–66.

Before the Second Circuit's decision in *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020), a plaintiff could impose supervisory liability by alleging one or more of the following:

> (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995)).  But this is no longer good law.   In *Tangreti*, the Second Circuit made clear that "[t]here is no special rule for supervisory liability."  983 F.3d at 618.  "Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 676).

Plaintiff improperly relies on the pre-*Tangreti* standard in support of his supervisory liability claim.  Pl.'s Second Opp. at 65–66.  Because such a claim is no longer cognizable, plaintiff's fourth cause of action is dismissed.

Still, plaintiff contends that he has plausibly alleged each supervisory defendant's personal involvement in the underlying constitutional violations.  Pl.'s Mem. at 20, 66.  Defendants disagree.  BPD Mem. at 18–22; Korchak & Loughran Mem. at 25–26.

"[A] defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority."  *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996).  Instead, "[t]he focus is on what the *supervisor* did or caused to be done, 'the resulting injury attributable to his conduct, and the *mens rea* required of him to be held liable, which can be no less than the *mens rea* required of anyone else.'"  *Tangreti*, 983 F.3d at 618 (quoting *Porro v. Barnes*, 624 F.3d 1322, 1327–28 (10th Cir. 2010) (Gorsuch, J.)) (emphasis in original).

### a. Chief Zikuski and Captain Minor

Chief Zikuski and Captain Minor argue that plaintiff's § 1983 claims must be dismissed because "the [c]omplaint barely mentions them and contains no allegations that they individually engaged in unconstitutional conduct."  BPD Mem. at 22.  According to plaintiff, "the [c]omplaint explicitly identifies Defendants Zikuski and Minor as personally involved."  Pl.'s Second Opp. at 20.

The complaint contains just two nonconclusory allegations concerning Captain Minor's individual actions: (1) on December 6, 2021, Captain Minor executed a search warrant on Yaron's office with Investigator Miller, Compl. ¶ 90; and (2) on December 8, 2021, Captain Minor met with DA Korchak, Chief ADA Loughran, ADA Congdon, and Investigator Miller, to discuss the complainants' allegations and the ongoing investigations, *id.* ¶ 104.  As for Chief Zikuski, plaintiff alleges only that, sometime prior to December 10, 2021, he told someone that he "recommended against filing criminal charges" in plaintiff's case.  *Id.* ¶ 98.

The remainder of plaintiff's factual allegations against Chief Zikuski and Captain Minor are speculative, conclusory, or based solely on their supervisory status, rather than their individual actions.  *See* Compl. ¶¶ 77, 121–22, 142, 180.

In sum, even taking his nonconclusory factual allegations as true, plaintiff has not plausibly alleged that either Captain Minor or Chief Zikuski were personally involved in any alleged constitutional violations, warranting dismissal of plaintiff's § 1983 claims against them.

### b. DA Korchak and Chief ADA Loughran[7]

Of the remaining prosecutor defendants, only DA Korchak and Chief ADA Loughran argue that plaintiff has failed to plausibly allege their personal involvement in any constitutional

---

[7] Plaintiff only asserts § 1983 claims for failure to intervene, supervisory liability, and civil rights conspiracy against Chief ADA Loughran.  Compl. ¶¶ 206–10, 211–17, 263–66.

violations.  Korchak & Loughran Mem. at 25; Dkt. No. 99 ("Korchak & Loughran Reply") at 21.

Plaintiff maintains that he has done so with the requisite specificity.  Pl.'s Second Opp. at 66–67.

As an initial matter, the Court considers only allegations of investigative conduct, as DA

Korchak and Chief ADA Loughran are absolutely immune for any conduct taken as advocates.

*See, supra* Point IV.A.3.i.  With that limitation in mind, plaintiff's primary allegations against

DA Korchak and Chief ADA Loughran stem from their participation in early investigative

meetings, prior to "ced[ing] ultimate decision-making authority over the investigation to ADA

Congdon," sometime in December 2021.  Compl. ¶¶ 104–06, 109, 125.  Beyond that, plaintiff

also alleges that Chief ADA Loughran and ADA Congdon agreed to continue seeking the

complainants' permission to access their electronic data throughout January 2022.  *Id.* ¶ 118.

Absent more, these allegations do not support a reasonable inference that either DA

Korchak or Chief ADA Loughran personally violated plaintiff's constitutional rights while

acting in an investigatory capacity.[8]

Plaintiff's remaining allegations amount to little more than supervision.  For example, he

alleges that DA Korchak and Chief ADA Loughran met with ADA Congdon throughout the

investigation, but failed to correct her various mistakes of law.  Compl. ¶¶ 121–23.

As the Court noted *supra*, to impose liability under § 1983, plaintiff must plausibly allege

that DA Korchak and Chief ADA Loughran *individually* violated his constitutional rights.

Because he has failed to do so, his § 1983 claims against them must be dismissed.

---

[8] Plaintiff's allegations that (1) DA Korchak issued a public statement encouraging those with knowledge about recent "incidents" in Broome County to contact the BCDA or BPD, Compl. ¶ 99, and (2) DA Korchak and Chief ADA Loughran failed to correct false information circulating in the media, *id.* ¶ 124, fare no better.  Taken as true, neither of these allegations amount to a violation of plaintiff's constitutional rights.

### iv. Doe Defendants

Plaintiff names ten Doe defendants who are "employees, agents and officers of either the "BCDA[ ] or BPD whose names are presently unknown but who violated Plaintiff's civil rights." Compl. ¶ 25. The BPD defendants argue that plaintiff's claims against any BPD employee Doe defendants should be dismissed, because plaintiff "fails to allege that any specific BPD Defendant arrested or decided to arrest [him], charged or decided to charge him, fabricated evidence that led to his arrest or prosecution, participated in his prosecution, or withheld any specific exculpatory evidence." BPD Mem. at 21, 24 n.3. In opposition, plaintiff maintains that "the John Doe Officers are alleged to have actively participated in investigative misconduct." Pl.'s Second Opp. at 22.

"[W]here, as in this case, [plaintiff] is suing 'John Doe' defendants, the pleading must nevertheless contain plausible allegations of wrongdoing by such defendants, even if their actual names are presently unknown.'" *James v. Monroe Cnty.*, 2022 WL 17155831, at *7 (W.D.N.Y. Nov. 22, 2022) (citing *Antonetti v. City of N.Y.*, 2022 WL 1105172, at *3 (E.D.N.Y. Apr. 13, 2022)). "The absence of allegations against them and lack of personal involvement is fatal to his claims against the John Does." *Azaryev v. City of N.Y.*, 2021 WL 3861722, at *4 (E.D.N.Y. Aug. 27, 2021); *see also Johnson v. N.Y.*, 2019 WL 13563241, at *3 (E.D.N.Y. Nov. 20, 2019) (dismissing § 1983 claims where pleading did not "provide any detail about the officers' particular roles in his arrest").

As the BPD defendants correctly point out, *see* BPD Mem. at 19–20, plaintiff fails to attribute many of his allegations regarding BPD officers to any of the named BPD defendants or to any particular Doe defendant, instead referring to "BPD" or "members of BPD," generally.

*See* Compl. ¶¶ 71, 91, 94–95, 98, 102–03, 108, 128, 131–32, 178.  Plaintiff insists that this "limited use of collective allegations is proper and permissible."  Pl.'s Second Opp. at 23.

Plaintiff has certainly alleged that other unknown BPD officers were involved in his investigation and arrest, but he has not plausibly alleged that any particular individual Doe defendant violated his constitutional rights.  Even taken as true, allegations that some unnamed BPD officers "obtained footage from security cameras" that was never shown to the complainants, Compl. ¶ 91, failed to take steps to preserve the complainants' cell phone data, *id.* ¶ 108, and "effectuated and processed" plaintiff's arrest, *id.* ¶ 128, are insufficient to state a plausible § 1983 claim against any individual Doe defendant.

Accordingly, plaintiffs' § 1983 claims against the BPD Doe defendants are dismissed.

The BCDA defendants have not explicitly moved for dismissal of plaintiff's claims against the BCDA Doe defendants.  This is understandable, as it is unclear how many of the Doe defendants are alleged to be BCDA employees and which claims plaintiff has asserted against them.  Compl. ¶ 25.

Of course, courts may *sua sponte* dismiss Doe defendants on the pleadings where a plaintiff has failed to state a plausible claim against them.  *See, e.g.*, *Darby v. Greenman*, 14 F.4th 124 (2d Cir. 2021) (affirming district court's dismissal of Doe defendants who had not appeared in the action where claims against them and appearing defendants were based on identical legal theories); *Baker v. Spinner*, 2019 WL 3430918, at *6 n.6 (N.D.N.Y. July 30, 2019) (dismissing unidentified and unserved Doe defendants *sua sponte* where defendants sought dismissal of entire complaint and their failure to appear on behalf of Does was likely "an oversight") *aff'd*, 826 F. App'x 105 (2d Cir. 2020); *see also Hanks v. City of Syracuse*, 2022 WL 4619877 (N.D.N.Y. Sept. 30, 2022), *aff'd*, 2023 WL 8889764 (2d Cir. Dec. 26, 2023).

Such is the case here. If anything, plaintiff's allegations against the BCDA Doe defendants are more tenuous than those asserted against the unidentified BPD officers. Plaintiff repeatedly alleges that "the BCDA[]," generally, failed to obtain or review certain evidence, failed to confront the complainants with evidence that undermined their allegations, and lacked fundamental knowledge as to certain investigative procedures regularly employed by prosecutors. Compl. ¶¶ 71, 94–95, 108, 113, 120, 146.

As with the BPD Doe defendants, plaintiff has failed to allege that any individual BCDA Doe defendant was personally involved in any constitutional violation. Accordingly, all Doe defendants that are "employees, agents, [] [or] officers" of the BCDA are dismissed.

**2.    False Arrest**

The Court begins its assessment of the merits of plaintiff's § 1983 claims with plaintiff's "First Cause of Action," which he characterizes as a claim for "Fourth and Fourteenth Amendment False Arrest and Malicious Prosecution." Compl. at 51. "Although they often accompany one another, false arrest and malicious prosecution are distinct causes of action." *Spearman v. Dutchess Cnty.*, 2008 WL 2945991, at *3 (N.D.N.Y. July 25, 2008) (citing *Heck v. Humphrey,* 512 U.S. 477 (1994)). Accordingly, the Court will address them separately, beginning with false arrest.

Of the remaining defendants to plaintiff's § 1983 claims, plaintiff asserts a false arrest claim against Investigator Miller and ADA Congdon. Compl. ¶¶ 220–27. Both moved to dismiss. *See* Dkt. Nos. 29, 31.

As a threshold matter, Investigator Miller argues that plaintiff's false arrest claim is time-barred. BPD Mem. at 26–27. Plaintiff has not addressed this argument. *See generally* Pl.'s Second Opp.

"Statutes of limitations establish the period of time within which a claimant must bring an action." *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 105 (2013).  "Section 1983 does not provide a specific statute of limitations.  Thus, courts apply the statute of limitations for personal injury actions under state law." *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013). "[T]he applicable statute of limitations for § 1983 actions in New York is three years." *Murphy v. Lynn*, 53 F.3d 547, 548 (2d Cir. 1995).

"[A] statute of limitations begins to run when the cause of action accrues—that is, when the plaintiff can file suit and obtain relief." *Heimeshoff*, 571 U.S. at 105 (internal quotations omitted).  "[A]lthough New York law provides the applicable statute of limitations, federal law governs the question of when a false arrest claim accrues." *Covington v. City of N.Y.*, 171 F.3d 117, 121 (2d Cir. 1999).

Under federal law, "it is the standard rule that [accrual occurs] when the plaintiff has a complete and present cause of action," *Wallace v. Kato*, 549 U.S. 384, 388 (2007).  As relevant here, "the statute of limitations upon a § 1983 claim seeking damages for a false arrest in violation of the Fourth Amendment, where the arrest is followed by criminal proceedings, begins to run at the time the claimant becomes detained pursuant to legal process." *Id.* at 397.  Put differently, the statute of limitations begins to run when the claimant is "bound over by a magistrate or arraigned on charges." *Id.* at 389. [9]

The complaint alleges that, on February 22, 2022, "[d]espite there being no probable cause . . . [ADA] Congdon met . . .  and decided with BPD to file criminal charges against

---

[9] In *Heck v. Humphrey*, the Supreme Court held that the accrual of a civil tort claim arising from an allegedly unlawful imprisonment or conviction should be deferred where that claim, if proven, would impugn the validity of an existing conviction.  512 U.S. 477, 484 (1994).  Under those circumstances, the statute of limitations would toll until "until the setting aside *of an extant conviction*." *Wallace*, 549 U.S. at 393 (emphasis in original).  But because plaintiff was never convicted, the deferred accrual rule established in *Heck* is inapplicable.  *Id.* at 394–95.

[p]laintiff . . . in local court." Compl. ¶ 131. The same day, plaintiff appeared at city court, where he was "arrested, charged, and arraigned." *Id.* ¶ 132.

Therefore, the statute of limitations on plaintiff's false arrest claim began to run once he was arraigned, on February 22, 2022. Plaintiff filed this action more than three years later, on March 18, 2025. Consequently, his § 1983 claim for false arrest is time-barred, and must be dismissed as to the remaining moving defendants.[10]

### 3. Malicious Prosecution

Of the remaining defendants, plaintiff asserts malicious prosecution claims against ADA Congdon and Investigator Miller. Compl. ¶¶ 220–27. Both moved to dismiss, arguing that plaintiff has failed to plausibly allege the elements of his claim. BPD Mem. at 28–32; Congdon Mem. at 23–24. Plaintiff maintains that his allegations state plausible malicious prosecution claims against both. Pl.'s Second Opp. at 19–20, 37–41, 54–56.

"To state a 42 U.S.C. § 1983 claim for malicious prosecution, a plaintiff must plead both 'a violation of his rights under the Fourth Amendment' and 'the elements of a malicious prosecution claim under state law.'" *Dettelis v. Sharbaugh*, 919 F.3d 161, 163 (2d Cir. 2019) (quoting *Manganiello v. City of N.Y.*, 612 F.3d 149, 160–61 (2d Cir. 2010)). "Under New York law, a malicious-prosecution claim requires a plaintiff to show '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor;

---

[10] The Second Circuit "recognizes an equitable tolling doctrine in the context of § 1983 actions, and when a 'defendant fraudulently conceals the wrong, the time [limit of the statute of limitations] does not begin running until the plaintiff discovers, or by the exercise of reasonable diligence should have discovered, the cause of action.'" *Pinaud v. Cnty. of Suffolk*, 52 F.3d 1139, 1157 (2d Cir. 1995) (quoting *Keating v. Carey*, 706 F.2d 377, 382 (2d Cir. 1983)).

However, equitable tolling applies "only in rare and exceptional circumstances, where . . . extraordinary circumstances prevented a party from timely performing a required act, and that the party acted with reasonable diligence throughout the period he [sought] to toll." *Walker v. Jastremski*, 430 F.3d 560, 564 (2d Cir. 2005) (internal quotation omitted). No such circumstances exist here.

(3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for the defendant's actions.'" *Dettelis*, 919 F.3d at 163–64 (quoting *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997)).

### i. Initiation

"The first element of a malicious prosecution cause of action, under state law or § 1983, is . . . 'that the defendant initiated a prosecution against the plaintiff.'" *Rohman v. N.Y. City Trans. Auth. (NYCTA)*, 215 F.3d 208, 217 (2d Cir. 2000) (quoting *Posr v. Ct. Officer Shield # 207*, 180 F.3d 409, 417 (2d Cir. 1999)). Both defendants argue that the complaint fails to establish initiation, but their arguments are premised on different theories.

Investigator Miller argues that plaintiff has not plausibly alleged that she, or any of the BPD defendants, commenced or continued the prosecution against plaintiff. BPD Mem. at 29–30. The Court disagrees.

"To initiate a prosecution, a defendant must do more than report the crime or give testimony. [Sh]e must 'play[ ] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.'" *Manganiello*, 612 F.3d at 163 (quoting *Rohman*, 215 F.3d at 217). "[P]olice officers can 'initiate' prosecution by filing charges or other accusatory instruments." *Cameron v. City of N.Y.*, 598 F.3d 50, 63 (2d Cir. 2010). "This element might be satisfied by, for example, showing that an officer generated witness statements or was regularly in touch with the prosecutor regarding the case." *Bermudez v. City of N.Y.*, 790 F.3d 368, 377 (2d Cir. 2015) (citing *Manganiello* 612 F.3d at 163).

Collectively and taken as true, plaintiff's allegations satisfy this requirement. According to plaintiff, Investigator Miller was the BPD officer assigned to plaintiff's case. Compl. ¶ 77. In this role, plaintiff alleges that Investigator Miller took witness statements, *id.* ¶¶ 78, 109,

gathered evidence, *id.* ¶¶ 79, 88, 90, attended meetings with members of the BCDA, *id.* ¶¶ 104, 109, and worked directly with ADA Congdon on investigative tasks leading up to plaintiff's arrest and prosecution, *id.* at 120.

Moreover, allegations that a police officer "forwarded statements to a prosecutor without sharing that the statements were suspect," can also satisfy the initiation requirement of a malicious prosecution claim. *Dufort,* 874 F.3d at 353 (citing *Manganiello,* 612 F.3d at 163). Indeed, "New York law has long equated the civil defendant's failure to make a full and complete statement of the facts to the District Attorney or the court . . . with that defendant's initiation of a malicious prosecution." *Ramos v. City of N.Y.*, 285 A.D.2d 284, 299–300 (N.Y. App. Div. 1st Dep't 2001) (citing *Hopkinson v. Lehigh Val. R. Co.*, 164 N.E. 104 (N.Y. 1928)); *see also Bailey v. City of N.Y.*, 79 F. Supp. 3d 424, 449 (E.D.N.Y. 2015) (holding that a police officer's "fail[ing] to make a complete and full statement of facts" to the prosecutor can constitute initiation).

Plaintiff alleges that:

> Demkovich told members of BPD that she was questioning whether she was, in fact, raped, or if the physical or sexual contact was consensual. This was not recorded by Defendant Miller or anyone else from BPD.

Compl. ¶ 82.

Investigator Miller argues that this allegation does not plausibly indicate that Demkovich told *her* that the sexual contact was consensual. BPD Mem. at 23. Again, the Court disagrees.

According to plaintiff, his encounter with the complainants took place in the early morning hours of November 27, 2021, Compl. ¶¶ 28, 32–55, Investigator Miller interviewed the complainants on November 28, 2021, *id.* ¶ 78, and Demkovich sent a text to her mother on December 28, 2021, stating that she "told them [BPD] the next day I was questioning if what happened to me was actually rape . . .," *id.* ¶ 74(w). From these facts, the Court can infer that

Demkovich told Investigator Miller, to whom she spoke *the next day*, that she was questioning whether she had sufficiently denied consent.

In sum, because plaintiff plausibly alleged that Investigator Miller was actively involved in the investigation, maintained regular contact with ADA Congdon, and failed to make a full and complete statement of the facts, he has plausibly alleged the initiation element as to Investigator Miller.

ADA Congdon makes a different argument. She contends that, as a prosecutor, she is absolutely immune for the commencement and continuation of a criminal proceeding. Congdon Mem. at 8.

As discussed *supra*, ADA Congdon *is* entitled to absolute immunity for her prosecutorial conduct: that is, any conduct undertaken as an advocate, in preparation for and during the prosecution of the criminal case against plaintiff. *See supra* Point IV.A.3.iii. Accordingly, the Court considers only whether her investigative conduct violated plaintiff's constitutional rights.

Plaintiff alleges that, while acting in an investigative capacity, ADA Congdon (1) participated in meetings, (2) worked closely with BPD, (3) met with the complainants, (4) instructed Herceg to delete electronic data, and (5) directed BPD to arrest plaintiff. Compl. ¶¶ 103–05, 120, 109–10, 131.

Ordinarily, "it would be impossible to satisfy the 'initiation' element of a malicious prosecution claim against the prosecutor." *Harris v. Tioga Cnty.*, 663 F. Supp. 3d 212, 241 (N.D.N.Y. 2023), *appeal dismissed*, 2024 WL 4179651 (2d Cir. Sept. 13, 2024). "After all, 'a prosecutor unquestionably acts as an advocate—and therefore receives absolute immunity— when she initiates and pursues a criminal prosecution.'" *Id.* (quoting *D'Alessandro v. City of N.Y.*, 713 F. App'x 1, 5 (2d Cir. 2017) (summary order)). But this protection ends "[w]hen a

prosecutor performs the investigative functions normally performed by a detective or police officer[.]" *Buckley*, 509 U.S. at 273.

"[T]he 'initiation' element of a malicious prosecution claim may be satisfied if a defendant fabricates evidence that is material to the probable cause determination." *Harris*, 663 F. Supp. 3d at 241 (citing *McDaniel v. City of N.Y.*, 585 F. Supp. 3d 503, 516–17 (S.D.N.Y. 2022) (collecting cases)). As relevant here, "government officials may be held liable for fabricating evidence through false statements *or omissions*." *Morse v. Fusto*, 804 F.3d 538, 547 (2d Cir. 2015) (emphasis added).

Here, plaintiff alleges that ADA Congdon directed Herceg to delete electronic data prior to plaintiff's arrest. Compl. ¶¶ 66, 110, 185. Herceg's text messages from the relevant period undoubtedly undermine the veracity of her and Demkovich's allegations. *Id.* ¶ 74. Taken together, plaintiff has plausibly alleged that suppressing Herceg's text messages affected the probable cause analysis. Accordingly, at this stage, plaintiff's allegations satisfy the initiation element as to ADA Congdon.

### ii. Probable Cause

Investigator Miller and ADA Congdon also argue that plaintiff's malicious prosecution claim must be dismissed, because he has failed to plausibly allege facts that rebut the presumption of probable cause established by his grand jury indictment. BPD Mem. at 27; Congdon Mem. at 23–24.

Because the third element of a malicious prosecution claim requires a plaintiff to allege that they were prosecuted without probable cause, "the existence of probable cause is a complete defense to a claim of malicious prosecution." *Savino*, 331 F.3d at 72 (citing *Colon v. City of N.Y.*, 455 N.E.2d 1248, 1250 (N.Y. 1983)). "'Probable cause, in the context of malicious

prosecution, has . . . been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty.'" *Kee v. City of N.Y.*, 12 F.4th 150, 166 (2d Cir. 2021) (quoting *Boyd v. City of N.Y.*, 336 F.3d 72, 76 (2d Cir. 2003)).

"[U]nder New York law, indictment by a grand jury creates a presumption of probable cause." *Savino*, 331 F.3d at 72. "[I]t is the plaintiff who bears the burden of proof in rebutting the presumption of probable cause that arises from the indictment." *Id.* at 73.

Because plaintiff concedes that "[t]he Grand Jury returned an indictment as to [him]," Compl. ¶ 170, the remaining inquiry is whether plaintiff has alleged sufficient facts to overcome the presumption of probable cause.

The presumption of probable cause "may *only* be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" *Savino*, 331 F.3d at 72 (quoting *Colon*, 455 N.E.2d at 1250–51) (emphasis in original). "The rule in New York differs in this respect from that in some jurisdictions which permit the presumption to be overcome by any evidence tending to show the absence of probable cause." *Colon*, 455 N.E.2d at 1251.

Plaintiff claims that he has rebutted the presumption of probable cause because the complaint "identif[ies] specific individuals, describe[s] the nature of the suppressed or omitted evidence, and explain[s] how the suppression affected the integrity of the grand jury process." Pl.'s Second Opp. at 39.

### a.  **Investigator Miller**

Broadly, plaintiff argues he has overcome the presumption of probable cause with respect to Investigator Miller by plausibly alleging that she failed to (1) show the complainants surveillance footage that contradicted their statements, Compl. ¶¶ 89, 91–94; (2) preserve the

complainants' electronic data, *id.* ¶ 85; and (3) document Demkovich's statement that she was questioning whether the alleged sexual assault had actually been consensual, *id.* ¶ 82.

Plaintiff alleges that Investigator Miller obtained security camera footage from the Colonial depicting the complainants "cognizant, in control of their actions, initiating and engaging in consensual sexual contact . . . with each other and with [p]laintiff, Yaron . . . and . . . Rindgen," in the hours preceding the alleged sexual assault. Compl. ¶¶ 88–89. According to plaintiff, Investigator Miller also possessed footage from street cameras showing the complainants "walking on their own and entering [a] car without assistance," following the alleged assault. *Id.* ¶¶ 57, 91. Investigator Miller allegedly failed to confront Herceg with the footage at any point during the investigation. *Id.* ¶ 94.

Plaintiff reasons that Investigator Miller's failure to confront the complainants with surveillance footage "showing [them] acting freely and consensually" amounts to bad faith misconduct sufficient to rebut the presumption of probable cause. Pl.'s Second Opp. at 38. There are two problems with this argument.

First, the surveillance footage, as described, does not exculpate plaintiff or otherwise impugn the veracity of the complainants' statements. Indeed, the footage corroborates the complainants' allegations that they were with plaintiff, Yaron, and Rindgen, at Yaron's office on the night in question. Further, footage that depicted the complainants "smiling and appearing in good spirits throughout the evening," and "walking through the basement area of their own free will," Compl. ¶ 81, did not undermine their allegations as to offenses occurring later in the night and outside the view of surveillance cameras. Likewise, footage of the complainants walking to a parking garage did not invalidate their recitation of events, absent an allegation that the complainants claimed to be unconscious or unable to walk after the alleged assault.

Second, plaintiff does not allege that Investigator Miller intentionally concealed or otherwise suppressed the footage from the prosecution in an effort to paint an incomplete picture of the facts and secure an indictment. He alleges only that Investigator Miller did not confront the complainants with the allegedly contradictory footage. Compl. ¶ 94.

Plaintiff's next allegation, that Investigator Miller failed to take "any steps during the early days of the investigation to obtain or preserve [the complainants'] electronic data," Compl. ¶ 85, similarly fails to rebut the presumption of probable cause.

According to plaintiff, the complainants provided Investigator Miller "with photographs and text messages from the night in question." Compl. ¶ 79. "The messages provided represented selected, non-continuous accounts of the night in question and did not provide a complete record of the relevant period." *Id.* ¶ 80. "The excluded text messages . . . included messages stating that the sexual contact between [the complainants] and [p]laintiff . . . had been consensual . . . " *Id.* ¶ 81.

By plaintiff's own account, any exculpatory text messages were excluded from those provided to Investigator Miller, and plaintiff does not allege any facts suggesting that Investigator Miller knew that the complainants failed to turn over exculpatory text messages. Accordingly, her failure to obtain or otherwise preserve those messages does not amount to a suppression of evidence which could rebut the presumption of probable cause.

Lastly, plaintiff argues that Investigator Miller intentionally failed to document Demkovich's statement that she was questioning whether the alleged assault would be "classified" as consensual, thereby rebutting the presumption of probable cause established by plaintiff's indictment. Compl. ¶¶ 74(o), 82.

Importantly, "[w]hen information is received from a putative victim or an eyewitness, probable cause exists, [*Martinez*, 202 F.3d at 634], unless the circumstances raise doubt as to the person's veracity." *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (citing *Singer v. Fulton Cnty. Sheriff,* 63 F.3d 110, 119 (2d Cir. 1995)). "[W]hile vastly inconsistent statements by a victim might undermine the victim's reliability, minor inconsistent statements do not automatically vitiate probable cause based solely on a victim's statements if the totality of the circumstances support probable cause." *Davenport v. City of N.Y.*, 2017 WL 4356883, at *11 (E.D.N.Y. Sept. 28, 2017) (citing *Crawford v. City of N.Y.*, 477 F. App'x. 777, 779 (2d Cir. 2012) (summary order)).

Even assuming Demkovich told Investigator Miller that she was questioning whether the alleged assault could be classified as rape, this statement, absent more, is not so "vastly inconsistent" that the remainder of her allegations must be discredited. Plaintiff does not contend, for example, that Demkovich told Investigator Miller that she and plaintiff did not engage in sexual activity, or that she was a willing participant in sexual activity. Compl. ¶ 74(w). Rather, it appears that Demkovich told police that she was questioning whether she had given sufficient indication that she did not want to engage in sexual activity, such that the encounter could be legally classified as "rape." *Id.* ¶ 74(o).

The Second Circuit addressed a similar situation in *Koester v. Lanfranchi*, 288 F. App'x 764, 766 (2d Cir. 2008) (summary order). The plaintiff in that case, who had been falsely accused of sexual abuse, similarly argued that "various circumstances cast doubt as to whether the victim provided a credible account of a forced, rather than consensual, sexual encounter." *Id.* The Second Circuit rejected that argument, holding that plaintiff was "wrong to suggest that

defendants had to eliminate these doubts before reasonably relying on the victim's statement to arrest him." *Id.* The same logic applies here.

Investigator Miller had no duty to resolve all doubts as to Demkovich's statement before reasonably relying on it, particularly as she provided text messages and photos that corroborated other aspects of her account. Compl. ¶ 79. And, in any case, "for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996), *as amended* (May 21, 1996). Demkovich's alleged expression of uncertainty did not render the charges against plaintiff groundless, particularly in light of the other evidence Investigator Miller possessed. Compl. ¶¶ 65, 74(b)(b), 76, 79, 139.

In sum, plaintiff has failed to plausibly allege facts sufficient to rebut the presumption of probable cause as to Investigator Miller, and his § 1983 malicious prosecution claim against her must be dismissed.

### b. ADA Congdon

Plaintiff argues that he has rebutted the presumption of probable cause as to ADA Congdon through his allegations that she (1) suppressed exculpatory DNA evidence from the grand jury, Compl. ¶ 168; (2) failed to obtain and review exculpatory text messages, *id.* ¶¶ 167, 169(b); and (3) instructed Herceg to delete exculpatory data, *id.* ¶ 72.

Plaintiff alleges that the grand jury did not "learn of the exculpatory DNA results that were learned after the Grand Jury returned a voted indictment," because of ADA Congdon's misconduct. Compl. ¶ 168.

This allegation concedes that ADA Congdon did not possess the exculpatory DNA results until after plaintiff's indictment. Accordingly, they could not have been "suppressed."[11]

Next, plaintiff contends that the presumption of probable cause is rebutted by ADA Congdon's failure to timely obtain and review the Saitta folder.

However, a plaintiff cannot "rebut the presumption of probable cause with mere 'conjecture' and 'surmise' that his indictment was procured as a result of conduct undertaken by the defendants in bad faith." *Savino*, 331 F.3d at 73. In that regard, "[a]ny alleged failure to conduct further investigation or apply all procedures that could have been followed does not amount to fraud, bad faith or the suppression of evidence and is insufficient to overcome the presumption." *Gil v. Cnty. of Suffolk*, 590 F. Supp. 2d 360, 370 (E.D.N.Y. 2008) (citing *Colon*, 455 N.E.2d at 1251).

The complaint alleges that the complainants' attorney made ADA Congdon aware of the Saitta folder on January 14, 2022. Compl. ¶ 115. ADA Congdon allegedly directed BCDA Investigator Wagner to retrieve the Saitta folder, but he never did. *Id.* ¶¶ 115–17, 167, 169(b). At the end of March 2022, "[o]verwhelmed by the amount of discovery . . . and having still not obtained the Saitta [folder], [ADA] Congdon . . . decided to present the case to the grand jury." *Id.* ¶ 167.

Plaintiff admits that ADA Congdon directed BCDA Investigator Wagner to retrieve the Saitta folder once she became aware of its existence. Her failure to follow up with BCDA

---

[11] Regardless, ADA Congdon "had the discretion and authority to decide what evidence to present to the grand jury—[and] was under no duty to present every item of arguably exculpatory evidence in seeking an indictment." *Savino*, 331 F.3d at 75.

Investigator Wagner may constitute negligence, but, without more, cannot support a plausible inference of bad faith sufficient to rebut the presumption of probable cause.[12]

Lastly, plaintiff argues that the presumption of probable cause was rebutted by his allegation that ADA Congdon instructed Herceg to destroy electronic data.

As discussed *supra*, plaintiff plausibly alleged that, during the pre-arrest investigation, ADA Congdon directed Herceg to delete electronic data, and Herceg's electronic data included text messages that substantially undermined the veracity of her and Demkovich's allegations against plaintiff. *See supra* Point IV.A.3.iii. At this stage, these allegations suffice to rebut the presumption of probable cause established by plaintiff's indictment.

### iii. Malice

ADA Congdon also argues that plaintiff failed to allege actual malice, the final element of his malicious prosecution claim. Congdon Mem. at 24. Specifically, ADA Congdon contends that any allegations of malice against her are conclusory. *Id.* In opposition, plaintiff maintains that the complaint "adequately alleges malice, both due to the lack of probable cause as well as the deliberate misconduct." Pl.'s Second Opp. at 55.

> Under New York law:
>
> The "actual malice" element of a malicious prosecution action does not require a plaintiff to prove that the defendant was motivated by spite or hatred . . . [r]ather, it means that the defendant must have commenced the prior criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served.

*Id.* at 976. "A lack of probable cause generally creates an inference of malice." *Boyd*, 336 F.3d at 78 (*Ricciuti,* 124 F.3d at 131).

---

[12] The same is true with respect to plaintiff's other allegations that ADA Congdon was generally inexperienced. *See* Compl. ¶¶ 106-07, 125, 165-67, 169.

Plaintiff has plausibly alleged facts that rebut the presumption of probable cause as to ADA Congdon, *see supra* Point IV.B.3.ii.b, thereby creating an inference of malice. Accordingly, at this stage, plaintiff has stated a plausible § 1983 malicious prosecution claim against ADA Congdon.

### 4.    Due Process and Denial of the Right to a Fair Trial

Plaintiff's "Second Cause of Action," is identified as: "Fourteenth Amendment Deprivation of Liberty Without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence, Withholding Material Exculpatory and Impeachment Evidence, and Deliberately Failing to Conduct a Constitutionally Adequate Investigation."  Compl. at p. 53.  Of the moving defendants, this claim remains only as to Investigator Miller and ADA Congdon.  Both have moved to dismiss.  BPD Mem. at 32–35; Congdon Mem. at 25.

"A fair trial claim is a civil claim for violations of a criminal defendant's Fourteenth Amendment due process rights."  *Fappiano v. City of N.Y.*, 640 F. App'x 115, 118 (2d Cir. 2016) (summary order) (citing *Ramchair v. Conway,* 601 F.3d 66, 73 (2d Cir. 2010)).

Plaintiff's fair trial claim is based, in part, on defendants' alleged failure to "conduct a constitutionally adequate investigation."  However, "[a]s Defendants correctly argue, 'there is no constitutional right to an adequate investigation.'"  *Buari v. City of N.Y.*, 530 F. Supp. 3d 356, 389 (S.D.N.Y. 2021) (quoting *Newton v. City of N.Y.*, 566 F. Supp. 2d 256, 278 (S.D.N.Y. 2008)); *see also Hicks v. Marchman*, 719 F. App'x 61, 64 (2d Cir. 2018) (summary order) (affirming dismissal of fair trial claim where plaintiff "cite[d] no authority for the proposition that there is a stand-alone fair trial claim based on officers' failure to conduct an adequate investigation").  Accordingly, plaintiff's fair trial claim based on defendants' alleged "failure to investigate" must be dismissed.

The remainder of this claim can reasonably be understood as a claim for denial of the right to a fair trial premised on two theories: (1) fabrication of evidence;[13] and (2) withholding of exculpatory and impeachment evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

Defendants argue that plaintiff has failed to state a plausible fair trial claim under either theory. BPD Mem. at 32–35; Congdon Mem. at 25. Plaintiff disagrees. Pl.'s Second Opp. at 56–57.

### i.   Fabrication of Evidence

"When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti*, 124 F.3d at 130. To state a fair trial claim premised on the fabrication of evidence, a plaintiff must allege that "'an (1) investigating official (2) fabricate[d] information (3) that is likely to influence a jury's verdict, (4) forward[ed] that information to prosecutors, and (5) the plaintiff suffer[ed] a deprivation of life, liberty, or property as a result.'" *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016) (quoting *Ricciuti*, 124 F.3d at 130).

### a.   Investigator Miller

Investigator Miller argues that plaintiff's allegations in support of his fabrication claim are boilerplate and do not state a plausible claim against her. BPD Mem. at 33–34.

---

[13] In his opposition papers, plaintiff seemingly rejects fabrication as a basis for this claim, stating that "[a] fair trial claim does not have to involve fabricated evidence," and "the Second Circuit has explicitly recognized that suppression of exculpatory evidence—whether intentional or reckless—also gives rise to a cognizable fair trial claim." Pl.'s Second Opp. at 62. But, because the complaint alleges that defendants "deprived [plaintiff] of his right to due process by fabricating inculpatory evidence," Compl. ¶ 231, the Court addresses both theories.

Crucially, the Second Circuit has consistently held that "the second element of a fair trial claim based on fabricated evidence requires a plaintiff to prove that a defendant's use of inaccurate information was 'knowing, as opposed to mistaken.'" *Davis-Guider v. City of Troy*, 2024 WL 5199294, at *3 (2d Cir. Dec. 23, 2024) (summary order) (quoting *Barnes v. City of N.Y.*, 68 F.4th 123, 129 (2d Cir. 2023)); *see also Ashley v. City of N.Y.*, 992 F.3d 128, 143 (2d Cir. 2021) ("The fabrication element requires only that the defendant knowingly make a false statement or omission.").

"[T]he requirements that the information be both false and likely to influence a jury's decision constrain the types of information that can serve as the basis for a denial of the right to a fair trial claim." *Garnett*, 838 F.3d at 280. "Information may be 'false' if material omissions render an otherwise true statement false." *Morse*, 804 F.3d at 548.

Plaintiff does not allege that Investigator Miller personally testified falsely before any jury or affirmatively fabricated any evidence. Instead, plaintiff alleges that "Demkovich told members of BPD that she was questioning whether she was, in fact, raped, or if the physical or sexual contact was consensual" and, because that statement "was not recorded by Defendant Miller," "the Grand Jury did not learn that . . . Demkovich had reported that she was questioning whether a rape had occurred." Compl. ¶¶ 82, 168.

Investigator Miller's omission of that portion of Demkovich's statement did not render the rest of her statement "false." Even if it did, plaintiff has not plausibly alleged that Miller had reason to know that Demkovich's allegations were false. *See Davis-Guider*, 2024 WL 5199294, at *3 (rejecting argument that "relie[d] on the speculation that because Defendants provided prosecutors with inaccurate information, they must have fabricated evidence," and concluding

that "[t]he mere fact that the parties present conflicting evidence does not mean that one side's evidence was fabricated.").

Indeed, at the time Investigator Miller interviewed the complainants, Herceg's allegations, the complainants' text messages and photos, and the surveillance footage all corroborated aspects of Demkovich's allegations. *See supra* Point IV.B.3.b; *see also Brown v. Vill. of Endicott*, 2025 WL 863105, at *30 (N.D.N.Y. Mar. 19, 2025) ("Insofar as the parties agree that [the complainant] provided inconsistent statements. . . the failure to present this inconsistency to the grand jury does not make the testimony 'false.' This is particularly true when [the complainant] made numerous other, consistent, statements concerning the alleged abuse.").

In sum, plaintiff has failed to state factual allegations that could support a reasonable inference that Investigator Miller knowingly fabricated evidence, either affirmatively or by omission. Therefore, plaintiff's fabrication claim against her must be dismissed.

### b. ADA Congdon

ADA Congdon argues that absolute prosecutorial immunity bars plaintiff's fabrication-of-evidence claim against her, as her allegedly violative conduct falls within the scope of her role as an advocate. Congdon Mem. at 25. Plaintiff disagrees, insisting that his "allegations detail a pattern of exculpatory evidence being deliberately destroyed or withheld by both police and prosecutors, well before any formal prosecution commenced." Pl.'s Second Opp. at 58.

In *Zahrey v. Coffey*, the Second Circuit explicitly recognized a constitutional "right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity." 221 F.3d 342, 349 (2d Cir. 2000). This includes prosecutors, as "a subsequent immunized act of a single official does not break the chain of causation traceable to

his initial misconduct occurring in another capacity." *Id.* at 353 (citing *White v. Frank*, 855 F.2d 956, 961 (2d Cir. 1988)).

Thus, a prosecutor, acting in her investigative capacity, deprives a criminal defendant of the constitutional right to a fair trial where she deliberately omits material information from evidence that would likely influence a jury's decision. *See Morse*, 804 F.3d at 547–49 (finding prosecutor and investigator, acting in investigative capacities, deprived dentist of fair trial right through deliberate material omissions in billing summaries material to grand jury's decision to indict).

In November 2022, the BCDA allegedly "received a hard drive with the extractions of the cell phones of [the complainants]." Compl. ¶ 179. Three months later, the BCDA turned this information over to plaintiff's attorney in a report, but "none of . . . Herceg's communications from November 27, 2021[,] through March 2022 were present" in the BCDA report, because Herceg obtained a new phone and iCloud account in March 2022. *Id.* ¶ 185. Herceg later testified that ADA Congdon instructed her to "destroy electronic data relating to the night in question . . . and that she did in fact destroy that evidence." *Id.* ¶ 72. In July 2023, plaintiff obtained the Saitta folder, which contained Herceg's messages from that period, including "numerous exculpatory and impeaching text messages," not included in the BCDA report. *Id.* ¶ 117(e). Saitta also informed plaintiff that ADA Congdon had been aware of the Saitta folder at least two months prior to his indictment (and Herceg's alleged destruction of evidence), but she never retrieved it. *Id.* ¶¶ 115–17.

Collectively, plaintiff has plausibly alleged that ADA Congdon (1) instructed Herceg to delete material electronic data prior to plaintiff's arrest and indictment; (2) failed to retrieve existing copies of that material electronic data, despite knowing of its availability before

plaintiff's arrest and indictment; and (3) subsequently produced a hard drive of the complainants' electronic data that necessarily omitted the data Herceg destroyed at her request.

Thus, plaintiff has plausibly alleged that ADA Congdon fabricated or otherwise omitted material evidence.  Accordingly, plaintiff's fabrication claim survives as to ADA Congdon.

### ii. Brady Violation

Plaintiff also alleges that defendants deprived him "of his right to due process by directing the destruction of material exculpatory and impeachment evidence in order to hide it from [plaintiff]'s defense counsel and the Court."  Compl. ¶ 232.  This "theory of liability is essentially a civil claim seeking damages for a *Brady* violation."  *Fappiano*, 640 F. App'x at 118 (citing *Bermudez,* 790 F.3d at 376 n.4).  "A classic *Brady* violation contains three elements: 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'"  *Fappiano*, 640 F. App'x at 118 (quoting *United States v. Rivas,* 377 F.3d 195, 199 (2d Cir. 2004)).

"To prevail on such a claim, a plaintiff must show the materiality of the nondisclosed evidence."  *Bellamy v. City of N.Y.*, 914 F.3d 727, 751 (2d Cir. 2019).  To determine materiality, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

Because "*Brady* is rooted in the constitutional right to a fair trial," a plaintiff "fails to allege any violation of his rights under *Brady*," where "the charges . . . were dropped before any trial began."  *Schnitter v. City of Rochester*, 556 F. App'x 5, 8 (2d Cir. 2014) (summary order) (affirming dismissal of § 1983 *Brady* claim); *see also Malik. v. City of N.Y.*, 2020 WL 2747979

(E.D.N.Y. May 27, 2020) (dismissing § 1983 *Brady* claim where charges were dismissed before trial), *aff'd sub nom. Malik v. City of N.Y.*, 841 F. App'x 281 (2d Cir. 2021) (summary order).

Plaintiff concedes that the charges were dismissed against him without a trial, Compl. ¶ 192, and that the BCDA ultimately withdrew their appeal of this dismissal, *id.* ¶¶ 6–7. Accordingly, plaintiff has failed to allege a *Brady* violation, and his fair trial claim premised on this theory must be dismissed as to the remaining moving defendants.

### 5.    Failure to Intervene

Plaintiff's "Third Cause of Action" is identified as a "failure to intervene" claim.  Compl. ¶¶ 237–242.  As a threshold matter, failure to intervene is not a standalone cause of action, but rather a form of individual "bystander" liability imposed where a government official could have, but did not, intervene in a constitutional violation committed by another government official in his or her presence.  *See Ellis v. City of Elmira*, 2018 WL 6047070, at *8 n.1 (W.D.N.Y. Nov. 19, 2018) ("[F]ederal courts uniformly have recognized a theory of 'bystander liability' based on a defendant's failure to intervene in § 1983 actions.") (citing *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)).  In that regard, it may be asserted even where a defendant did not directly participate in an alleged constitutional violation.

Accordingly, this claim remains as to the individual BPD defendants, DA Korchak, Chief ADA Loughran,  ADA Congdon, and BCDA Investigator Wagner.  Plaintiff also asserts this claim against the City and the County.  All have moved to dismiss.

Liability for failure to intervene may attach "if '(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take

reasonable steps to intervene.'" *Jackson v. City of N.Y.*, 939 F. Supp. 2d 219, 231–32 (E.D.N.Y.

2013) (quoting *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y. 2008).

As for the municipal defendants, the County argues that plaintiff has failed "fail to allege

or articulate how the County, as a municipal entity, was positioned to prevent or remedy . . .

[alleged] violations in real time." County Mem. at 13. Plaintiff concedes this point in his

opposition papers and voluntarily "withdraws the failure to intervene claim against the County

only." Pl.'s Opp. at 65. But the City of Binghamton is also a municipal entity. Compl. ¶ 17. To

the extent plaintiff attempts to impose individual liability for failure to intervene against the City,

that claim must be dismissed for substantially the same reasons.

Turning to the individual defendants, they argue that (1) plaintiff has not plausibly

alleged an underlying constitutional violation; or (2) alternatively, plaintiff has not plausibly

alleged that defendants had a realistic opportunity to intervene in any constitutional violations.

Korchak & Loughran Mem. at 24–25; BPD Mem. at 36–37; Congdon Mem. at 25–26; Wagner

Mem. at 22–24. Additionally, ADA Congdon argues that she "could never have had a

reasonable opportunity to intervene in her own actions." Congdon Mem. at 26.

A failure to intervene claim "is predicated on there being an underlying violation of

[plaintiff]'s constitutional rights that the defendants could have prevented." *McIntosh v. City of

N.Y.*, 722 F. App'x. 42, 46 (2d Cir. 2018) (summary order) (citing *Terebesi v. Torreso*, 764 F.3d

217, 243 (2d Cir. 2014)).

Here, plaintiff has plausibly alleged constitutional violations against ADA Congdon. His

surviving § 1983 claims against her are for malicious prosecution and the denial of the right to a

fair trial premised on the fabrication of evidence. *See supra* Points IV.3–4.

"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson*, 17 F.3d at 557 (citing *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988)).[14] But, "[o]bviously, a person who is held liable under a theory of direct participation in the constitutional violation cannot also be held liable for a failure to intervene." *Rizk v. City of N.Y.*, 462 F. Supp. 3d 203, 226 (E.D.N.Y. 2020) (citing *Jackson*, 939 F. Supp. 2d at 231–32). Because plaintiff has only plausibly stated § 1983 claims against ADA Congdon, she cannot also be liable for failure to intervene in her own conduct.

The remaining individual defendants argue that plaintiff has not alleged that they had a realistic opportunity to intervene in any constitutional violations. Korchak & Loughran Mem. at 24–25; BPD Mem. at 36–37; Wagner Mem. at 22–24.

Both of plaintiff's surviving § 1983 claims are premised on plaintiff's allegation that, prior to his arrest and indictment, ADA Congdon instructed Herceg to destroy electronic data related to the night of the alleged assault. Compl. ¶¶ 72, 110. Yet, plaintiff does not allege that any other individual defendant was present for, aware of, or had any realistic opportunity to intervene in or prevent ADA Congdon from instructing or directing Herceg to destroy the allegedly exculpatory electronic data. *See generally* Compl.

Accordingly, he fails to state a plausible § 1983 claim under a failure to intervene theory as to any moving defendant.

---

[14] While the Second Circuit has not addressed whether law enforcement officials or prosecutors have a duty to intercede in a *prosecutor's* alleged misconduct, plaintiff's surviving claims against ADA Congdon concern actions taken in her investigatory capacity, for which she, like a law enforcement officer, is entitled to qualified immunity at most. *See Buckley*, 509 U.S. at 273 ("When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is 'neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.'" (quoting *Hampton*, 484 F.2d at 608)). Thus, for purposes of assessing defendants' failure to intervene in ADA Congdon's alleged constitutional violations, she will be treated as a law enforcement officer.

### 6. *Monell* Liability

Plaintiff's fifth and sixth causes of action are identified as "*Monell* Claim" and "*Monell* Claim for the Unconstitutional BPD Custom or Policy," respectively.  Compl. ¶¶ 251–95.  His first *Monell* claim is asserted against the County and his second, against the City, Chief Zikuski, and Captain Minor.  All have moved to dismiss plaintiff's *Monell* claims.  County Mem. at 8–11; BPD Mem. at 15–17.

As the Second Circuit has explained:

> In *Monell v. Department of Social Services,* 436 U.S. 658, 98 S. Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court established that "[l]ocal governing bodies . . . can be sued directly under [42 U.S.C.] § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."

*Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 124–25 (2d Cir. 2004) (quoting *Monell*, 436 U.S. at 690).

Plaintiffs proceeding under a *Monell* theory must "'plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right.'"  *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020) (quoting *Wray v. City of N.Y.*, 490 F.3d 189, 195 (2d Cir. 2007)).  "In other words, municipalities may not be held liable 'unless action pursuant to official municipal policy of some nature caused a constitutional tort.'"  *Friend v. Gasparino*, 61 F.4th 77, 93 (2d Cir. 2023) (quoting *Monell*, 436 U.S. at 691).

The Court addresses plaintiff's *Monell* claims in turn.

### i. County

Plaintiff alleges that the BCDA "failed to implement policies and procedures including training and supervision to ensure that criminal defendants . . . would not have their

constitutional rights violated," and "had unconstitutionally infirm policies and procedures that led to assistant district attorneys not knowing their obligations under *Brady, Giglio,* and discovery." Compl. ¶¶ 267–68.

The County argues that this claim must be dismissed, because plaintiff has not plausibly alleged a custom or policy of the County that caused any alleged violations. County Mem. at 9–10. Plaintiff disagrees. Pl.'s Second Opp. at 70–75.

"'Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law.'" *Friend*, 61 F.4th at 93 (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)).

A plaintiff can satisfy the official policy element by alleging, *inter alia*, that (1) "a municipal policy or ordinance is itself unconstitutional," *Amnesty Am.*, 361 F.3d at 125; (2) a municipality's persistent and widespread "practice, as opposed to its formal policy, is to engage in the constitutional violation at issue," *Green v. City of N.Y.*, 465 F.3d 65, 80 (2d Cir. 2006); (3) an official with final policymaking authority makes a "a deliberate choice to follow a course of action . . . from among various alternatives," *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986); or (4) "the municipality is aware that its policy for handling a given situation, although not unconstitutional in itself, may be applied unconstitutionally, but nevertheless consciously chooses not to train its employees in proper application of the policy," *Green*, 465 F.3d at 80.

First, plaintiff argues that the County is liable under *Monell* for the acts of the prosecutor defendants, because they are all alleged to be "final policymakers." Pl.'s Second Opp. at 70–75 (citing Compl. ¶¶ 252, 274).

"Where a plaintiff seeks to hold a municipality liable for a 'single decision by [a] municipal policymaker[ ],' . . . the plaintiff must show that the official had final policymaking

power." *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008) (quoting *Pembaur*, 475 U.S. at 480). "Whether an official has final policymaking authority is a legal question, determined on the basis of state law." *Roe v. City of Waterbury*, 542 F.3d at 37. "[T]he critical inquiry is not whether an official generally has final policymaking authority; rather, the court must specifically determine whether the government official is a final policymaker with respect to the particular conduct challenged in the lawsuit." *Id.*

As an initial matter, plaintiff has not plausibly alleged any facts in support of his legal conclusion that DA Korchak, Chief ADA Loughran, ADA Congdon, or ADA Cronin are final policymakers. *See generally* Compl.

Setting that aside, the Second Circuit has held that a district attorney acts as a final policymaker when the "district attorney acts as the manager of the district attorney's office." *Walker v. City of New York*, 974 F.2d 293, 301 (2d Cir. 1992). Here, the complaint plausibly alleges that DA Korchak acted as a manager of the BCDA at various times. Compl. ¶¶ 103, 125.

Next, to prove the causation element, a plaintiff must plausibly allege "either that the official who is a final policymaker in the area directly committed or commanded the violation of the plaintiff's federal rights . . . or that . . . he indirectly caused the misconduct of a subordinate municipal employee." *Jeffes v. Barnes,* 208 F.3d 49, 61 (2d Cir. 2000).

Plaintiff alleges that DA Korchak assigned plaintiff's case to ADA Congdon, "whom [he] knew lacked the necessary prosecutorial experience, knowledge, and training to handle a serious felony investigation, and who repeatedly expressed concern to [him] . . . that she was being given more responsibility than she could handle." Compl. ¶ 125.

This is not enough. "The fact that inadequate scrutiny of an applicant's background would make a violation of rights more *likely* cannot alone give rise to an inference that a

policymaker's failure to scrutinize the record of a particular applicant produced a specific constitutional violation." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410–11 (1997) (emphasis in original).  Instead, "[a] plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Id.* at 411.

Plaintiff also points out that the BCDA hired ADA Congdon, who had no prosecutorial experience, less than a month before assigning her to his case.  Compl. ¶ 103(a).  According to plaintiff, ADA Congdon was quickly promoted to Bureau Chief of the Special Victims Bureau, even though she had expressed "that she believed she lacked sufficient prosecutorial experience for the role." *Id.* ¶ 103(c).  Plaintiff further contends that, "[d]espite having been a member of the Bar of the State of New York from 2012, and despite having practiced criminal defense for nearly a decade, Congdon did not understand her legal obligations as a prosecutor." *Id.* ¶ 103(f).

Still, taken as true, these allegations could not plausibly amount to an inference that defendants were deliberately indifferent in hiring and assigning ADA Congdon to plaintiff's case.  An official's failure to adequately scrutinize an applicant's background amounts to deliberate indifference "[o]nly where adequate scrutiny of [the] applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire . . . would be the deprivation of a third party's federally protected right." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl.*, 520 U.S. at 411.  Here, that is not the case.

Plaintiff admits that ADA Congdon had nearly ten years of experience as a criminal defense attorney.  Compl. ¶ 103(f). The fact that she had never been a prosecutor and had expressed some reluctance about taking on a leadership role, without more, could not plausibly lead a policymaker "to conclude that the plainly obvious consequence of the decision to hire

[ADA Congdon] . . . would be the deprivation of [plaintiff]'s federally protected right." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl.*, 520 U.S. at 411.

Next, plaintiff argues that the County should be held liable under *Monell* because the BCDA employed inadequate training procedures. Compl. ¶¶ 193, 268.

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61. "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by the municipality can the failure be properly thought of as an actionable city 'policy.'" *City of Canton, Ohio v. Harris*, 489 U.S. 378, 379 (1989). "Moreover, the identified deficiency in the training program must be closely related to the ultimate injury." *Id.*

First, Plaintiff alleges ADA Congdon failed to recognize and disclose exculpatory evidence because the BCDA failed to train its assistant district attorneys regarding their disclosure obligations under *Brady*. Compl. ¶ 268. This allegation cannot support a plausible *Monell* claim.

To establish *Monell* liability, there must be "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton*, 489 U.S. at 385. Because plaintiff has not plausibly alleged a *Brady* violation, *see supra* Point IV.B.4.ii, he cannot impose *Monell* liability on the County based on a custom or policy that allegedly caused such a violation.

Plaintiff's allegation that ADA Congdon erroneously instructed the grand jury because of the BCDA's "improper practices and procedures," Compl. ¶ 193, fails for largely the same reasons. Plaintiff has plausibly alleged that his constitutional rights were violated only when ADA Congdon instructed Herceg to delete electronic data during the investigation. *See supra*

Point IV.B.3. There is no direct causal link between this constitutional violation and the BCDA's allegedly deficient training procedures with respect to grand jury instructions.

In sum, plaintiff has not plausibly alleged that an official policy or practice of the BCDA caused any alleged constitutional deprivation. Accordingly, plaintiff's *Monell* claim against the County must be dismissed.

### ii. City

Plaintiff's second *Monell* claim is asserted against "Defendants City of Binghamton, Zikuski, and Minor." Compl. p. 61.

In *Monell*, the Supreme Court noted that:

> Since official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent . . . local government officials sued in their official capacities are "persons" under § 1983 in those cases in which, as here, a local government would be suable in its own name.

436 U.S. at 691 n.55.

Conversely, "a suit against a government official in his or her personal capacity cannot lead to . . . liability upon the governmental entity," because "a municipality cannot be made liable under 42 U.S.C. § 1983 on a *respondeat superior* basis." *Graham*, 473 U.S. at 167–68. In other words, a municipal official, sued only in their personal or individual capacity, is not a proper defendant to a claim premised on *Monell* liability.

Plaintiff appears to be suing the individual BPD defendants in only their personal capacities, *see* Compl. at 1 (naming Chief Zikuski and Captain Minor "in their individual capacities"), warranting dismissal of his "*Monell* claim[s]" against them.

To the extent his claims are brought against either Chief Zikuski or Captain Minor in their official capacities, "they are redundant to the claims against the [City]," and are therefore

dismissed. *Booker v. Bd. of Educ., Baldwinsville Cent. Sch. Dist.*, 238 F. Supp. 2d 469, 475 (N.D.N.Y. 2002).

As to the City's liability, the Second Circuit has held that:

> Where the plaintiff does proceed against both the municipal actors alleged to have inflicted the tort and the municipality that promulgated the offensive policy, the plaintiff's failure to secure a judgment against the individual actors would, indeed, preclude a judgment against the municipality if the ruling in favor of the individual defendants resulted from the plaintiff's failure to show that they committed the alleged tort.

*Askins v. Doe No. 1*, 727 F.3d 248, 253–54 (2d Cir. 2013).

Plaintiff's *Monell* claim against the City necessarily depends on his allegations against the individual BPD defendants. Compl. ¶¶ 276–95. Fatally, plaintiff has not plausibly alleged that any BPD defendant violated his constitutional rights. *See supra* Points IV.B.1–5. Thus, plaintiff's *Monell* claim against the City must be dismissed.

### 7. Civil Rights Conspiracy

Plaintiff's seventh cause of action is identified as a "Civil Rights Conspiracy" claim against all defendants. Compl. ¶¶ 296–301. Broadly, he alleges that defendants, "acting within the scope of their employment and under color of state law . . . agreed among themselves and with other individuals to act in concert in order to deprive [p]laintiff of his clearly established" constitutional rights. Compl. ¶ 297.

Defendants argue that these claims must be dismissed because (1) plaintiff has not plausibly alleged the existence of an agreement between defendants; and (2) to the extent plaintiff's claims are premised on conspiracies between actors wholly within BPD or wholly within the BCDA, they are barred by the intra-corporate conspiracy doctrine. Korchak & Loughran Mem. at 28–30; County Mem. at 14–16; BPD Mem. at 37–39; Congdon Mem. at 26–28; Wagner Mem. at 24–26. In opposition, plaintiff maintains that (1) he has plausibly alleged

all elements of his conspiracy claims; and (2) the intra-corporate conspiracy doctrine is inapplicable, because "[t]he Complaint sufficiently alleges that BPD defendants conspired with BCDA[ ]defendants, and both conspired with Herceg and Demkovich." Pl.'s Second Opp. at 76–80.

"To survive a motion to dismiss, a conspiracy claim under 42 U.S.C. § 1983 must allege facts plausibly suggesting that (1) an agreement existed between two or more state actors to act in concert to inflict an unconstitutional injury on plaintiff, and (2) an overt act was committed in furtherance of that goal." *Vega v. Artus*, 610 F. Supp. 2d 185, 202 (N.D.N.Y. 2009) (citing *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002)). "A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss." *Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir. 1983).

Plaintiff alleges that either or both the BPD defendants and the BCDA defendants conspired with the complainants to fabricate the complainants' allegations against plaintiff. The Second Circuit addressed similar allegations in *Betts v. Shearman*, 751 F.3d 78 (2d Cir. 2014). There, the § 1983 plaintiff alleged that two police officers conspired with a private actor to arrest him based on a false allegation that plaintiff assaulted the private actor. *Id.* at 86. The Second Circuit affirmed a pre-answer dismissal of a conspiracy claim, finding plaintiff's "allegation that [the private actor] was coached by the Officers into making false accusations is not plausible given that [the private actor] first called the police and reported that she was assaulted *prior to* her interaction with the officers." *Betts*, 751 F.3d at 86 (emphasis added).

The logic of *Betts* applies with equal force to these facts. To the extent plaintiff's conspiracy claim depends on the alleged fabrication of the complainants' allegations, it, too,

must fail.  Plaintiff alleges that the complainants initially reported the alleged sexual assault to the New York State Police, who directed them to contact BPD.  Compl. ¶ 76.  Accordingly, he has not plausibly alleged that the complainants conspired with either BPD or the BCDA to generate their false allegations.

Plaintiff also argues that defendants conspired with one another and the complainants to disregard and suppress exculpatory evidence in order to arrest and prosecute him without probable cause and deny him the right to a fair trial.  Compl. ¶¶ 297, 298(c).

As with failure to intervene, a plaintiff bringing "a § 1983 conspiracy claim must [plead and] prove an actual violation of constitutional rights."  *Singer*, 63 F.3d at 119.  Plaintiff has plausibly alleged that ADA Congdon violated his rights by instructing Herceg to delete electronic data relating to the night of the alleged assault.  *See supra* Point IV.B.3–4.  But he does not allege that any other defendants were aware of or involved in this violative conduct.

While plaintiff does allege that ADA Congdon worked closely with BPD officers and other BCDA employees during the investigation, Compl. ¶ 120, this allegation, without more, does not permit an inference that defendants entered an agreement with ADA Congdon to violate plaintiff's rights.

Because plaintiff has alleged that just ADA Congdon and Herceg were present at the time of the alleged violations, plaintiff has only plausibly alleged his civil conspiracy claims against them.  Accordingly, plaintiff's civil conspiracy claims are dismissed as to all other moving defendants.

### 8.    Qualified Immunity

ADA Congdon argues that she is entitled to qualified immunity for any alleged actions not protected by absolute immunity.  Congdon Mem. 18–21.  In opposition, plaintiff argues that

courts generally deny qualified immunity where prosecutors allegedly fabricated evidence while acting in an investigative capacity.  Pl.'s Second Opp. 50–53.

"Qualified immunity is available to officials so long as their actions do not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Chamberlain Est. of Chamberlain v. City of White Plains*, 960 F.3d 100, 110 (2d Cir. 2020) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

"[A]s a general rule, 'the defense of qualified immunity cannot support the grant of a [Rule] 12(b)(6) motion.'"  *Chamberlain Est. of Chamberlain*, 960 F.3d at 110 (quoting *Green v. Maraio*, 722 F.2d 1013, 1018 (2d Cir. 1983)).  "Not only must the facts supporting the defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where it appears [that the alleged facts, if true, plausibly state a claim] that would entitle him to relief.'"  *Chamberlain Est. of Chamberlain*, 960 F.3d at 110 (quoting *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004)).

"Thus, a qualified immunity defense presented on a Rule 12(b)(6) motion 'faces a formidable hurdle . . . and is usually not successful.'"  *Chamberlain Est. of Chamberlain*, 960 F.3d at 111 (quoting *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 191–92 (2d Cir. 2006)).

As noted *supra*, plaintiff's surviving § 1983 claims against ADA Congdon for malicious prosecution, fabrication of evidence, and civil rights conspiracy are all premised on his allegation that ADA Congdon instructed complainant Herceg to delete exculpatory electronic data.

"Government officials may be held liable for fabricating evidence through false statements *or omissions*," *Morse*, 804 F.3d at 547 (emphasis added), and the Second Circuit has explicitly held that the "right not to be deprived of liberty as a result of *any government officer's*

fabrication of evidence . . . was clearly established in 1996." *Zahrey*, 221 F.3d at 357 (emphasis in original).

According to plaintiff, ADA Congdon allegedly violated this clearly established right sometime during or after December 2021. Compl. ¶¶ 72, 110. Therefore, at this stage, ADA Congdon is not entitled to qualified immunity.

### C.    State Law Claims

Plaintiff identifies his state law causes of action as: (1) false arrest and malicious prosecution; (2) intentional, reckless, or negligent infliction of emotional distress; (3) violation of sections 6 and 12 of Article I of the New York State Constitution; (4) *respondeat superior*; and (5) abuse of process. Compl. ¶¶ 302–339. The moving defendants seek dismissal of all state law causes of action asserted against them. Korchak & Loughran Mem. 17–21, 30–31; County Mem. at 17–26; BPD Mem. at 24–32, 35–36, 39–43; Congdon Mem. at 21–25, 28–29; Wagner Mem. at 16–21, 26–31.

As an initial matter, "[i]t is well-established . . . that *respondeat superior* 'is not a cause of action at all, but a theory of liability that must attach to a separate claim.'" *Lederman v. Benepe*, 2016 WL 11588628, at *5 (S.D.N.Y. Mar. 11, 2016) (quoting *Alexander v. Westbury Union Free Sch. Dist.*, 829 F. Supp. 2d 89, 110 n.6 (E.D.N.Y. 2011)). Accordingly, the Court addresses *respondeat superior* liability in tandem with the underlying cause(s) of action for which it is asserted.

### 1.    False Arrest

Plaintiff's eighth cause of action is identified as "false arrest and malicious prosecution" and is asserted against "All Defendants." Compl. ¶¶ 302–16.

False arrest and malicious prosecution are distinct causes of action under state law. *See Broughton*, 335 N.E.2d at 313 ("Although [false imprisonment and malicious prosecution] are

kindred actions, each protects a different personal interest and is composed of different elements."). Accordingly, the Court addresses them separately.

Beginning with false arrest, the City and the individual BPD defendants argue that plaintiff's state law false arrest claim must be dismissed because it is time-barred. BPD Mem. at 26–28. In response, plaintiff has "withdraw[n] his cause[ ] of action for . . . false arrest." Pl.'s Second Opp. at 80 n. 20.

Accordingly, plaintiff's state law false arrest claims are dismissed as to all moving defendants.

**2.  Malicious Prosecution**

Defendants have moved to dismiss plaintiff's state law malicious prosecution claims, arguing that they are time-barred, BPD Mem. at 25–26, 28–29, and insufficiently pleaded. Korchak & Loughran Mem. at 19–21; County Mem. at 18–21; BPD Mem. at 28–32; Congdon Mem. at 23–24; Wagner Mem. at 18–21. The City also contends that plaintiff has failed to plead compliance with New York's notice of claim requirements. BPD Mem. at 24–26.

The City argues that plaintiff's state law malicious prosecution claims are time-barred because they accrued when Broome County Court dismissed the criminal charges against him, on May 20, 2023, and he filed this action more than one year and ninety days later. BPD Mem. at 25, 28–29.

Although, under New York law, "causes of action to recover damages for intentional torts . . . are generally subject to a one-year period of limitations . . . intentional tort causes of action asserted against municipal defendants must be commenced within the one–year–and–90–day statute of limitations contained in General Municipal Law § 50–i." *Williams v. City of N.Y.*, 153 A.D.3d 1301, 1305 (N.Y. App. Div. 2d Dep't 2017).

"Under New York law, the cause of action for malicious prosecution accrues 'when plaintiff first becomes entitled to maintain the action, (namely, when there is a determination favorable to plaintiff).'" *Riverhead Park Corp. v. Cardinale*, 881 F. Supp. 2d 376, 381 (E.D.N.Y. 2012) (quoting *10 Ellicott Square Court Corp. v. Violet Realty, Inc.,* 81 A.D.3d 1366, 1369 (N.Y. App. Div. 4th Dep't 2011).

For example, a trial court's dismissal of criminal charges against a criminal defendant constitutes a "a determination favorable to plaintiff," notwithstanding the possibility or pendency of an appeal. *Marks v. Townsend*, 97 N.Y. 590, 595 (N.Y. 1885) (holding party may sue for malicious prosecution upon final judgment in trial court); *Ciferri v. State*, 118 A.D.2d 676, 676 (1986) (holding statute of limitations on malicious prosecution action "begins to run upon dismissal of the charges by the trial court"); *Lombardo v. Cnty. of Nassau*, 791 N.Y.S.2d 292, 296 (N.Y. Sup. Ct. 2004) ("New York courts have held that the cause of action accrues when plaintiff first becomes entitled to maintain the action (*i.e.*, when there is a determination favorable to plaintiff), notwithstanding the pendency of an appeal"); *Karen v. State*, 444 N.Y.S.2d 381 (N.Y. Ct. Cl. 1981) ("[W]e believe consonance with the Court of Appeals' *Marks* decision calls for a finding of accrual on trial court dismissal.").

Plaintiff alleges that Broome County Court dismissed all charges against him on May 31, 2023.  Compl. ¶¶ 192, 196.  Accordingly, the one-year-and-90-day limitations period began to run from that day.  Plaintiff filed this action over nearly two years later, on March 18, 2025.

Consequently, his state law malicious prosecution claims are time-barred and must be dismissed as to all moving defendants.[15]

### 3. Intentional, Reckless, or Negligent Infliction of Emotional Distress

Plaintiff's ninth cause of action, for "Intentional, Reckless, or Negligent Infliction of Emotional Distress," is asserted against "All Defendants." Compl. ¶¶ 317–21. Defendants argue that New York law does not permit this claim under the facts alleged, and regardless, plaintiff has failed to state a plausible claim for relief under this theory. Korchak & Loughran Mem. at 30–31; County Mem. at 21–24; BPD Mem. at 39–40; Congdon Mem. at 28–29; Wagner Mem. at 26–29. In response, plaintiff has voluntarily withdrawn this cause of action. Pl.'s Second Opp. at 80 n.20. Accordingly, plaintiff's intentional, reckless, or negligent infliction of emotional distress claims are dismissed as to all defendants.

### 4. New York Constitutional Violations

Plaintiff's "Tenth Cause of Action," asserted against all defendants, alleges violations of Article I, sections 6 and 12 of the New York State Constitution. Compl. ¶¶ 322–26. Defendants have moved to dismiss this cause of action, because (1) it is precluded by the availability of traditional tort remedies and adequate alternative remedies under federal law; and (2) regardless,

---

[15] The limitations period set forth in N.Y. Gen. Mun. Law § 50-i also applies to an action against an employee of a municipality where the municipality is deemed "the real party in interest," *i.e.*, where the employee's alleged conduct occurred within the scope of their employment, such that the municipality would be required to indemnify them. *See Ruggiero v. Phillips*, 292 A.D.2d 41, 44, 739 N.Y.S.2d 797, 800 (2002); *Ripka v. Cnty. of Madison*, 162 A.D.3d 1371, 1373 (N.Y. App. Div. 3d Dep't 2018*); Clark v. City of Ithaca*, 235 A.D.2d 746, 746 (N.Y. App. Div. 3d Dep't 1997).

Although plaintiff has alleged that the individual defendants were acting within the scope of their employment, Compl. ¶¶ 18–24, some courts have held that the limitations period set forth in N.Y. Gen. Mun. Law § 50-i does not apply to claims against municipal employees for intentional torts, like malicious prosecution, because municipalities do not have a duty to indemnify employees for their intentional wrongdoing or reckless. *Coker v. City of Schenectady*, 200 A.D.2d 250, 253–54 (N.Y. App. Div. 3d Dep't 1994). Under those circumstances, courts apply the one-year statute of limitations provided by N.Y. C.P.L.R. § 215(3).

Regardless of which limitations period applies to plaintiff's malicious prosecution claims against the individual defendants, they are time-barred.

it is not plausibly alleged.  Korchak & Loughran Mem. at 17–21; County Mem. at 24–25; BPD

Mem. at 35–36; Congdon Mem. at 25; Wagner Mem. at 31.  Plaintiff argues that the Court

should deny defendants' motions as to this claim, because defendants "do not explain how these

other remedies could reach them under a theory of [*respondeat superior*]."  Pl.'s Second Opp. at

84.

      The Court of Appeals has "recognized a private right of action to recover damages

against the State for violations of the Equal Protection and Search and Seizure Clauses . . .

Finding neither injunctive, declaratory, nor exclusionary relief adequate to protect against the

invasion of personal liberty interests suffered by the claimants."  *Martinez v. City of

Schenectady*, 276 A.D.2d 993, 996 (N.Y. App. Div. 3d Dep't 2000) (citing *Brown v. State*, 674

N.E.2d 1129, 1140–41 (N.Y. 1996)), *aff'd*s 761 N.E.2d 560 (N.Y. 2001).  "[H]owever, the Court

of Appeals made it clear that th[is] 'narrow remedy'. . .  was not 'boundless.'"  *Lyles v. State*, 2

A.D.3d 694, 695 (N.Y. App. Div. 2d Dep't 2003) (quoting *Martinez v. City of Schenectady*, 761

N.E.2d 560, 563 (N.Y. 2001)), *aff'd*, 820 N.E.2d 860 (N.Y. 2004).

      In *Lyles*, the Appellate Division for the Second Department held that:

> recognition of the claimant's State constitutional claims was neither necessary nor
> appropriate to ensure the full realization of his rights, because the alleged wrongs
> could have been redressed by an alternative remedy, namely, timely interposed
> common-law tort claims for assault and battery, false imprisonment, and the
> intentional and negligent injury to his property.

2 A.D.3d at 695.

      Similarly, here, plaintiff alleges that his rights under the New York State Constitution

were violated by defendants when he was arrested, charged, and forced to spend "nearly two

years fighting patently false allegations and criminal charges."  Compl. ¶ 325.  This is the same

conduct that underlies his state law tort claims.  *See id.* ¶ 323 ("The conduct of Defendants,

described above, also violated Mr. Kweller's rights under the New York State Constitution,

Article I, §§ 6 and 12."). Accordingly, it is not necessary to recognize a state constitutional

claim, because plaintiff's alleged wrongs could have been redressed by timely interposed

common-law tort claims, which permit a damages remedy. *See id.* ¶¶ 220–27.

### 5. Abuse of Process

Plaintiff's twelfth cause of action, for "abuse of process," is asserted against the City, DA

Korchak, and Chief Zikuski. Compl. ¶¶ 332–39. Defendants argue that this claim must be

dismissed, because plaintiff has failed to plausibly allege that they distorted regularly issued

process to accomplish a collateral objective, or that they had an intent to do harm. Korchak &

Loughran Mem. at 31–32; BPD Mem. at 41. In opposition, plaintiff argues that the

"extraordinary level of public outcry" alleged in the complaint created a reasonable inference

that defendants had an improper motive for continuing the prosecution. Pl.'s Second Opp. at 85.

"Abuse of process has three essential elements: (1) regularly issued process, either civil

or criminal, (2) an intent to do harm without excuse or justification, and (3) use of the process in

a perverted manner to obtain a collateral objective." *Curiano v. Suozzi*, 469 N.E.2d 1324, 1326

(N.Y. 1984). "The mere commencement of an action, even with malicious intent, does not give

rise to a cause of action for abuse of process." *Dixon v. City of Rochester*, 234 A.D.3d 1301,

1302 (N.Y. App. Div. 4th Dept. 2025).

Plaintiff alleges no facts that could support an inference that either DA Korchak or Chief

Zikuski perverted the process brought against him. *See supra* Point IV.B.1. Instead, he alleges

only that DA Korchak "was facing a re-election in the upcoming year," and there was "public

outcry for the arrest and prosecution of [p]laintiff." Compl. ¶¶ 338–39.

However, "[i]t is not enough that the actor ha[s] an ulterior motive in using the process of

the court. It must further appear that he did something in the use of the process outside of the

purpose for which it was intended . . . [t]here must be a further act done outside the use of the process—a perversion of the process." *Hauser v. Bartow*, 7 N.E.2d 268, 269 (N.Y. 1937).

As discussed above, plaintiff has not plausibly alleged that either DA Korchak or Chief Zikuski were personally involved in any of the challenged conduct. *See supra* Point IV.B.1. The fact that DA Korchak or Chief Zikuski had reason to benefit from the perversion of the process against plaintiff cannot permit the inference, absent any other allegations, that they committed any acts to distort the process.

Accordingly, plaintiff's abuse of process claims against DA Korchak and Chief Zikuski must be dismissed. Plaintiff's abuse of process claim against the City must also be dismissed, because it is necessarily premised on *respondeat superior* liability, and plaintiff has failed to state a claim against Chief Zikuski.

### 6. Qualified Immunity

Because all of plaintiff's state law claims have been dismissed, the court need not reach the issue of qualified immunity under state law.

### D. Loss of Consortium

Plaintiff's wife, Ms. Liberman, does not assert any substantive causes of action against defendants. *See generally* Compl. Instead, she seeks damages for injuries she allegedly suffered as a result of defendants' arrest and prosecution of plaintiff. *Id.* ¶¶ 213–19. Defendants argue that this claim must be dismissed. BPD Mem. at 43–44; Congdon Mem. at 30–31; Wagner Mem. at 31–32. The Court agrees.

All of plaintiff's state law claims have been dismissed, *see supra* Point IV.C, and district courts have routinely held that § 1983 does not support derivative claims for damages, because a party seeking only derivative damages has not alleged a deprivation of their constitutional rights.

*See Harrison v. Harlem Hosp.*, 2007 WL 2822231 (S.D.N.Y. Sept. 28, 2007) ("While the Second Circuit has not addressed whether a plaintiff may bring a loss of consortium claim pursuant to federal civil rights statutes, the weight of authority holds they may not."), *aff'd,* 364 Fed. Appx. 686 (2d Cir. 2010) (summary order); *Rakchi v. City of New York*, --- F.Supp.3d ---, 2025 WL 2711237 at *5 (E.D.N.Y. Sept. 22, 2025) (dismissing loss of services claim brought pursuant to § 1983); *Fleming v. Sharma*, 605 F. Supp. 2d 399, 409 (N.D.N.Y. 2009); *Chambers v. N. Rockland C. Sch. Dist.*, 815 F. Supp. 2d 753, 772 n.16 (S.D.N.Y. 2011) (collecting cases); *Dilworth v. Goldberg*, 914 F. Supp. 2d 433 (S.D.N.Y. 2012); *Reed v. Medford Fire Dept., Inc.*, 806 F. Supp. 2d 594, 606 (E.D.N.Y. 2011).

Accordingly, Ms. Liberman's sole claim for loss of consortium claim must be dismissed.

### E.    Leave to Amend

Finally, the Court must address plaintiff's request for leave to amend his complaint. Plaintiff argues that he should be granted leave to amend his complaint (1) to remedy his failure to plead compliance with New York notice of claim requirements, Dkt. Nos. 43, 46; and (2) "to address any [other] deficiency the Court identifies," Pl.'s Second Opp. at 12. Defendants oppose plaintiff's request because he has not complied with this District's Local Rules, and, regardless, any proposed amendment would be futile. Dkt. No. 53 at 25; Dkt. No. 56 at 5–6; Dkt. No. 61 at 11.

Under this District's Local Rules of Practice, "[a] party moving to amend a pleading . . . must attach an unsigned copy of the proposed amended pleading to its motion papers." L.R. 15.1(a). "[T]he proposed amended pleading must be a complete pleading, which will supersede the pleading sought to be amended in all respects." *Id.* A motion to amend "must set forth specifically the proposed insertions and deletions of language and identify the amendments in the proposed pleading." *Id.*

Plaintiff has not complied with this Local Rule. His failure to attach a proposed amended pleading "precludes the Court from 'examin[ing] the exact amendment that it is being asked to permit[;] . . . ensur[ing] that all of the allegations asserted . . . are contained in a single document[;] . . . [and] eliminat[ing] the confusing nature of piecemeal amended pleadings.'" *Wynn v. Lee*, 2019 WL 13546213, at *1 (N.D.N.Y. May 1, 2019) (quoting *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 508 (N.D.N.Y. 2009)).

Plaintiff's non-compliance with the Local Rules is a sufficient basis on which to deny his motion to amend. *Reynolds-Sitzer v. EISAI, Inc.*, 586 F. Supp. 3d 123 (N.D.N.Y. 2022) (denying motion for leave to amend where plaintiffs requested leave in a brief paragraph of their opposition papers and failed to comply with the Local Rules); *Webb v. Mentor Worldwide LLC*, 453 F. Supp. 3d 550 (N.D.N.Y. 2020) (denying plaintiff's motion for leave to amend, in part, for noncompliance with the Local Rules); *Braxton v. Bell*, 2020 WL 13908846, at *1 (N.D.N.Y. July 7, 2020) (denying "motion to amend for failure to comply with the Local Rules for the Northern District of New York and Federal Rules of Civil Procedure.").

While plaintiff is correct that leave to amend should be freely given when justice so requires, Pl.'s Second Opp. at 87 (citing Fed. R. Civ. P. 15(a)(2)), "a court need not always allow a party to replead simply because it asked. In particular, denial of leave to amend is proper where the request gives no clue as to how the complaint's defects would be cured." *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 107 (2d Cir. 2022) (internal quotation omitted); *Murphy Med. Assocs., LLC v. Yale Univ.*, 120 F.4th 1107, 1114 (2d Cir. 2024) (affirming denial of leave to amend where plaintiff failed to make formal motion to amend or offer proposed amended complaint).

The only discernable amendment plaintiff has proposed is an amendment to plead compliance with New York's notice of claim requirements.  *See* Dkt. Nos. 43, 46.  Defendants maintain that this amendment would be futile.  Dkt. No. 61 at 11.  The Court agrees.

"Leave to amend may be denied on grounds of futility if the proposed amendment fails to state a legally cognizable claim."  *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 726 (2d Cir. 2010).  For instance, "[c]laims barred by an applicable statute of limitations are futile."  *Jones v. City of N.Y.*, 571 F. Supp. 3d 118, 126 (S.D.N.Y. 2021) (citing *Grace v. Rosenstock*, 228 F.3d 40, 53 (2d Cir. 2000)).

Plaintiff's proposed amendment would not save any of his state law claims.  His state law malicious prosecution claims were filed after the statute of limitations had run, *see supra* Point IV.C.2, and he has not plausibly alleged any of his other state law claims, *see supra* Point IV.C.4–5.  Accordingly, plaintiff's request for leave to amend must be denied.

## V.    CONCLUSION

Therefore, it is

ORDERED that

1.  Chief Zikuski, Captain Minor, Investigator Miller, DA Korchak, BCDA Investigator Wagner, Chief ADA Loughran, and ADA Cronin, are dismissed;

2.  Does 1–10 are dismissed;

3.  The City and the County are dismissed; and

4.  Plaintiff's Third, Eighth, Ninth, Tenth, and Twelfth Causes of Action are dismissed against ADA Congdon.

5.  Plaintiff's surviving claims against ADA Congdon are:

    -Section 1983 Malicious Prosecution;

-Section 1983 Denial of the Right to a Fair Trial based on Fabrication of

Evidence; and

-Section 1983 Civil Rights Conspiracy.

The Clerk of the Court is directed to:

a.  Terminate the dismissed defendants from the docket report; and

b.  Terminate the moving defendants' pending motions (Dkt. Nos.19, 27, 29, 30,

31, 37).

**IT IS SO ORDERED.**

Dated:  November 25, 2025
        Utica, New York.

Anthony J. Brindisi
U.S. District Judge